UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

PATRICK JAYSON REENERS,      )
                                                 )
        Plaintiff,            )
                                                 )
v.                                 )       No. 3:15-cv-00625
                                 )       Judge Trauger/Brown
RICKY TROUP, *et al.*,       )
                                 )       Jury Demand
        Defendants.      )

To: The Honorable Aleta A. Trauger, United States District Judge

## REPORT AND RECOMMENDATION

Before the Court is *Defendants' Motion for Summary Judgment*. (Doc. 121). Therein, the individual defendants seek entry of judgment in their favor based on the doctrine of qualified immunity. Upon considering the briefing and materials submitted, the Magistrate Judge **RECOMMENDS** that *Defendants' Motion for Summary Judgment* be **GRANTED** as to Plaintiff's claims that Defendant Bandy violated the Fourth Amendment and Tennessee State common law by prolonging Plaintiff's involuntary commitment. As to all remaining defendants and claims, the Magistrate Judge **RECOMMENDS** *Defendants' Motion for Summary Judgment* be **DENIED**.

## I.      PROCEDURAL HISTORY

Initially proceeding *pro se*, Plaintiff filed this lawsuit on June 5, 2015. (Doc. 1). Counsel was later appointed for Plaintiff. (Doc. 61). A tumultuous few months of briefing culminated in Plaintiff filing a *Fifth Amended Complaint*. (Doc. 169). Named defendants include Lieutenant Rickey Troup, Chief Donald Bandy, Lieutenant Lamar Ballard, Officer Bradley Jones, Corporal Jamie Helson ("individual defendants"), and the City of Gallatin. (*Id.*). The individual defendants

1

are employed by the Gallatin Police Department. (*Id.*). The allegations against these defendants stem from an incident on June 12, 2014, when Plaintiff was forcibly taken to Sumner Regional Medical Center ("SRMC") and Middle Tennessee Mental Health Institute ("MTMHI") and thereafter involuntarily committed until June 18, 2014. (*Id.*). Plaintiff sets forth the following counts:

Count I:    False arrest on June 12, 2014, in violation of the Fourth Amendment by Defendants Troup, Ballard, Helson, Jones, and the City of Gallatin;

Count II:   False arrest on June 12, 2014, in violation of Tennessee State common law by Defendants Troup, Ballard, Helson, and Jones;

Count III:  Excessive force on June 12, 2014, in violation of the Fourth Amendment by Defendants Jones and Helson;

Count IV:   False arrest from June 13, 2014 to June 18, 2014, in violation of the Fourth Amendment against Defendants Bandy and the City of Gallatin; and

Count V:    False imprisonment from June 13, 2014 to June 18, 2014, in violation of Tennessee State common law against Defendant Bandy.

(*Id.*).

On August 3, 2016, Defendants filed *Defendants' Motion for Summary Judgment*, arguing Plaintiffs claims should be dismissed because they are barred by the federal and state doctrines of qualified immunity. (Doc. 121). Plaintiff's response (Docs. 146, 150-1) and Defendants' reply (Docs. 152, 165) have been filed. Though this dispositive motion was filed and briefed prior to the filing of Plaintiff's most recent amended complaint, the parties agree that the motion is ready for a Report and Recommendation ("R&R"). (Doc. 174). The parties have, however, agreed to withdraw any claims to dismiss for municipal liability. (*Id.*). The only claims that remain at issue in the instant motion, therefore, are the claims against Defendants Troup, Bandy, Ballard, Jones, and Helson.

## II.    STATEMENT OF FACTS

Over the course of several years, Plaintiff has made numerous attempts to persuade the City of Gallatin and its police department to stop treating the City water with fluoride. (Doc. 153-1, p. 1 ¶ 1). He peacefully expressed his views on the matter at City Council meetings. (Doc. 162, p. 2 ¶ 2). Through inflammatory posts on social media in January, April, and June 2014, he expounded on his fluoride concerns. (Doc. 153-1, pp. 4-9 ¶¶ 5-8).[1] From 2010 to 2012, Rosemary Bates, Special Operations Director and former assistant to the Mayor, reported her suspicions that Plaintiff may "act out," "snap," be "ramping up to an episode," and had "escalated." (Docs. 124-1, 124-2, 124-3, 124-4).

On January 12, 2013, Plaintiff called the Gallatin Police Department to ask about the rules of chalking messages on sidewalks. (Doc. 162, p. 2 ¶ 3). Both a dispatcher and Officer Morgan told Plaintiff that chalking messages was not illegal. (*Id.* at p. 2 ¶ 4). Plaintiff was then arrested by Officer Castleberry and Defendant Jones on April 18, 2014, for public intoxication and vandalism after he chalked messages outside City Hall and the District Attorney's Office. (Doc. 146-3) (Doc. 162, p. 2 ¶ 5). Plaintiff went to City Hall on April 21, 2014, to complain about his arrest and explain he had been told chalking was not illegal. (Doc. 162, pp. 3-4 ¶ 8). Officer Cantrell met Plaintiff there and issued a misdemeanor criminal citation to him for vandalism. (*Id.*). On May 14, 2014, Plaintiff called the Internal Affairs-Chief's Office regarding this April 18, 2014, arrest. (*Id.* at p. 4 ¶ 9).

While in a gazebo outside City Hall on June 9, 2014, Plaintiff complained about his April arrest to another individual and discussed the dangers of flouride. (*Id.* at p. 4 ¶ 10). His conversation was overheard by Julie McGuire, a City Hall employee. (*Id.*). At her supervisor's instruction, McGuire called the police and reported that Plaintiff "was saying strange things

---

[1] These posts were forwarded to Defendant Troup on June 17, 2014, after the incident at issue. (Doc. 146-20).

3

about filing a complaint against the police, and about suing the city over the kidnapping and fluoride." (*Id.* at pp. 4-5 ¶¶ 11-12). The dispatcher sent an offer to check on an individual "yelling at people walking around the gazebo." (*Id.* at p. 5 ¶ 14). Officer Cantrell—an officer who cited Plaintiff for the chalking incident—took the call. (*Id.* at pp. 5-6 ¶ 15). Plaintiff explained he had not been yelling at anyone. (*Id.* at p. 6 ¶ 17). Officer Cantrell stated he knew there would not be a problem as soon as he recognized Plaintiff. (*Id.* at p. 6 ¶ 18).

Plaintiff went to City Hall on June 10, 2014, to complain about the vandalism charge from April and the false report that he was yelling at people near the gazebo. (*Id.* at p. 7 ¶ 22). He told a City employee that the police officers' conduct with respect to the chalking and gazebo incidents deprived him of his First and Fourth Amendment rights. (Doc. 146-9, p. 2). The City employee forwarded Plaintiff's complaint to Bates, among others, noting that Plaintiff already had two pending claims with the "Attorney's office." (*Id.*). He demanded the City buy his house so he could leave town, and he filed a records request to obtain a copy of the June 9, 2014, report. (Doc. 162, p. 7 ¶ 22). Bates described him as being in an "assertive, serious, agitated mode." (Doc. 153-1, p. 9 ¶ 9). Plaintiff returned on June 11, 2014, to announce he was making a complaint to the Department of Justice ("DOJ"). (Doc. 162, p. 8 ¶ 23). Defendant Bandy was informed of Plaintiff's threat to contact the DOJ that same day. (Doc. 146-11).

Defendants Bandy, Troup, and Ballard, met to discuss Plaintiff on the morning of June 12, 2014. (Doc. 162, p. 8 ¶ 24). At that time, Defendants had no basis to believe Plaintiff had done anything violent to anyone. (*Id.* at p. 1 ¶ 1). After the meeting, Defendant Troup asked Bates to gather information about Plaintiff. (*Id.* at p. 8 ¶ 25). Bates forwarded her past emails about Plaintiff to Defendant Troup and asked other City employees to forward their relevant information. (*Id.* at pp. 8-9 ¶ 26).

4

Defendant Troup called Community Mental Health Center and reported the Gallatin Police were trying to obtain mental health treatment for Plaintiff. (*Id.* at p. 9 ¶ 28). Defendant Troup reported to the Center that he was afraid Plaintiff would do something "dangerous," said "You can just see the signs," and "Everything is there for this guy to just snap one day." (*Id.* at p. 9 ¶ 29). Defendant Troup told the Center that Plaintiff had threatened to arrest the governor. (*Id.* at p. 10 ¶ 30).[2] Defendant Troup was referred to Mobile Crisis. (Doc. 153-1, p. 10 ¶ 12).

Defendant Troup called Mobile Crisis and reported Plaintiff was becoming increasingly unstable, had sent "threatening" emails to members of the city and state government, and was going to do something "dangerous." (Doc. 162, p. 10 ¶¶ 32-33). Defendant Troup did not clarify that these "threatening" emails contained threats of litigation, not physical threats. (*Id.* at p. 11 ¶ 34). The Mobile Crisis dispatcher connected Defendant Troup with Emily Cecil of Volunteer Behavioral Health Services. (*Id.* at p. 11 ¶¶ 35-36).

Defendant Troup told Cecil that Plaintiff was sending threatening emails to the governor, state representatives, and the senate. (*Id.* at pp. 11-12 ¶ 37). Cecil asked if Plaintiff had been charged with anything, to which Defendant Troup responded Plaintiff had been charged with vandalism and public intoxication and that state troopers had been dispatched to deal with Plaintiff the previous year for threatening a state representative. (*Id.* at p. 12 ¶¶ 38-39). Defendant Troup admitted that Plaintiff was "never really breaking the law," and was just "constantly harassing city workers." (*Id.* at p. 12 ¶ 40). Defendant Troup reported his own thoughts that Plaintiff needed to be evaluated and would become "increasingly violent." (*Id.* at p. 13 ¶ 41). After Cecil asked if threatening government officials was against the law, Defendant Troup admitted Plaintiff had not threatened to kill the officials or "anything like that," but had

---

[2] Plaintiff maintains he never threatened to arrest the governor. (*Id.* at p. 10 ¶ 31).

5

been charged with harassment for his emails and calls. (*Id.* at p. 13 ¶¶ 42-43). These alleged charges of harassment are not substantiated in the record.

Cecil offered to perform a mental assessment of Plaintiff, but she indicated "he might not even be able to be assessed" based on Defendant Troup's description. (*Id.* at pp. 13-14 ¶ 44). Cecil explained she could potentially write a "6.401" which would permit the police to take Plaintiff to a hospital for an inpatient commitment evaluation. (*Id.* at p. 14 ¶ 45). Defendant Troup and Cecil strategized the best way to evaluate Plaintiff, first considering tricking Plaintiff into going to the police department. (*Id.* at p. 14 ¶ 46). They ultimately planned to meet Plaintiff at his home. (*Id.* at p. 14 ¶ 47). Having agreed to that location, Defendant Troup collaborated with the Gallatin Police Department to set the plan in action. (*Id.* at p. 15 ¶ 49). At Defendant Helson's instruction, Officer Jones located Plaintiff at City Hall speaking with Defendant Ballard. (Doc. 153-1, p. 11 ¶¶ 14-16). Plaintiff agreed to meet Defendant Jones at Plaintiff's home later that afternoon. (*Id.* at p. 11 ¶ 16).

Plaintiff was met at his home by Cecil and Defendants Ballard, Troup, Jones, and Helson around 2:00 p.m. (*Id.* at p. 11 ¶ 17). Despite the fact that Plaintiff had vocally criticized his arrest for the chalking incident and the police report made during the gazebo incident, Defendants Jones and Ballard told Plaintiff's roommates they were present to see why Plaintiff seemed agitated with law enforcement. (Doc. 146-14, pp. 14-16).

Plaintiff voluntarily spoke with Cecil for an hour while the officers stood by. (Doc. 153-1, p. 12 ¶ 18) (Doc. 162, p. 16 ¶ 52). Plaintiff told Cecil several times that he would only go to legal lengths to get his point across; he had no intention of harming himself or others; if he had a problem he would go to the police; and during his sixteen years living in Gallatin the only ticket he received was for a DUI in 2000. (Doc. 146-14, pp. 18-19, 23, 38, 41, 43-45). During their

6

conversation, Plaintiff stated he had not received mental health services anywhere or been hospitalized for mental health issues, did not have depression, anxiety, or paranoia, had not attempted or thought about suicide, did not have a history of self-harm or past trauma, did not have auditory or visual hallucinations, had no history of aggression, and had never been in a fight. (*Id.* at pp. 26-28, 30-31). Plaintiff agreed to drop the fluoride issue, stop going to City Hall, and stop calling the police unless a new emergency arose. (*Id.* at pp. 57-59, 64) (Doc. 162, p. 17 ¶ 56). Cecil then urged Plaintiff to attend outpatient counseling, which Plaintiff declined. (Doc. 162, p. 17 ¶ 57). Cecil clarified she was not asking Plaintiff to be medicated, just to attend counseling. (*Id.* at p. 17 ¶ 58). After Plaintiff again declined her request to attend counseling, Cecil called her supervisors from her vehicle. (*Id.* at p. 17 ¶ 59).

While Cecil was away, Officer Jones and another officer engaged Plaintiff in conversation for about half an hour, with topics ranging from gardening tips, to the Constitution, to other public safety issues important to Plaintiff. (*Id.* at p. 18 ¶¶ 60-61). Officer Jones acknowledged that Plaintiff had been attempting to resolve the fluoride issue through legal means, and that his only personal knowledge of the situation included the chalking incident, talking to Plaintiff on the phone, and Plaintiff asking the mayor's office for a recording of a phone call. (Doc. 146-14, p. 90). During their conversation, Officer Jones repeatedly suggested that Plaintiff become a confidential narcotics informant and offered to pay Plaintiff for this service. (*Id.* at pp. 74-75, 78) (Doc. 162, p. 18 ¶¶ 62-63). Under the guise of wanting to ensure Plaintiff would be a trustworthy informant, Defendant Jones asked Plaintiff for consent to search his vehicle. (Doc. 146-14, pp. 103-104). Plaintiff declined, asserting his Fourth Amendment right out of principle. (*Id.* at pp. 104-105).

7

Upon exiting her vehicle, Cecil told the officers she had requested an immediate mental health evaluation for Plaintiff and that he should be transported to SRMC for evaluation. (Doc. 153-1, p. 12 ¶ 20). She provided the officers with a "Request for Immediate Examination for Emergency Admission," for Plaintiff, with the justification that "Law enforcement believes he's a danger to the community." (Doc. 146-15) (Doc. 162, p. 20 ¶¶ 70-71).

An officer told Plaintiff he had no choice but to go to the hospital for a mental evaluation and would be taken in handcuffs. (Doc. 146-14, p. 110) (Doc. 162, p. 19 ¶ 66). Plaintiff cooperated, stating he did not agree to go and was being taken under duress. (Doc. 146-14, p. 110) (Doc. 162, p. 19 ¶ 67). Plaintiff requested that his hands be cuffed in front of his body because his wrist was sore. (Doc. 146-14, p. 110) (Doc. 162, pp. 19-20 ¶ 68). Officer Jones and another officer denied the request, stating that department policy required prisoners to always be transported with their hands cuffed in the back. (Doc. 146-14, pp. 110-111) (Doc. 162, p. 20 ¶ 69).[3] Noticing Plaintiff was wearing a compression sleeve or wrap on his right wrist, Defendant Jones handcuffed Plaintiff behind his back but double-locked the cuffs to keep them from tightening. (Doc. 146-14, pp. 110-111) (Doc. 153-1, p. 13 ¶ 22). Plaintiff remained calm and explained his constitutional rights were being violated because Cecil had no basis to order his detention. (Doc. 146-14, p. 114) (Doc. 162, p. 21 ¶ 73). Defendant Jones admitted he was not aware of Cecil's qualifications. (Doc. 146-14, p. 114) (Doc. 162, p. 21 ¶ 74). Later, Defendant Jones said he did not know what Cecil needed to have, such as probable cause, to order a mental evaluation. (Doc. 146-14, p. 156).

---

[3] This is not necessarily the case. Pursuant to the Gallatin Police Department guidelines for transporting prisoners, a prisoner's hands may be handcuffed in front, or other means of restraining the prisoner may be used, when the prisoner is pregnant, has a physical handicap, or has injuries that could be aggravated by standard handcuffing procedures. (Doc. 146-21, p. 1).

8

Defendant Troup called Defendant Bandy at 4:49 p.m. and explained Plaintiff was being taken to the hospital. (Doc. 162, pp. 20-21 ¶ 72). Defendant Jones and Defendant Helson took Plaintiff to the SRMC emergency room. (Doc. 124-11, p. 3) (Doc. 153-1, p. 13 ¶ 23).

When Plaintiff was brought to SRMC, he explained to hospital staff that he did not have a history of mental health problems and had been detained because he complained about someone filing a false police report. (Doc. 162, p. 21 ¶ 75). Officer Jones deferred to Cecil to explain the basis for Plaintiff's detention. (*Id.* at p. 22 ¶ 76). Cecil told hospital staff she needed to admit Plaintiff because local law enforcement had been "dealing with [Reeners] for two or three years," to which hospital staff said, "So what?" (*Id.* at p. 22 ¶ 77). Instead of stating her rationale for the recording, Cecil said, "And they [law enforcement] believe that—is there a place that we can talk where—." (Doc. 146-14, p. 122). Cecil then reported Defendant Troup's claim that Plaintiff had threatened state government officials. (Doc. 162, p. 22 ¶ 78). The hospital staff then involuntarily admitted Plaintiff. (*Id.* at p. 22 ¶ 79).

During the first hour at the hospital, Officer Jones stayed with Plaintiff, and Plaintiff behaved calmly. (*Id.* at p. 23 ¶ 80). Plaintiff reported to SRMC staff that he had taken six Naproxen the night before for a wrist injury and had taken an additional unidentified pill that he purchased from a friend for pain relief. (Doc. 153-1, p. 14 ¶ 25). While waiting to see a doctor, Plaintiff advised a nurse his wrist was hurting and requested medication. (*Id.* at p. 15 ¶ 26). Defendant Jones told Plaintiff he would move the handcuffs in front of Plaintiff's body once the nurse was finished, which he did. (*Id.* at pp. 15-16 ¶¶ 26, 28). Plaintiff informed Defendants Jones and Helson he hurt his tendons a couple of weeks earlier when shutting his tailgate. (Doc. 146-14, pp. 129-130). A few minutes after the cuffs were moved to his front, Plaintiff reported he was still in pain, stating, "These cuffs really hurt my—my—my wrist is really, really, really

sore." (Doc. 162, p. 24 ¶ 84). Officer Jones did not remove the handcuffs. (*Id.* at p. 24 ¶ 85). Plaintiff indicated his wrist was swollen, and Defendant Jones agreed. (Doc. 146-14, p. 136). Several more minutes passed, and Plaintiff told Defendant Jones, "My wrist is really killing me, I have damaged test—tendons," and complained about the handcuffs. (Doc. 162, p. 24 ¶ 85). Officer Jones did not remove the handcuffs. (*Id.* at p. 24 ¶ 86).

While Plaintiff was waiting to be evaluated at SRMC, Cecil told Plaintiff he would not "have an issue" if the doctor's evaluation revealed there "is nothing wrong with [him] mentally" and that "what [Reeners] is saying is true." (*Id.* at p. 24 ¶ 87). She said Plaintiff would have "nothing to worry about" if he was deemed "completely healthy." (*Id.* at p. 25 ¶ 89). Cecil additionally stated that the involuntary evaluation was required because Plaintiff declined mental health counseling. (*Id.* at p. 25 ¶ 88).

At 5:37 p.m., Dr. Scott Bradley signed a certificate of need for Plaintiff to be involuntarily committed, stating he had conducted a "face to face" examination of Plaintiff. (Doc. 146-17).[4] A hospital employee told Plaintiff that his doctor had signed a "TCA code 33-6-404" form and had prescribed Atvian for anti-anxiety and Zyprexa to calm Plaintiff down. (Doc. 146-14, pp. 184, 187-188, 190). Plaintiff repeatedly stated he had not been seen by a doctor and asked how a doctor could prescribe medication without ever seeing him. (*Id.* at pp. 184, 189-191). A hospital employee responded, "He knows about you." (*Id.* at p. 191). Plaintiff further stated he did not need anything to calm him down; what he needed was something for the serious pain in his arm, which he rated a "13" on a scale of one to ten. (*Id.* at pp. 188, 195).

---

[4] Whether Dr. Bradley conducted a face to face evaluation is in dispute. Although Dr. Bradley purportedly signed a certificate of need at 5:37 p.m., Defendant Jones' bodycam recording does not reveal Dr. Bradley's alleged face-to-face visit with Plaintiff. As Defendant Jones was with Plaintiff until 6:00 p.m., it is concerning that the audio recording from Defendant Jones' bodycam does not evidence Dr. Bradley's alleged assessment of Plaintiff.

A little before 6:00 p.m., hospital staff administered Atvian and Zyprexa, stating the medication would help Plaintiff's wrist pain. (Doc. 162, p. 26 ¶ 92). Defendant Jones removed Plaintiff's handcuffs at 6:00 p.m., suggested Plaintiff may have a sprained wrist, and left. (Doc. 146-14, p. 201) (Doc. 162, p. 26 ¶ 93).

At 6:05 p.m., SRMC staff reported Plaintiff was non-psychotic, non-suicidal, and cooperative. (Doc. 162, p. 26 ¶ 95). Plaintiff demanded to see a supervisor at 7:20 p.m. (*Id.* at pp. 26-27 ¶ 96). He remained calm and was noted to be "resting quietly" at 7:58 p.m. (*Id.* at p. 27 ¶ 97). Plaintiff began getting agitated as another hour and a half went by, and at 9:30 p.m. asked to make a complaint against Dr. Bradley who had not met with him. (*Id.* at p. 27 ¶¶ 98-99). SRMC staff then medicated Plaintiff with Norco and Zyprexa. (*Id.* at p. 27 ¶ 100). X-rays performed at 9:40 p.m. revealed a fracture in Plaintiff's wrist. (*Id.* at p. 28 ¶ 101). By 11:22 p.m., Plaintiff was frustrated and reportedly began singing, yelling, knocking on the door, and asking for a supervisor. (*Id.* at p. 28 ¶ 102). Dr. Bradley noted:

> This is a 41-year-old-male evaluated by mobile crisis prior to arrival and he was determined to have met inpatient treatment criteria. Based on this, a 6404 was placed with concerns that he was a danger to himself and possibly to others. The patient was obsessed during his evaluation process and unfortunately his behavior escalated while in the emergency department. He actively taunted police officers and became threatening many times exhibiting inappropriate behaviors including singing, demanding repeated visits by the supervisor, yelling, and repeated knocking on the doors. In spite of multiple attempts at redirection and oral medications on initial presentation for anxiety and agitation, eventually the patient's behavior degenerated and he was given intramuscular medications to assist in behavior control as he appeared to be threatening to the staff in the emergency department.

(Doc. 153-1, pp. 21-22 ¶ 41). SRMC staff administered Geodon, Versed, and Benadryl. (Doc. 162, p. 28 ¶ 103). Plaintiff fell asleep around 2:00 a.m. and was transported to MTMHI. (*Id.* at p. 28 ¶ 104).

Dr. Philip Brooks conducted an initial evaluation on Plaintiff's arrival at MTMHI. (*Id.* at pp. 28-29 ¶ 105). This evaluation revealed Plaintiff posed no risk of violence to others and only a low risk of self-harm. (Doc. 146-18). Despite these findings, Dr. Brooks signed a certificate of need to involuntarily commit Plaintiff at 3:00 a.m. on June 13, 2014. (Doc. 153-1, p. 23 ¶ 44). At 8:42 a.m. on June 13, 2014, MTMHI sought and received an *ex parte* commitment order from the General Sessions Court of Davidson County at 9:28 a.m. (*Id.* at p. 20 ¶¶ 37-38). The matter was set for a probable cause hearing on June 18, 2014. (*Id.* at p. 20 ¶ 38).

Plaintiff was also observed by Dr. Shireen Huda at MTMHI, who reported Plaintiff's insight, judgment, reliability, and impulse control were poor, Plaintiff was anxious and featured psychomotor agitation, and Plaintiff suffered from preoccupations and paranoid ideations. (*Id.* at p. 24 ¶ 46).

On June 13, 2014, Defendant Troup emailed Defendant Bandy and relayed Cecil's suggestion that individuals concerned with Plaintiff's behavior should send a letter to Plaintiff's social worker at MTMHI. (*Id.* at p. 17 ¶ 31). That afternoon, Defendant Bandy faxed a letter to the social worker, in which he requested that Plaintiff "receive in-depth psychological evaluations and treatments that will assist him in dealing with his emotional and mental state concerning his obsessive behavior with his issues. . . . I am more and more concerned with ensuring not only my employees but other employees with the City and the citizens of Gallatin are not placed in a state of fear because of Mr. Reener's behaviors." (*Id.* at pp. 18-19 ¶ 34). MTMHI received Defendant Bandy's letter at 2:34 p.m. on June 13, 2014. (*Id.* at p. 27 ¶ 54).

MTMHI released Plaintiff on the morning of June 18, 2014, just before his scheduled judicial hearing. (Doc. 162, p. 31 ¶ 112). He was released pursuant to Tennessee Code Annotated

33-6-424, titled "Release of defendant if Chief Officer determines certificates of need not supported by facts." (*Id.* at p. 31 ¶ 113).

## III. LEGAL STANDARDS

### A. SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is deemed "material" if it could affect the outcome of the case under the applicable law. *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016), *cert. denied,* 137 S. Ct. 1229 (2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Material facts are in genuine dispute if, based on the evidence presented, a reasonable jury could find in favor of the nonmoving party. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 301 (6th Cir. 2016) (quoting *Anderson*, 477 U.S. at 248). Upon consideration of a motion for summary judgment, the court is required to construe the facts in the light most favorable to the nonmovant. *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017) (citing *Banks v. Wolfe Cty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003)).

### B. FEDERAL QUALIFIED IMMUNITY

Qualified immunity does more than protect against liability; it is a defense against suit entirely. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 565 (6th Cir. 2016) (internal quotations omitted) (quoting *Pearson*, 555 U.S. at 231).

13

Whether an individual is entitled to qualified immunity is determined in a two-step process: "(1) whether a constitutional right has been violated; and (2) whether that right was clearly established, though the steps need not be taken in that order." *Getz v. Swoap*, 833 F.3d 646, 652 (6th Cir. 2016) (citing *Pearson*, 555 U.S. at 232, 236). Each prong is based on an objective standard. *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982)).

"For a right to be 'clearly established,' '[t]he contours of that right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 788 (6th Cir. 2012) (quoting *Wheeler v. City of Lansing*, 660 F.3d 931, 938 (6th Cir. 2011)). In deciding whether a right was "clearly established," this court may look to decisions from the Supreme Court, the Sixth Circuit, district courts within the Sixth Circuit, and then to decisions from other circuit courts. *See Barber v. Miller*, 809 F.3d 840, 845 (6th Cir. 2015) (quoting *Andrews v. Hickman Cty., Tenn.*, 700 F.3d 845, 853 (6th Cir. 2012)).

"If the district court determines that the plaintiff's evidence would reasonably support a jury's finding that the defendant violated a clearly established right, it must deny summary judgment." *Thompson v. City of Lebanon, Tennessee*, 831 F.3d 366, 370 (6th Cir. 2016) (citing *DiLuzio v. Vill. of Yorkville, Ohio*, 796 F.3d 604, 609 (6th Cir. 2015)).

## C.  QUALIFIED IMMUNITY UNDER TENNESSEE STATE LAW

Longstanding Tennessee authority provides that the doctrine of qualified or "good faith" immunity applies to state law tort claims alleged against government employees. *Youngblood v. Clepper*, 856 S.W.2d 405, 406-08 (Tenn. Ct. App. 1993); *see also Willis v. Neal*, 247 F. App'x 738, 745 (6th Cir. 2007); *Rogers v. Gooding*, 84 F. App'x 473, 477 (6th Cir. 2003); *Cawood v.*

*Booth*, No. E200702537COAR3CV, 2008 WL 4998408, at *11-13 (Tenn. Ct. App. Nov. 25, 2008). The two-prong inquiry for federal qualified immunity applies with equal force to state law claims. *Fowler v. Burns*, 447 F. App'x 659, 663 (6th Cir. 2011); *Harris v. Metro. Gov't of Nashville*, No. CIV.A. 3:06-0868, 2007 WL 4481176, at *9 (M.D. Tenn. Dec. 18, 2007). With respect to state law torts, it is "the existence of ***reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief*** that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." *Luna v. White Cty.*, No. M201402111COAR3CV, 2015 WL 4119766, at *5 (Tenn. Ct. App. June 29, 2015) (emphasis added) (quoting *Youngblood*, 856 S.W.2d at 407).

## IV.     ANALYSIS

### Count I: False arrest on June 12, 2014, in violation of the Fourth Amendment by Defendants Troup, Ballard, Helson, and Jones

Plaintiff alleges his Fourth Amendment right to be protected from an unreasonable seizure was violated on June 12, 2014, when Defendants Troup, Ballard, Helson, and Jones detained and transported him to SRMC. (Doc. 169, p. 6 ¶¶ 56-65).

For the following reasons, the Magistrate Judge **RECOMMENDS** Defendants' motion for summary judgment be **DENIED** as to Count I.

#### 1.   Clearly Established Right

This element of the qualified immunity inquiry is easily satisfied. "The constitutional right to 'freedom from arrest in the absence of probable cause' is clearly established within our circuit." *Courtright v. City of Battle Creek*, 839 F.3d 513, 520 (6th Cir. 2016) (quoting *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015)). Binding Sixth Circuit precedent provides even more-detailed guidance: "The Fourth Amendment requires an official seizing and detaining a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous

15

to himself or others." *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997); *see also Fisher v. Harden*, 398 F.3d 837, 846 (6th Cir. 2005).

Defendants advocate for a narrower scope, contending no clearly established law precluded them from relying on Cecil's guidance, and even if it did, their reliance on Cecil was reasonable. (Doc. 122, pp. 14-16). This is not the proper inquiry. As the Sixth Circuit clearly articulated in *Monday* and later reaffirmed in *Fisher*, the reviewing court must determine whether there was probable cause to believe the individual seized and detained for a psychiatric evaluation was dangerous to himself or to others.

Defendants additionally rely on precedent awarding qualified immunity to public officials who enforce valid laws, stating police are responsible for enforcing laws, not deciding which laws to enforce. (*Id.*). This has no effect on the "clearly established" inquiry here. Plaintiff is not challenging the validity of Tennessee's involuntary commitment statutes. He is challenging the application of these statutes.

Defendants state they relied on Tennessee Code Annotated §§ 33-6-401, -402, and -501 to detain and transport Plaintiff. (*Id.* at pp. 15-16). Upon making requisite findings, these sections *authorize* the detention of an individual for examination. They do not, however, *mandate* that law enforcement detain such individual. *Compare* Tenn. Code Ann. § 33-6-401 ("the person may be detained"); Tenn. Code Ann. § 33-6-402 ("the officer . . . may take the person into custody"), *with* Ky. Rev. Stat. Ann. § 202A.041(1) ("officer . . . shall take the individual into custody"). The reasonableness of the detention must still be evaluated.

### 2. Whether Defendants Had Probable Cause to Arrest Plaintiff

Construing the facts in Plaintiff's favor, a reasonable finder of fact could conclude Defendants Troup, Ballard, Helson, and Jones did not have probable cause to arrest Plaintiff.

16

"It is well established that absent suspected criminal activity, a law-enforcement agent may not seize a person simply in order to assess his mental fitness." *Zucker v. City of Farmington Hills*, 643 F. App'x 555, 563 (6th Cir. 2016). "The Fourth Amendment requires an official seizing and detaining a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous to himself or others." *Monday*, 118 F.3d at 1102. "[A] showing of probable cause in the mental health seizure context requires only a 'probability or substantial chance' of dangerous behavior, not an actual showing of such behavior." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)).

Whether the arresting officer had probable cause is considered objectively from the officer's position at the time of the arrest. *Id.* The probable cause "decision must be viewed in the context of all the information presented before the Court." *Ziegler v. Aukerman*, 512 F.3d 777, 784 (6th Cir. 2008). It may be reasonable for an officer to consider information from a third party so long as the third party is credible and reliable. *Id.*

The case of *Monday v. Oullette*, 118 F.3d 1099 (6th Cir. 1997) provides a good starting point for this discussion. There, the Sixth Circuit held an officer had probable cause to take Monday into protective custody because the objective facts suggested Monday was attempting to commit suicide or at least injure himself. *Monday*, 118 F.3d at 1102. The arresting officer in *Monday* responded to a radio dispatch which stated Monday "had telephoned a mental health worker and stated that he was upset over a divorce and had ingested some pills and was drinking alcohol in a suicide attempt." *Id.* at 1101. The officer observed Monday was intoxicated and depressed, learned Monday was missing at least twenty Xanax pills from a prescription he had renewed the previous day, and knew that individuals who overdose do not always show observable symptoms. *Id.* at 1101-02.

17

In stark contrast are the facts in *Fisher v. Harden*, 398 F.3d 837 (6th Cir. 2005). Fisher was a retired farmer who had gone out to shoot groundhogs on his neighbor's farm. *Fisher*, 398 F.3d at 839. He was sitting on a folding chair on an elevated railroad grade. *Id.* A passerby on a nearby road saw Fisher, and thinking Fisher was possibly suicidal, incorrectly reported to the local sheriff's department that Fisher had his feet tied to the railroad tracks. *Id.* at 839-40. Upon arrival, the officers stopped approximately 250 yards away from Fisher and instructed Fisher to approach the officers. *Id.* at 840. At the officers' instructions, Fisher laid down his rifle, chair, and tripod, walked backwards towards the officers, and upon reaching the officers lay face-down on the road where he was handcuffed. *Id.* The officers did not have probable cause to believe Fisher was a danger to himself or others. *Id.* at 843. The officers should have questioned the veracity of the attempted suicide report once they saw Fisher was not tied to the railroad tracks. *Id.* Further, Fisher's normal and compliant behavior indicated he did not pose a risk of harm. *Id.* at 843-45.

The Sixth Circuit found probable cause to detain in *Simon v. Cook*, 261 F. App'x 873 (6th Cir. 2008). In that case, a police officer was dispatched to Simon's home after he reported being harassed by a coroner, unidentified individuals, and the police department. *Simon*, 261 F. App'x at 875. Simon's address was flagged as presenting a potential risk to police officers. *Id.* Simon was neatly dressed and groomed, was calm and nonviolent, and spoke rationally and coherently. *Id.* The officers present told Simon his allegations were outlandish. *Id.* at 876. At this, Simon suggested he would start following police officers and pointed his finger in an officer's face. *Id.* Simon was thereafter taken to a hospital, where two doctors found he satisfied the criteria for a 72-hour involuntary hold. *Id.* at 877. Finding this was a closer case than *Monday* or *Fisher*, the court concluded the following gave officers probable cause: the flag on Simon's

address, Simon's "bizarre and improbable" allegations, Simon's suggestion that he would follow police officers, and Simon's finger pointing. *Id.* at 880-81. Significantly, the court also found the doctors' evaluations were further evidence that the officer's decision was objectively reasonable. *Id.* at 881.

In *Ziegler v. Aukerman*, 512 F.3d 777 (6th Cir. 2008), the Sixth Circuit found a police officer had probable cause to detain Ziegler for a mental evaluation where Ziegler was reported as suicidal and there was a clinical certificate requiring that she be taken to a hospital. There, Ziegler voluntarily visited a hospital and told a nurse and a physician that she was "suicidal and planned to run into a tree on the way home from work." *Ziegler*, 512 F.3d at 779. Upon hearing these remarks, the nurse filled out a mental health petition, and the physician completed a clinical certificate requesting that Ziegler be hospitalized. *Id.* at 779-80. Somehow Ziegler managed to leave the hospital. *Id.* at 780. At the doctor's orders, the nurse called 911 to have the police find and take Ziegler back to the hospital because she was suicidal and because there was a certificate authorizing police action. *Id.* Acting on this information, an officer arrested Ziegler outside her home and took her to the hospital. *Id.* The court concluded the officer had probable cause because he acted on statements from physicians that Ziegler was suicidal, there was a certificate authorizing Ziegler's arrest, and Ziegler had been hospitalized already for presumably mental health reasons. *Id.* at 783-84.

More akin to the present facts is a case from the Tenth Circuit, *Meyer v. Board of County Commissioners of Harper County, Oklahoma*, 482 F.3d 1232 (10th Cir. 2007). There, the court found the arresting officers had failed to identify specific facts supporting a commitment decision. The court explained:

> Ms. Meyer has presented evidence that Officers Snider, Stoddard and Painter
> attempted to commit her to a mental health facility following a verbal altercation

19

in which there was no violence, no threats of violence, or damage to property. Ms. Meyer never threatened or hindered the police. On the contrary, she complied with the officers' request to remain in her vehicle for upwards of an hour while they interviewed bystanders, and she willingly accompanied officers to the police station thereafter. In short, the officers have articulated no reason to believe Ms. Meyer was a threat to herself or others, or that she had or was about to commit an act of violence.

*Meyer*, 482 F.3d at 1240. The court further found circumstantial evidence suggested one or more of the officers had deliberately lied in order to detain Meyer. *Id.* at 1240-43. Though the evidence showed Meyer was not violent, had not threatened violence during the verbal altercation, and did not resist the officers, the admitting physician's notes stated Meyer "had 'apparently' threatened violence and that it has required four officers to restrain her." *Id.* at 1240-41. This discrepancy, among others, was relevant to the qualified immunity inquiry because "a reasonable officer would know that he cannot rely on deliberate falsehoods to establish probable cause to deprive a person of her liberty." *Id.* at 1242.

Construing the evidence in the light most favorable to Plaintiff, a reasonable jury could find Plaintiff did not pose a substantial and imminent risk of harm to himself or others and therefore should not have been detained and transported for a mental health evaluation. Nothing in the record indicates Plaintiff has engaged in violent conduct in the past. Plaintiff voluntarily complied with law enforcement's request that he speak with Cecil. In the presence of Defendants Troup, Ballard, Helson, and Jones, Plaintiff told Cecil he did not have a history of violence or mental illness. He did not make any suicidal remarks, and he repeatedly stated he only intended to use lawful means to express his views and he did not intend to injure anyone. He further explained he used legal channels to express his frustration with law enforcement activities.

The events following Cecil's conversation with Plaintiff further detract from a finding of probable case. While Cecil was away speaking to her supervisor, Plaintiff engaged in conversation with the officers present. Officer Jones persistently attempted to persuade Plaintiff

20

to turn informant for the police department and offered to pay Plaintiff for information. Neither party suggests Defendant Jones bears such callous disregard for the safety of informants that he would intentionally send a mentally unstable person to report on illegal drug activities. Defendant Jones' attempts to persuade Plaintiff to work for him indicate Plaintiff did not pose an imminent risk of harm.

Even if, for sake of argument, there was probable cause to detain Plaintiff and take him to the emergency room, the absence of probable cause should have become readily apparent once at the emergency room. Cecil first tried admitting Plaintiff to the emergency room by stating local law enforcement had been "dealing with [Reeners] for two or three years," to which hospital staff said, "So what?" (Doc. 162, p. 22 ¶ 77). The hospital staff's reaction was entirely appropriate. Cecil's stated justification for admitting Plaintiff failed to identify facts showing he posed an immediate substantial likelihood of serious harm to himself or others. While waiting to see a physician at the emergency room, Cecil further told Plaintiff he would not "have an issue" if the doctor's evaluation revealed there "is nothing wrong with [him] mentally" and that "what [Reeners] is saying is true." (*Id.* at p. 24 ¶ 87). She said Plaintiff would have "nothing to worry about" if he was deemed "completely healthy." (*Id.* at p. 25 ¶ 89). She further stated that the involuntary evaluation was required because Plaintiff declined mental health counseling. These statements, too, do not indicate Cecil applied the appropriate detention standard. An individual may be involuntarily committed when he suffers from a mental illness or serious emotional disturbance and poses an immediate substantial likelihood of serious harm. Cecil's statements that Plaintiff must be "completely healthy" set the standard far too low. Further, Cecil's remark that Plaintiff was sent for evaluation because he declined counseling services is troubling. This statement indicates Plaintiff would not have been detained for evaluation had he agreed to attend

21

counseling services. If this is the case, Plaintiff could hardly have posed an "immediate" risk of harm.

Comparing this case to *Ziegler v. Aukerman*, 512 F.3d 777 (6th Cir. 2008), Defendants contend they reasonably relied on Cecil's detention order. (Doc. 122, pp. 10-11). *Ziegler* is easily distinguishable. First, the plaintiff in *Ziegler* made suicidal statements to healthcare providers. Neither side has produced any suicidal statements from Plaintiff. Second, the plaintiff in *Ziegler* had been previously hospitalized for presumably mental health reasons. Plaintiff denied receipt of prior mental health treatment, and the record does not contradict him. Further, the officer in *Ziegler* reasonably relied on a mental health care provider's assessment of the plaintiff's mental state. Here, Officer Jones admitted he was not aware of Cecil's qualifications and did not know whether Cecil needed probable cause to order a mental evaluation. Further, the record strongly suggests Cecil's assessment was tainted by false background information from Defendant Troup. Before Cecil evaluated Plaintiff, Troup made unsubstantiated remarks that Plaintiff had threatened public officials and had been charged with harassment for calling and emailing these officials. After hearing this, Cecil opined he may not be capable of being assessed. Cecil later repeated Troup's unsupported statements in order to admit Plaintiff to the emergency room. As the Tenth Circuit held in *Meyer*, an officer cannot rely on false information to establish probable cause to detain an individual. *Meyer*, 482 F.3d at 1242.

Cecil's opinion is questionable for an entirely different reason. Her written request for an emergency admission is based on the justification that "Law enforcement believes he's a danger to the community." (Doc. 162, p. 20 ¶¶ 70-71). Rather than expressing her independent judgment, Cecil parroted the officers' beliefs. The Magistrate Judge is hard-pressed to find that

the officers are entitled to hide behind Cecil's judgment when she, in turn, relied on the officers' opinions.

Defendants further rely on *Simon v. Cook*, 281 F. App'x 873 (6th Cir. 2008) for the position that probable cause may be supplemented by a physician's commitment order. (Doc. 122, p. 12). Because Dr. Bradley at SRMC and Dr. Brooks at MTMHI each signed a certificate of need for emergency involuntary admission, Defendants argue probable cause existed for Plaintiff's detention. (*Id.* at pp. 12-13). The record here does not indicate that the physicians' opinions are entitled to much weight, if any. Though Dr. Bradley signed a certificate of need at 5:37 p.m. based on a purported "face to face" examination of Plaintiff, whether this examination actually occurred is in genuine dispute. Defendant Jones' bodycam recording does not indicate Dr. Bradley's alleged face-to-face visit with Plaintiff occurred. To the contrary, Plaintiff repeatedly states he had not been seen by a physician. Dr. Brooks' opinion, too, does not provide great support for Plaintiff's commitment. Based on Dr. Brooks' assessment, Plaintiff posed no risk of violence and was only a low risk of self-harm. This does not equate to the "immediate substantial likelihood of serious harm" required for a finding of probable cause.

### Count II: False arrest on June 12, 2014, in violation of Tennessee State common law by Defendants Troup, Ballard, Helson, and Jones

Plaintiff likewise alleges Defendants Troup, Ballard, Helson, and Jones falsely arrested him in violation of Tennessee State common law. (Doc. 169, p. 7 ¶¶ 66-70).

It is clearly established in the State of Tennessee that law enforcement officers must have probable cause to arrest an individual. *State v. Nicholson*, 188 S.W.3d 649, 656 (Tenn. 2006). For the reasons stated with respect to Count I, the Magistrate Judge further finds Plaintiff has proffered enough evidence to show that a reasonable jury would find Plaintiff's arrest was not

23

supported by probable cause and that Defendants Troup, Ballard, Helson, and Jones abused their discretion when they arrested Plaintiff.

The Magistrate Judge therefore **RECOMMENDS** Defendants' motion for summary judgment be **DENIED** as to Count II.

### Count III: Excessive force on June 12, 2014, in violation of the Fourth Amendment by Defendants Jones and Helson

Plaintiff alleges Defendants Jones and Helson used excessive force in violation of the Fourth Amendment when Jones handcuffed Plaintiff's hands behind his back despite Plaintiff's complaints of pain and because Jones and Helson kept Plaintiff in handcuffs at SRMC despite Plaintiff's complaints of pain. (Doc. 169, p. 7 ¶¶ 71-75).

For the following reasons, the Magistrate Judge **RECOMMENDS** Defendants' motion for summary judgment be **DENIED** as to Count III.

#### 1. Clearly Established Right

Within the Sixth Circuit, "unduly tight or excessively forceful handcuffing is a clearly established violation of the Fourth Amendment." *Baynes v. Cleland*, 799 F.3d 600, 613 (6th Cir. 2015), *cert. denied,* 136 S. Ct. 1381 (2016) (collecting cases).

#### 2. Whether Defendants Jones and Helson Used Excessive Force Against Plaintiff

Reviewing the evidence in the light most favorable to Plaintiff, a reasonable finder of fact could conclude Defendants Jones and Helson subjected Plaintiff to excessive force when they handcuffed him for transportation to SRMC and thereafter kept him in handcuffs.

To determine if excessive force was used in the course of a seizure, the reviewing court considers whether the officer's conduct was objectively reasonable, balancing the government's interest in effecting the seizure with the potential consequences to the individual. *Getz*, 833 F.3d at 652 (quoting *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009);

*Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002)). The court should consider all of the surrounding facts, but particularly: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (internal quotations omitted) (quoting *Darrah v. City of Oak Park*, 255 F.3d 301, 307 (6th Cir. 2001)).

The Fourth Amendment's prohibition of "excessively forceful handcuffing" likewise applies to complaints that the arrestee's handcuffs are too tight. *Id.* at 654 (quoting *Morrison*, 583 F.3d at 401). To survive summary judgment on such a claim, the plaintiff must submit sufficient evidence to establish or create a genuine dispute of material fact that: "(1) he complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing." *Id.* (quoting *Morrison*, 583 F.3d at 401).

A reasonable finder of fact could conclude the use of handcuffs during Plaintiff's initial arrest was excessive. Plaintiff had a history of nonviolence, and he was not charged with a crime at the time he was placed in handcuffs. He voluntarily presented to his home and spoke with Cecil with the officers present. As previously discussed, a reasonable jury could conclude Plaintiff did not pose an imminent risk of danger to himself or others. Further, Plaintiff did not attempt to flee or evade arrest. While voicing his opposition to being arrested, Plaintiff voluntarily complied with the officers' instructions. Plaintiff additionally told the officers that his wrist sore, and Officer Jones noted Plaintiff was wearing a compression sleeve or wrap on his right wrist. In view of these circumstances, a reasonable finder of fact could conclude the use of handcuffs was unnecessary.

25

Further, a finder of fact could conclude the maintenance of the handcuffs constituted excessive force. Before he was taken to the emergency room, Plaintiff requested his wrists be cuffed in the front of his body because his wrist was sore. This request was denied. Jones and Helson stayed with Plaintiff at SRMC. While at SRMC, Plaintiff told a nurse his wrist was hurting and requested pain medication. Jones moved the handcuffs in front of Plaintiff after a nurse was finished caring for him. However, Plaintiff reported he was still in pain, telling Jones and Helson that the cuffs hurt his wrist and he had damaged tendons from shutting his tailgate two weeks prior. Jones did not remove the cuffs until he left the emergency room at 6:00 p.m. The evidence in the record demonstrates Plaintiff complained of pain from the handcuffs, and though Jones moved the cuffs in front of Plaintiff after a delay, his complaints of pain thereafter went unheeded. A reasonable finder of fact could find in Plaintiff's favor on the first two elements.

Defendants contend Plaintiff was not injured by the handcuffs. (Doc. 122, pp. 16-17). With respect to the third element, Plaintiff contends the handcuffs exacerbated the pain he suffered from a fractured wrist. Addressing a similar claim at the motion to dismiss point of a case, the Sixth Circuit found allegations of handcuffs aggravating existing injuries—there a rotator cuff injury—and causing pain satisfied the "some physical injury" requirement. *Courtright*, 839 F.3d at 520. Similarly, a district court in this circuit denied summary judgment on a claim of excessive force where the plaintiff had a pre-existing shoulder injury and had told arresting officers they were hurting her in their efforts to handcuff her. *Nelson v. Green Oak Twp.*, No. 14-10502, 2016 WL 233100, at *10-11 (E.D. Mich. Jan. 20, 2016). A reasonable jury could find Defendants were made aware of Plaintiff's injury from his statements. A reasonable

finder of fact could further conclude the pain caused by the aggravation of this fracture resulted in physical injury to Plaintiff.

### Count IV: False Arrest from June 13, 2014 to June 18, 2014, in violation of the Fourth Amendment against Defendant Bandy

Plaintiff alleges Defendant Bandy caused Plaintiff's involuntary commitment to MTMHI by directing his subordinates to arrange the mental health evaluation and later by sending a letter to MTMHI requesting Plaintiff be subjected to an "in-depth psychological treatment." (Doc. 169, p. 8 ¶¶ 76-84).

With respect to Plaintiff's claim against Defendant Bandy in Count IV, the Magistrate Judge **RECOMMENDS** Defendants' motion for summary judgment be **GRANTED**.

#### 1. Clearly Established Right

As previously stated, it is clearly established that law enforcement officers must have probable cause to believe an individual poses a danger to himself or others before the individual is detained for a mental health evaluation. *See, e.g.*, *Monday*, 118 F.3d at 1102.

#### 2. Whether Plaintiff was Falsely Arrested by Defendant Bandy

As Defendants indicate, the decision to commit Plaintiff at MTMHI was made before Defendant Bandy sent his letter to MTMHI. The General Sessions Court of Davidson County granted MTMHI's *ex parte* request for a commitment order at 8:42 a.m. on June 13, 2014. MTMHI received Defendant Bandy's letter at 2:34 p.m. on June 13, 2014. Though it is possible that Defendant Bandy's letter prolonged Plaintiff's stay at MTMHI, Plaintiff has not put forth any evidence to support this theory and has not satisfied his burden to survive summary judgment.

27

**Count V: False imprisonment from June 13, 2014 to June 18, 2014, in violation of Tennessee State common law against Defendant Bandy**

Plaintiff alleges Defendant Bandy committed the Tennessee common law offense of false imprisonment when he directed his subordinates to have a mental health counselor evaluate Plaintiff and initiate an intervention and later sent a letter to MTMHI requesting Plaintiff be subjected to an "in-depth psychological treatment." (Doc. 169, p. 9 ¶¶ 85-92).

As to Plaintiff's claim against Defendant Bandy in Count V, the Magistrate Judge **RECOMMENDS** Defendants' motion for summary judgment be **GRANTED**.

**1. Clearly Established Right**

In the State of Tennessee, common law claims of false arrest and false imprisonment arising from the same set of facts are evaluated together. *Lee v. Ritter*, No. 1:02-CV-282, 2005 WL 3369616, at *20 (E.D. Tenn. Dec. 12, 2005) (citing *Walker v. Schaeffer*, 854 F.2d 138, 142 (6th Cir. 1988)). The clearly established right is the same: an arrest must be made with probable cause. *Id.* (citing *McLaughlin v. Smith*, 412 S.W.2d 21, 26-27 (Tenn. 1966)).

**2. Whether Defendant Bandy Falsely Imprisoned Plaintiff**

"To prevail on his claim of false imprisonment/false arrest, plaintiff must prove two elements: (1) he was restrained or detained against his will by the defendants; and (2) the restraint or detention was unlawful." *Id.* (citing *Bryant-Bruce v. Vanderbilt Univ., Inc.*, 974 F. Supp. 1127, 1145 (M.D. Tenn. 1997); *Raines v. Shoney's, Inc.*, 909 F. Supp. 1070, 1082 (E.D. Tenn. 1995); *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990)). This necessarily requires the plaintiff to prove he was arrested without probable cause. *Id.*

As to Defendant Bandy's role in prolonging Plaintiff's stay at MTMHI, Plaintiff has again failed to meet his burden of establishing Defendant Bandy's letter to MTMHI actually

caused his detention. Having failed the first element of the cause of action, qualified immunity is warranted.

## V.     RECOMMENDATION

For the reasons stated above, the Magistrate Judge **RECOMMENDS** that *Defendants' Motion for Summary Judgment* (Doc. 121) be **GRANTED** as to Plaintiff's claims in Counts IV and V that Defendant Bandy violated the Fourth Amendment and Tennessee State common law by prolonging Plaintiff's stay at MTMHI. The Magistrate Judge further **RECOMMENDS** that *Defendants' Motion for Summary Judgment* be **DENIED** as to all other remaining defendants and claims.

Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen days, after being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen days after being served with a copy thereof. Failure to file specific objections within fourteen days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, 155 (1985).

**ENTERED** this 11th day of August, 2017.

/s/ Joe B. Brown
JOE B. BROWN
UNITED STATES MAGISTRATE JUDGE