**In The Matter Of:**

*Patrick Jayson Reeners v.*
*Ricky Troup, Donald Bandy, et al.*

---

*Rickey Troup*
*October 16, 2018*

---



*402 BNA Drive, Suite 108*
*Nashville, TN 37217*
*(615) 726-2737*
*cleetondavis.com*

*Min-U-Script®*

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                     NASHVILLE DIVISION

 3
     PATRICK JAYSON              )
 4   REENERS,                    )
                                 )
 5         Plaintiff,            )
                                 )
 6   vs.                         ) NO. 3:15-cv-00625
                                 ) Judge Aleta Trauger/
 7   RICKY TROUP, DONALD         ) Magistrate Judge Brown
     BANDY, LAMAR BALLARD,       )
 8   BRADLEY JONES, JAMIE        ) JURY DEMAND
     HELSON, and CITY OF         )
 9   GALLATIN, TENNESSEE,        )
                                 )
10         Defendants.           )
     _____  )
11

12

13

             Deposition of:
14

15           RICKEY TROUP

16

             Taken on behalf of the Plaintiff
17

18           October 16, 2018

19

20   _____

21

             CLEETON DAVIS COURT REPORTERS, LLC
22              402 BNA Drive, Suite 108
                Nashville, Tennessee 37217
23                  (615) 726-2737
                 www.cleetondavis.com
24

25
```

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 2 of 189 PageID #: 3429

```
 1                A P P E A R A N C E S

 2

    FOR THE PLAINTIFF:
 3
           Kyle Mothershead, Esq.
 4         414 Union Street
           Suite 900
 5         Nashville, Tennessee 37219
           (615) 982-8002
 6         kyle@mothersheadlaw.com

 7

    FOR THE DEFENDANTS:
 8
           William N. Bates, Esq.
 9         FARRAR & BATES, LLP
           211 Seventh Avenue North
10         Suite 500
           Nashville, Tennessee 37219
11         (615) 254-3060
           bill.bates@farrar-bates.com
12

13
    ALSO PRESENT:
14
              Daniel Ayoade Yoon, Esq.
15         Shahn Donegan, Senior Litigation Paralegal
           Susan High-McAuley, Gallatin City Attorney
16         Donald Bandy, Gallatin Chief of Police
           Patrick Reeners
17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2
     Examination by Mr. Mothershead            5
 3
     Examination by Mr. Bates                165
 4
     Examination by Mr. Mothershead          183
 5
     Examination by Mr. Bates                186
 6

 7                  E X H I B I T S

 8
     Exhibit        Description            Page
 9
     No. 1          Performance Evaluations of    29
10                  Rickey Troup

11   No. 2          General Order                 54
                    Subject:  Mentally Ill Subjects
12
     No. 3          Responding to Mental Illness  59
13                  policy

14   No. 4          Law Enforcement dealing with  65
                    Individuals with Mental
15                  Health/Disabilities policy

16   No. 5          Patrick Reeners - Timeline    75

17   No. 6          Email chain with attachments  89

18   No. 7          Transcript of audio recording 107

19   No. 8          Transcript of audio recording 118

20   No. 9          Incident Report               140

21   No. 10         General Order                 150
                    Subject: Transportation of
22                  Prisoners

23   No. 11         Fax sent to Kristina Barker    158

24   No. 12         Affidavit of Rickey Troup      159

25   No. 13         Affidavit of Rosemary Bates    174
```

1              The deposition of RICKEY TROUP was taken

2    by counsel for the Plaintiff pursuant to notice, at

3    Gallatin City Hall, 132 West Main Street, Gallatin,

4    Tennessee, on October 16, 2018, for all purposes

5    under the Federal Rules of Civil Procedure.

6              The formalities as to notice, caption,

7    certificate, et cetera, are waived.  All objections,

8    except as to the form of the questions, are reserved

9    to the hearing.

10              It is agreed that Lisa K. Henderson,

11    being a licensed court reporter for the State of

12    Tennessee, may swear the witness, and that the

13    reading and signing of the completed deposition by

14    the witness are waived.

15

16

17

18

19

20

21

22

23

24

25

```
 1                    RICKEY TROUP,
 2  having been first duly sworn, was examined and
 3  testified as follows:
 4                    EXAMINATION
 5  BY MR. MOTHERSHEAD:
 6     Q   Can you just give your name and spell it,
 7  please, sir?
 8     A   Rickey Troup.  R-I-C-K-E-Y T-R-O-U-P.
 9     Q   And where do you work?
10     A   Gallatin Police Department.
11     Q   And if you can just kind of give like a
12  little bit of a basic sort of background sketch of
13  your career and where you're from.
14     A   Been with the police department since summer
15  of 2001.  Worked in various areas of the department
16  from patrol to detective to sergeant and lieutenant,
17  various responsibilities over the years.
18     Q   And before you joined the police department,
19  where did you --
20     A   Tennessee Department of Corrections.
21     Q   Okay.  And you're from Nashville originally?
22     A   Yes.
23     Q   Graduated McGavock?
24     A   Yes.
25     Q   Did you serve in the Army?
```

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 6 of 189 PageID #: 3433

```
1       A    I did.

2       Q    What did you do in the Army?

3       A    I was a 63 Whiskey Ten.  I was a heavy-wheel

4   mechanic.

5       Q    Is that what 63 Whiskey Ten means?

6       A    That was my MOS number.

7       Q    What's an MOS?

8       A    Your job in the Army.

9       Q    Okay.  And where were you stationed when you

10  did this?

11      A    Schofield Barracks, Hawaii.

12      Q    And then did you work for a Neely Coble?

13      A    Neely Coble Freightliner for about a year as

14  a mechanic.

15      Q    Okay.  And then Department of Corrections you

16  did inmate transport; is that right?

17      A    Yes.

18      Q    Any other jobs that you did at the

19  department?

20      A    I worked in housing units and then promoted

21  up the ranks to the transportation division as a

22  corporal.

23      Q    Okay.  Did you do any kind of law enforcement

24  function, any sort of arrests, or anything like

25  that?
```

```
 1      A    No, no.   Prison guard.

 2      Q    Did you ever have any grievances or anything

 3   filed against you in that job?

 4      A    Not that I remember.   I had inmates that

 5   always complained on officers for various things.

 6      Q    Do you mind just speaking up a little bit?   I

 7   want to make sure the camera catches --

 8      A    Yeah.   I don't recall any grievances filed

 9   against me.   The inmates complained on officers all

10   of the time for various things, but I don't recall

11   anything specific about me.

12      Q    Did the inmates complain on you all of the

13   time?

14      A    No, not at all.

15      Q    Do you remember what kinds of complaints they

16   were making?

17      A    They would complain if they didn't get enough

18   food at chow times and things like that.

19      Q    Okay.   And then from there you started at the

20   Gallatin Police Department?

21      A    Yes.

22      Q    Okay.   And that was 2001?

23      A    Yes.

24      Q    And you started in patrol?

25      A    Yes.
```

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 8 of 189 PageID #: 3435

1    Q    How long were you in patrol?

2    A    Several years.  2004, 2005.  I went to

3  criminal investigations division as a detective.

4    Q    What's criminal investigations?

5    A    Detectives.

6    Q    So does that mean any kind of crime that

7  needs to be investigated?

8    A    Our detectives investigate the entire gamut

9  of crimes from misdemeanor petty theft to homicide.

10    Q    Okay.  Can you, again, just try to speak up

11  just a little bit more.

12    A    Okay.

13    Q    I just want to make sure this microphone is

14  picking you up.

15    A    All right.

16    Q    Thank you.  What year was that that you --

17    A    I think that was 2004 when I went to criminal

18  investigations.  I was there for a few years before

19  getting promoted.

20    Q    Okay.  And then promoted to sergeant?

21    A    Sergeant.  I believe in 2008 I was promoted

22  to sergeant and then I was promoted to lieutenant, I

23  believe in 2009.

24    Q    Okay.  And is that unusual to go so fast from

25  sergeant to lieutenant or is that typical?

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 9 of 189 PageID #: 3436

1    A   I don't know if it's unusual.  I was just

2  eligible for promotion.  I went through the process

3  and got promoted.

4    Q   How big is the force there at the Gallatin

5  Police Department?

6    A   About 80 sworn, 85 sworn officers, something

7  like that.

8    Q   How many -- so there's the chief, right?

9  That's Chief Bandy?

10   A   Yes.

11   Q   And then is the lieutenant, is that directly

12 below the chief?

13   A   No.  It's the chief, assistant chief,

14 captain, and then four lieutenants, and then we

15 have, I think, ten sergeants.

16   Q   Okay.  Okay.  Who is the assistant chief?

17   A   Bill Sorrells.

18   Q   And how long has he been the assistant chief?

19   A   Like 2011, 2012, something like that.

20   Q   Okay.  And below him is captain?

21   A   Captain Novitsky.

22   Q   So there's just one captain?

23   A   Yes.  One captain and four lieutenants.

24   Q   Okay.  Captain Lovitsky?

25   A   Novitsky.

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 10 of 189 PageID #: 3437

1      Q    Novitsky.  And how long has Novitsky been the
2  captain?
3      A    I don't know.  2012, 2013.  About the same
4  time Assistant Chief Sorrells became the assistant
5  chief, I think.
6      Q    Okay.  And how long has been Bandy been the
7  chief?
8      A    2010, I think, Chief Bandy became the chief.
9      Q    Okay.
10     A    I don't know exactly.
11     Q    And has that structure been the same like the
12 whole time that you've been at the department?
13     A    No.  It's changed a few times over the years.
14 When I was lower ranking, I think we had chief.
15 Then below the chief was commanders, that was the
16 rank then.  And then below that, I think, was
17 lieutenants, and then down to sergeants.  So the
18 ranking structure has changed a couple of times over
19 the years.
20     Q    Okay.  Do you remember, roughly, what year
21 this present structure came into effect?
22     A    2009 maybe, 2010.
23     Q    Okay.  And is the chief -- is the chief
24 appointed by the mayor or how does the chief get to
25 be the chief?

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 11 of 189 PageID #: 3438

```
1        A    I don't know.

2        Q    Okay.

3        A    Not an elected position, I don't believe.  I

4   believe it's appointed by the council and the mayor.

5        Q    Okay.  All right.  All right.  So you became

6   lieutenant in you think about 2009?

7        A    I think it was 2009 I was promoted.

8        Q    And what are the responsibilities of a

9   lieutenant?

10       A    We oversee divisions.  There are certain

11  divisions within the department.  There's the

12  traffic division or the patrol division, support

13  services division, criminal investigation division.

14       Q    And what division do you oversee?

15       A    Currently, I'm one of the two lieutenants

16  over patrol.

17       Q    Okay.  And that sounds like you used to be

18  over a different division?

19       A    Yeah.  We rotate periodically.  Every couple

20  of years we'll rotate.  The lieutenants will rotate

21  assignments.  So I've been in charge of criminal

22  investigations division as a lieutenant.  I've been

23  in charge of support services.  And now I'm

24  lieutenant over one of the -- half of the patrol

25  division.
```

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 12 of 189 PageID #: 3439

1    Q    Okay.  And so it sounds like there are three

2  divisions; is that right?

3    A    Yes.  Well, yeah, now there are.  Yeah.

4    Q    There's criminal investigations, support

5  services, and patrol?

6    A    Yes.

7    Q    And you've got two lieutenants over patrol?

8    A    Yes.

9    Q    One lieutenant for each of the other

10  divisions?

11    A    Yes.

12    Q    Okay.  All right.  And you're one of two

13  lieutenants in patrol?

14    A    Yes.

15    Q    And how long have you been in the division?

16    A    Well, I've been in charge of it before and we

17  just rotated back.  Just in the last month we went

18  back to the -- I went back to patrol.

19    Q    Okay.  And in 2014 what division were you

20  lieutenant over?

21    A    I was over the criminal investigations

22  division in 2013 and 2014.

23    Q    Okay.  How far back do you and Chief Bandy

24  go?  How long have you known Chief Bandy?

25    A    I've known him my whole career.

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 13 of 189 PageID #: 3440

1       Q    Whole career?

2       A    Yes.

3       Q    What was his rank when you first started?

4       A    I believe he was a field training officer in

5    patrol when I first started here.

6       Q    Okay.  Did he train you?

7       A    No.

8       Q    Okay.  Did you work cases with him at all?

9       A    Just -- we were both assigned to the criminal

10   investigations division at the same time, 2004,

11   2005.

12      Q    Okay.  And at that time you would investigate

13   cases together sometimes?

14      A    Yes.

15      Q    Okay.  And so was he your supervisor then or

16   were you guys the same rank?

17      A    No.  We were the same rank then.

18      Q    Okay.  Would you say you were partners or --

19      A    We were all coworkers.  We didn't have

20   partners.  We sometimes -- two or three detectives

21   would work the same cases, things like that,

22   assisting each other on investigations.

23      Q    How many detectives were in that unit?

24      A    Five or six at that time, if I remember

25   correctly.

```
 1        Q    Okay.  And that's for the whole city, those
 2   are the detectives?
 3        A    Yes.
 4        Q    And so you guys would just sometimes team up
 5   for --
 6        A    Yeah.
 7        Q    -- certain cases essentially.  Okay.  And do
 8   you and -- have you and Chief Bandy had dinner with
 9   each other's families?
10        A    Yes.
11        Q    Or hung out socially?
12        A    Yes.
13        Q    So you guys are friends?
14        A    He's my boss.
15        Q    Okay.  Would you say that you're not friends?
16        A    No, I didn't say that.  He's my boss.
17        Q    He's your boss before he is your friend?
18        A    Yes.
19        Q    Is that what you're trying to say?
20        A    Absolutely.
21        Q    But he's also your friend?
22        A    Yes.
23        Q    Do you guys go fishing together?
24        A    No.
25        Q    Hunting?  Or I don't know what kind of stuff
```

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 15 of 189 PageID #: 3442

```
 1    you do.
 2         A    We watch football games.  Our families
 3    socialize with each other.  I mean, it's --
 4         Q    Okay.
 5         A    -- a professional relationship.
 6         Q    Do you go to the same church or anything like
 7    that?
 8         A    No.
 9         Q    How frequently would you say that you watch
10    football games together?
11         A    It's been a couple of years since we've
12    watched one together.  Not every week.  Maybe once
13    or twice a year.
14         Q    Okay.  And your families get together how
15    often?
16         A    Holidays.
17         Q    Do you -- I'm not trying to -- I don't want
18    anything like identifying or specific, but do you
19    have -- do you have kids?
20         A    I do.
21         Q    Are they -- does Chief Bandy have kids?
22         A    Yes.
23         Q    Do your kids hang out with each other?
24         A    No.  They're nowhere near the same age.
25         Q    Okay.  What about Lieutenant Ballard, how
```

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 16 of 189 PageID #: 3443

```
1    long have you known Lieutenant Ballard?
2         A    My whole career.
3         Q    What was Lieutenant Ballard doing when you
4    started?
5         A    He was in patrol when I first started here.
6    He was a patrol officer.
7         Q    Same as you?
8         A    Yes.
9         Q    But he was already working?
10        A    Yes.
11        Q    Okay.  Do you recall -- do you know how long
12   he had been in patrol when you started?
13        A    No, I don't know.  I don't know when he
14   started here.
15        Q    Okay.  And when did he get promoted out of
16   patrol?
17        A    I don't remember that.
18        Q    Do you remember when he became lieutenant?
19        A    I was in patrol when he got promoted, so I
20   don't remember.
21        Q    Okay.  Do you know what division Lieutenant
22   Ballard currently has?
23        A    He's in charge of the criminal investigations
24   division detectives.
25        Q    Was he -- were you guys ever detectives
```

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 17 of 189 PageID #: 3444

```
 1   together in the investigation --
 2        A    He was my supervisor in the criminal
 3   investigations division.
 4        Q    Oh, okay.  For how long?
 5        A    The entire time I was a detective.
 6        Q    Okay.  Was he Bandy's supervisor then too?
 7        A    He was.
 8        Q    Okay.  Interesting.  All right.  And with
 9   Lieutenant Ballard, have you spent time together
10   socially?
11        A    Just holidays.  We don't hang out.  We don't
12   -- we're just coworkers.  Our family -- our
13   daughters are about the same age, so when they were
14   little they would -- we took them to a couple of
15   different child things, like Disney on Ice, things
16   like that.  That was it.  We don't hang out.  We
17   don't watch football games together or anything like
18   that.
19        Q    Okay.  Are your daughters still friends, or
20   no?
21        A    No, they're not.
22        Q    All right.  What about Jones, Bradley Jones?
23        A    What about him?
24        Q    Do you know him?
25        A    I know him.
```

1      Q    How long -- how far back do you and he go?

2      A    Just when he started working here.  I don't

3  remember exactly when it was.  I just remember when

4  he became a police officer here.

5      Q    Do you have a -- can you give me just a

6  ballpark year of when that might have been?

7      A    2012, 2013.

8      Q    Okay.  And so was he -- I guess he would have

9  been patrol when he started?

10     A    Yes.

11     Q    And were you involved with patrol at that

12  point or no?

13     A    I don't remember if I ever directly

14  supervised Brad.  I don't think I did.

15     Q    Okay.  That sounds like -- tell me if this is

16  wrong -- it's a small enough department that

17  everybody -- everybody in the department knows

18  everybody else; is that correct?

19     A    Yes.

20     Q    And it's one building essentially; is that

21  right?

22     A    No.  There's two buildings.

23     Q    Two buildings.  Okay.  Even if somebody is in

24  a different unit then you, you would just see them

25  --

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 19 of 189 PageID #: 3446

1       A    Yeah.

2       Q    -- and get to know them a little bit?

3       A    Uh-huh.

4       Q    And have you ever socialized with him?

5       A    No.

6       Q    Okay.  Helson, do you know Helson?

7       A    I do.

8       Q    It sounds like you do.  How far back do you

9    and Helson go?

10      A    Just coworkers.  I know he was in patrol and

11   he was in CID.  I remember supervising him in

12   patrol, but I never supervised him when he was a

13   detective.  I was in charge of patrol when he was in

14   CID.

15      Q    Okay.  How far back -- do you remember, like,

16   when he got hired?

17      A    2005, 2006, somewhere along those lines.

18      Q    Okay.  Have you ever hung out with him

19   watching games or anything?

20      A    No.

21      Q    All right.  I'll hand you some excerpts from

22   your personnel file.  I didn't bring the whole

23   thing.

24      A    Okay.

25      Q    Can you take a look at it and just review it.

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 20 of 189 PageID #: 3447

1    And then we'll go through some things.

2        A    Okay.

3        Q    Okay.  Does that look like sections from your

4    personnel file?

5        A    Looks like annual evaluations mostly.

6        Q    Okay.  So I just want to talk to you about

7    some parts of this.  In the 2015 evaluation, if you

8    want to look at page 7 of that.  So there if you

9    look at interpersonal relations -- do you want me to

10   slow down?

11           MS. DONEGAN:  Which one were you on in

12       evaluation number?

13           MR. MOTHERSHEAD:  So we're in the first

14       evaluation, which is 2015 evaluation, page 7 of

15       that one.

16           MS. DONEGAN:  Okay.

17   BY MR. MOTHERSHEAD:

18       Q    So in the interpersonal relations the comment

19   is, Lieutenant Troup continues to show improvement

20   in this area.  He is direct with other employees,

21   but is more mindful of his demeanor when addressing

22   issues with subordinates, continue to treat

23   subordinates as you would want to be treated.  I

24   guess -- it reads like, you know, there's been some

25   kind of an issue that you've been improving from,

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 21 of 189 PageID #: 3448

1    and I wonder if you speak to -- you know, what is

2    that comment?  What's the context of that comment?

3        A    I don't know.  You'd have to ask the

4    evaluator.

5        Q    Is that Chief Bandy?  Is that Captain

6    Novitsky?

7        A    Captain Novitsky.

8        Q    Okay.  All right.  So that would be for

9    Captain Novitsky to say?

10        A    Yes.

11        Q    So, I mean, in your opinion, do you think

12    that there was anything wrong with your style of

13    interpersonal relations that you were showing

14    improvement from?

15        A    I don't know what she is referring to.  I

16    don't remember where I was -- would have improved

17    on.  I've always been a direct supervisor.  Direct

18    and to the point.

19        Q    Okay.  All right.  It sounds like you don't

20    think that there was anything to improve?

21        A    I didn't say that.

22        Q    You were good?

23        A    I didn't say that.  I said I don't know what

24    she is referring to.

25        Q    Okay.  Did you guys talk about this when she

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 22 of 189 PageID #: 3449

1    did the evaluation?

2        A    Yeah, but this was like three years ago.  I

3    don't remember exactly the entire conversation I

4    would have had with her from an evaluation from

5    three years ago.

6        Q    Then this same page there's relationships

7    with citizen in the community.  And it says,

8    Lieutenant Troup has shown improvement in this area

9    also.  He has received no citizen complaints during

10   this rating period.  Lieutenant Troup should always

11   remember that the general public's perception of a

12   situation may differ from that of a law enforcement

13   officer and that is okay.  Do you know what she is

14   talking about?

15       A    I don't.

16       Q    Okay.  Do you -- I mean, do you think there's

17   some constructive criticism there of ways that you

18   had behaved in the past or no?

19       A    I don't know.  You would have to ask her.

20       Q    Okay.  Did you talk about this with her when

21   you got the evaluation?

22       A    I did.

23       Q    Okay.  Do you remember anything about what

24   this might have been about?

25       A    No.

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 23 of 189 PageID #: 3450

1        Q   Do you sometimes when you're dealing with

2   members of the public feel like impatient, like why

3   don't they get it?  Like why don't these, you know,

4   nonpolice officers understand, you know, what we're

5   doing here?

6        A   I'm not sure I understand your question.

7        Q   Do you get frustrated with feeling like

8   people who aren't police officers don't understand

9   what it's like to be a police officer?

10       A   No.

11       Q   Or that they don't understand how a police

12  officer interprets a situation?

13       A   I don't know how to answer that question.  I

14  don't understand your question.  I don't.

15       Q   I'm just trying to make sense out of what

16  your captain commented here.  Lieutenant Troup

17  should always remember that the general public's

18  perception of a situation may differ from that of a

19  law enforcement officer, and that is okay.

20           I just don't know if you remember having

21  situations where your perception was different from,

22  you know, kind of the laypeople?

23       A   I don't know if there's a specific incident

24  she was talking about.  Like I say, that was three

25  years ago.  I don't remember if there was a specific

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 24 of 189 PageID #: 3451

1    incident she was referring to.

2        Q    Okay.  Under the same evaluation, but there's

3    a supervisor supplement.

4        A    Okay.

5        Q    On page 2 of that there's a section called

6    communication.  And the comment is, Lieutenant Troup

7    communicates well with his subordinates and his

8    higher command.  He needs to make sure the facts are

9    as close to correct as they can be when forwarding

10   information.

11          So that second part, I mean, was there some

12   situation where you had forwarded information that

13   was not accurate?  What do you think that's

14   referring to?

15       A    The only thing I could think she would be

16   meaning there is when I received information from

17   subordinates and when I passed it on to her, it may

18   not have included everything about an incident.

19   Like I said, I don't remember anything specific that

20   she would have been referring to here.  It's, like I

21   said, three years ago.  I don't remember our

22   conversation about this evaluation.

23       Q    Okay.  On page 11 it kind of goes back to

24   this.  I'll let you catch up.  Lieutenant should

25   make sure all facts are correct concerning a

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 25 of 189 PageID #: 3452

1   situation before presenting them up the chain of

2   command.

3          Does that help jog your memory at all as far

4   as what we're talking about here?

5      A   No.  I don't know if there was a specific

6   incident she was referring to or what.

7      Q   Okay.  So let's go to the 2014 evaluation.

8      A   (Witness complies.)

9      Q   And looking at page 8, Lieutenant Troup

10  received an oral reprimand of this rating period and

11  completed remedial training for making an offensive

12  remark to a coworker.  Lieutenant Troup was

13  receptive of the reprimand and stated he did not

14  intend to offend anyone.  Lieutenant Troup can at

15  times come across as abrasive in his interaction

16  with his coworkers.  Lieutenant Troup has a strong

17  desire to get assignments completed and expects the

18  same urgency from his coworkers.  This at times

19  causes conflict.

20     A   Uh-huh.

21     Q   So what was the oral reprimand for?

22     A   That was in reference to one morning in

23  criminal investigations division when this was

24  happening, one of the detectives, a female detective

25  was in the room and making comments about how -- she

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 26 of 189 PageID #: 3453

1  had just gotten off the phone with a sex offender.

2  And she made reference to how much of an -- am I

3  allowed to use profanity?

4          MR. BATES:  Yes.

5      A  She made reference to how much of a bitch she

6  was to this sex offender.  Another female employee

7  who used to be a detective had come into the room

8  and was talking to other detectives in there.  And

9  she asked me, she said, something along the lines

10 of, What would you do if I came back in here?  I

11 said, Well, I wouldn't want two people in here being

12 bitches to people.  That was Investigator Renz at

13 the time.  Her name is Officer Stockdale.  She's

14 since been married.  And she took offense to that

15 comment.

16         When she filed her complaint with command

17 staff, it wasn't exactly how it occurred that

18 morning.  She made reference to the fact that I said

19 -- she said that I told her bitches do bitch work

20 and that's not what was said.  She twisted what was

21 said.

22     Q  Like she kind of made a false allegation

23 against you?

24     A  Absolutely.

25     Q  She said you said words that you didn't

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 27 of 189 PageID #: 3454

```
 1   actually say?
 2       A    Absolutely.
 3       Q    And what were the words that you actually
 4   said to her?
 5       A    I said I don't need two people in here being
 6   bitches to people.
 7       Q    Okay.  And she claimed that you said what?
 8       A    Bitches do bitch work.
 9       Q    Okay.  What's her name?
10       A    Emily Renz.
11       Q    Emily Renz and now Stockdale?
12       A    Stockdale.
13       Q    Does she still work for the police
14   department?
15       A    She does.
16       Q    What's her rank?
17       A    She is a patrol officer.
18       Q    So you would say that she lied?
19       A    Absolutely.
20       Q    Okay.  And so you got an oral reprimand for
21   saying --
22       A    The word "bitch."
23       Q    The word "bitch."  Was there any kind of
24   training or counseling --
25       A    Just with the captain and the assistant chief
```

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 28 of 189 PageID #: 3455

1    about using proper tact when dealing with
2    subordinates.
3        Q    Did you feel like you deserved to be
4    reprimanded?
5        A    Yeah, I did.  As a supervisor I shouldn't
6    have said that.
7        Q    Was she investigated or disciplined for
8    making a false allegation against you?
9        A    No.
10       Q    Did you ask that she be?
11       A    No.
12       Q    Was there any kind of recording of what had
13   happened?
14       A    No.
15       Q    The next -- at the bottom of the page, it
16   talks relationships with citizens and the community.
17   Lieutenant Troup received two complaints from
18   citizens during this rating period.  One complaint
19   was sustained and Lieutenant Troup admitted to the
20   incident.  The other complaint could not be
21   sustained due to a lack of evidence.  So what's the
22   complaint that was sustained?
23       A    I don't remember.
24       Q    Okay.  Do you remember did you get some kind
25   of a disciplinary sanction?

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 29 of 189 PageID #: 3456

1      A   I don't remember what the incident was.  I

2   know that I did have a complaint, but I don't

3   remember if this was the year.  I don't remember

4   what she's referring to here.  It probably details

5   it more later on in the evaluation.

6      Q   I don't think I saw it.  There's some

7   possibility that's in the file and I didn't print

8   it, but I think I would have seen it.

9      A   Yeah, if you had it.  I don't remember what

10  she's referring to here.

11     Q   Okay.

12          MR. BATES:  Kyle, I'm going to go ahead

13     and mark this as Exhibit 1.

14          MR. MOTHERSHEAD:  Yeah.  That's great.

15     The whole personnel file.

16          MR. BATES:  Collective.

17          MR. MOTHERSHEAD:  That was my plan.

18          (Document marked Exhibit No. 1.)

19  BY MR. MOTHERSHEAD:

20     Q   All right.  So you don't know what that

21  complaint was about?

22     A   I don't remember what this particular

23  statement is in reference to.

24     Q   Okay.  Do you remember the other complaint

25  that was not sustained?

1      A     Uh-huh.  Oh, no.  I don't remember anything

2   about these complaints.

3      Q     Okay.  So this is talking about two separate

4   complaints.

5      A     Yeah.

6      Q     One was sustained, the other one was not?

7      A     Yeah.  I don't remember.

8      Q     You don't know what either of them are?

9      A     I'd have to see the complaints.

10     Q     Okay.  All right.  Let's move to the 2013

11  evaluation.  Page 4, it says --

12     A     Okay.

13     Q     -- that you received a major suspension from

14  duty during this rating period.  During the

15  investigation Lieutenant Troup violated a written

16  directive not to discuss the incident with any other

17  employees and violated the directive.  He was not

18  truthful when confronted with the violation.

19           What do you remember about that situation?

20     A     I was accused of horseplay with a gun, an

21  unloaded weapon in the patrol area.  Lyndon

22  Satterfield didn't make the complaint, but someone

23  else made the complaint that they saw me point a gun

24  at him.  I was -- there was an internal

25  investigation.  I was instructed not to talk about

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 31 of 189 PageID #: 3458

1    it.  I talked about it with a coworker, a close

2    friend of mine.  Shouldn't have.  When I was asked

3    if I had discussed the internal with anyone, I said

4    no.

5        Q   Okay.  So you did lie?

6        A   I did.

7        Q   Okay.

8        A   And I was suspended for that.

9        Q   Okay.  And who was it that you lied to about

10   that?

11        A   The captain.

12        Q   Novitsky?

13        A   Uh-huh.

14        Q   Is there any kind of -- like in the Gallatin

15   Police Department general orders or I don't know if

16   you have a policy manual or something.  Is there any

17   kind of designated punishment for a truthfulness

18   violation?

19        A   I don't think it's specifies.

20        Q   What was your punishment for this incident?

21        A   Ten days suspension.

22        Q   Did you get to use vacation days to resolve

23   that?

24        A   It was ten days without pay.

25        Q   Was the horseplay allegation -- was that

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 32 of 189 PageID #: 3459

1  accurate that you pointed the gun at somebody?

2      A    No.

3      Q    What actually happened?

4      A    I don't remember what happened.  In fact, it

5  was brought to my attention a few weeks or almost a

6  month after I remember that we were in the patrol

7  room and we were looking at a very small pistol that

8  almost looked like a -- it was kind of like a BB gun

9  it was so small.  I don't remember who said they saw

10 me point it at Lyndon, but to the best of my

11 knowledge, Lyndon said that it didn't happen.

12     Q    Okay.  So you're saying that you didn't

13 actually point it at him?

14     A    I did not.

15     Q    Okay.  And who was it that -- you said you

16 had a close friend who worked there that you talked

17 to about it?

18     A    Chris Shockley.

19     Q    Shockley.  Was Shockley a witness?

20     A    I don't remember if he was or not.

21     Q    Okay.  So you don't know whether he was there

22 when whatever happened happened?

23     A    No.  I don't remember who all was there.  I

24 know the room was full of people.

25     Q    Did you ask Shockley to give a statement?

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 33 of 189 PageID #: 3460

1    A   I asked him if he remembered being there.
2  And if he did, I did ask him to say something.
3    Q   So why did you lie to Novitsky about talking
4  to Shockley?
5    A   I didn't want to get in trouble for it, and I
6  didn't want to bring him in the middle of it.
7    Q   Who was there for the horseplay incident?
8    A   I don't remember.
9    Q   You don't remember any of the people --
10   A   I remember Shane Woodard was there, but I
11 know there were other officers in the room.  Like I
12 said, this was brought to my attention somewhere
13 between two weeks or a month after the alleged
14 incident happened.  And I didn't even remember all
15 of the facts of it then.  It was so -- such a minor
16 thing in my thoughts that I didn't recall pointing a
17 gun at him, because I didn't.  So it was something
18 that I just didn't sit there and dwell on and
19 remember who was in the room that day.
20   Q   Where did it take place?
21   A   In the patrol room allegedly.
22   Q   Okay.  What time of day would that have been?
23   A   I don't remember.
24   Q   Do you remember, like morning or afternoon?
25   A   I don't remember.  I just know it was in the

1    patrol room.  So it would have been -- it would have

2    been daytime sometime because I worked day shift.

3        Q    Like what happens in the patrol room

4    generally?  What's that?

5        A    It's where the officers do their daily

6    assignments, reports.  It's where their computers

7    are.  It's where they hold their shift briefings.

8    Some of them have lunch there in the patrol room.

9    It's the operations area for the patrol division.

10       Q    Do you remember -- any idea, like how many,

11   even if you can't remember who they were, how many

12   people would have been around when this horseplay

13   was happening?

14       A    At various times of day there's different

15   numbers of people in and out of the building, so I

16   don't remember.

17       Q    Okay.  But not just like two or three people.

18   I mean, if a patrol room -- it sounds like during

19   the day you would have, you know, 10, 20 officers in

20   there?

21       A    No.  Nowhere near 10, 20 officers.  Officers

22   are on the staff.  They're only in there when

23   they're doing reports.  So the whole patrol division

24   is not in there doing reports at the same time.

25   They're out on patrol.  So they would come in

1  periodically to the police department to do

2  different functions.

3      Q   Okay.  Like if you wrap up an arrest or

4  something, then you come in and do a report?

5      A   Uh-huh.

6      Q   What are the other kinds of things that cause

7  you to go to the patrol room?

8      A   Shift briefings.

9      Q   And that's it?

10      A   Like roll call.  Beginning of the shift, of

11  each shift.

12      Q   Okay.  Did this horseplay situation happen

13  during --

14      A   No.  It didn't happen during a shift

15  briefing.

16      Q   Okay.  Is there anybody that's just assigned

17  during the day to just be in the patrol room --

18      A   No.

19      Q   -- just to kind of supervise the patrol room?

20      A   No.

21      Q   If we could go to page 7 of the same

22  evaluation.

23      A   (Witness complies.)

24      Q   Yeah, page 7.  So Lieutenant Troup can be

25  very direct with his subordinates.  At times this

1    approach is needed.  At other times it is not.

2    Lieutenant Troup needs to be mindful of his tone of

3    voice and attitude when giving directives to

4    subordinates.

5         Do you remember what that was referring to?

6    A    No.  I don't remember what she's referring to

7    there.  I just know I'm very direct.  Is this the

8    2013 evaluation?

9    Q    This is the 2014 evaluation.

10   A    2013 we were dealing with two murders at

11   about the same time.  And I was supervising those

12   investigations.  And I was very direct with the

13   employees under me at that time of the urgency in

14   working those cases, and probably direct with them a

15   couple of times.

16   Q    It sounds like you don't think you did

17   anything wrong in the way that you interacted with

18   them?

19   A    No.

20   Q    This is Novitsky again?

21   A    Yes.

22   Q    How long has Novitsky been your superior?

23   A    Since she got promoted to captain.  She was

24   my patrol sergeant several years ago when I was in

25   patrol.  But directly supervising me would have been

```
1    after she got promoted to captain, she would have

2    been my supervisor.

3         Q    And what year was that?

4         A    I think it was about the same time earlier

5    when I said Assistant Chief Sorrells became the

6    assistant chief.  It was 2011, 2012, something like

7    that.

8         Q    Did you apply for captain too?

9         A    I did.

10        Q    So Novitsky kind of beat you out of a job?

11        A    Yes, she did.

12        Q    It seems like there's a theme of concerns

13   she's raising about you through your tone and the

14   way that you communicate with --

15        A    If that's your perception.

16        Q    Do you perceive it that way or no?

17        A    No.

18        Q    You don't think she's trying to counsel you

19   on that in these evaluations?

20        A    I mean, if she thinks that I'm too direct

21   back then -- but, like I said, you would have to ask

22   her what her evaluation of me was then.

23        Q    You don't think the same kind of general

24   critique keeps popping up in the same evaluation,

25   like every year that we've looked at kind of getting
```

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 38 of 189 PageID #: 3465

1    the same theme?

2        A    Does it say I did anything wrong?

3        Q    It says that the way you're talking to

4    citizens and subordinates could be more tactful and

5    more respectful.

6        A    Okay.

7        Q    Do you not see that in these evaluations?

8        A    No.  I see it as I've been direct with

9    subordinates, and that's her evaluation of me.

10       Q    Right.  I think I've gathered that you don't

11   think you're doing anything wrong.  We're pretty

12   clear on that, right, in the way that you're

13   communicating with people; is that right?

14       A    Are you talking about five years ago?

15       Q    I'm talking about each one of these years

16   where this kind of general concern has come up.  You

17   don't agree with this critique.  You don't think --

18       A    I didn't say I didn't agree with it.  I just

19   said that that's her evaluation of me.  And I've

20   been a direct supervisor with subordinates.  At

21   times maybe I was too harsh on subordinates and, you

22   know, if she felt that those were issues that I

23   needed to work on, I see that she documented it in

24   my evaluations.  Every supervisor has different

25   supervisory skills that they need to work on.  And I

1   do understand that I have some things that I -- at

2   that time I needed to work on.  So I'm not saying

3   that what she's saying is wrong.  But if she went

4   over it with me and if there have been corrections

5   made, then obviously I listened to her and learned

6   from any mistakes that I was making.

7       Q   You don't do it that way anymore?  Have you

8   modified the way that you communicate with your

9   subordinates because of these --

10      A   I'm still direct with subordinates.  I don't

11  think anything in here ever said that I yelled or

12  screamed or anything like that.  I'm just very

13  direct.  I do supervise to get the job done.  I

14  don't mistreat people.  I try to treat everyone

15  fairly.  And if I've made those corrections from

16  this time to now, I haven't -- she hasn't said

17  anything to me about anything that I need to correct

18  here recently.

19      Q   Do you think that you should have gotten the

20  captain job?

21      A   No.

22      Q   Why don't you think you should have gotten

23  it?

24      A   Because Captain Novitsky has been with this

25  department for 20-plus years.  She's very

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 40 of 189 PageID #: 3467

1    experienced.  She's very intelligent.  I think she

2    earned that title.  Would I have liked to have

3    gotten it?  Absolutely.  But I do think that she

4    earned it.

5        Q    In this same evaluation, let's look at the

6    supervisor's supplement, page 2.  Lieutenant Troup's

7    written is accurate, grammatically correct and

8    provides the appropriate information.  Lieutenant

9    Troup can be very direct and come across as

10   belittling in tone to subordinates at times,

11   particularly when upset.  Lieutenant Troup needs to

12   continue to work on being direct but tactful.

13            Do you know what she is referring to?

14       A    I don't.

15       Q    Do you think you've ever been belittling in

16   tone to your subordinates?

17       A    I've been direct.

18       Q    Do you think you've been belittling to your

19   subordinates?

20       A    I don't think I've ever belittled anybody.

21       Q    Have you talked about this issue with her?

22       A    I'm sure that we went over this evaluation

23   together.

24       Q    Did she give you any examples of what she was

25   talking about?

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 41 of 189 PageID #: 3468

```
 1      A    I wouldn't remember.  It was five years ago.
 2      Q    So then on page 11 kind of revisits this.
 3  Lieutenant Troup is very passionate about this job
 4  and this department.  Therefore at times he can come
 5  across as harsh when dealing with subordinates when
 6  issues arise.  While certain situations require such
 7  action, Lieutenant Troup needs to work on being less
 8  harsh in tone and should always correct subordinates
 9  in private.  He should take a moment to step back
10  from the situation and evaluate all information
11  before attempting correction.  In many situations
12  the information first received is not entirely
13  correct.  Lieutenant Troup should attempt to make
14  sure he has all pertinent information prior to
15  taking corrective action with a subordinate.
16          Does that help you remember any of the
17  context of what we're talking about here?
18      A    No.  But I can definitely see where she's
19  talking about correcting subordinates in private.  I
20  have admonished subordinates openly in front of
21  other coworkers before, and I've learned from that.
22  I do try to make it a point to pull people to the
23  side and discuss shortcomings with them rather than
24  get onto them in front of other people about things
25  that they've done wrong.
```

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 42 of 189 PageID #: 3469

1     Q    Do you agree that the way you were speaking

2   to subordinates was harsh?

3     A    Not always.  There were times when I would be

4   very direct with subordinates.  Never cursed at

5   them.  Never yelled and screamed at them.  But I've

6   been very direct with them about corrections that

7   they need to make.

8     Q    Do you agree that there were times that you

9   corrected them before you actually had all of the

10  information?

11    A    Yes.

12    Q    What kind of situations do you remember that

13  happening?

14    A    No, but I know that I've -- there have been

15  times I've got onto probably the group rather than

16  an individual.

17    Q    And then you found out information later that

18  you wouldn't have acted the way you did if you had

19  known?

20    A    Yes.

21    Q    It sounds like you didn't take the time to

22  investigate everything before?

23    A    This was a very stressful year.  2013 was a

24  very stressful year.  We were investigating a rash

25  of violent crimes that were happening in our city

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 43 of 189 PageID #: 3470

1    that I was responsible for investigating.  I

2    remember having some folks in criminal

3    investigations division that weren't pulling their

4    weight.  And at times I would get frustrated with

5    the group.  We had a couple of violent gang-related

6    homicides, a bunch of drive-by shootings that year,

7    and I was directly responsible for those

8    investigations.  And it was a very stressful time.

9         Q    So that's basically a yes, you did not always

10   take the time to investigate these situations before

11   yelling at the team?

12        A    No.

13        Q    Is that right?

14        A    You said, Yelling at the team.  I never said

15   I yelled at them.  I said correct them in front of

16   each other.

17        Q    But you didn't take the time to investigate

18   the whole situation or correct them --

19        A    You would have to -- I would have to know a

20   specific incident to be able to answer that

21   accurately.  I don't remember --

22        Q    Well, you know the incidents.  I don't know

23   them.

24        A    I don't remember every single incident.  I

25   just know this was a very stressful time.  And there

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 44 of 189 PageID #: 3471

1    were a lot of things that were going on in those

2    cases.  And I tried to keep on top of them.  There

3    were some shortcomings on some people in the group.

4    And instead of addressing an individual, I would

5    address the group.  And that's a mistake that I

6    would make.

7        Q    All right.  But the evaluation said that you

8    were correcting people before getting all of the

9    information; is that accurate?

10       A    I don't know exactly what she is referring

11   to.  I would have to -- it's five years ago.  I

12   don't remember specific incidents.

13       Q    I think I heard you say just a couple of

14   minutes ago that that was accurate, that that had

15   happened.  Is that not right?  You did correct

16   people without getting all of the information first.

17   Now you don't think you did that?

18       A    No.  I think what I said was, there were

19   times that I would get onto the group for things

20   that didn't -- for things that weren't getting done

21   on investigations.

22            So, yeah, if there were times that I got onto

23   people without knowing all of the facts, if I would

24   get onto the group, then, yes, you're right.  I

25   probably should have stepped back and realized who

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 45 of 189 PageID #: 3472

1   was responsible for any of those shortcomings rather
2   than getting onto the entire group.
3       Q   Okay.  And then the next is the internal
4   affairs write-up of this horseplay incident.  What
5   you're saying is that -- what actually happened?  I
6   think you were saying you didn't point a gun at
7   anybody.  What did happen during this horseplay
8   incident?
9       A   It's like six years ago.  Do you mind if I
10  refresh my memory?
11      Q   Yeah.  You can look at this.
12      A   I just remember that I was accused of
13  pointing the gun at Lyndon and pulling the trigger
14  on an empty gun.
15      Q   My question is, did you do that?
16      A   No.
17      Q   Okay.  Well, what did you do?
18      A   We were looking at the gun.  Someone felt
19  like I pointed the gun at him and I didn't.  Lyndon,
20  if I remember correctly, said that I didn't, so. . .
21      Q   Do you remember whether they sustained this
22  complaint against you for pointing the gun at him
23  and pulling the trigger?
24      A   I was suspended.
25      Q   So, I mean, the department found that you had

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 46 of 189 PageID #: 3473

```
 1    actually committed this act, right?
 2        A    Yes.  I was found guilty of it.
 3        Q    Was Novitsky the one that made that finding
 4    or is that --
 5        A    I don't remember who did the investigation.
 6    I believe it was Captain Novitsky and Bill Storment,
 7    who were the internal affairs investigators at the
 8    time.
 9        Q    All right.  And so you -- you're saying you
10    disagree with the finding from the investigation; is
11    that right?
12        A    Not all of them.
13        Q    I mean, they found that you did point the gun
14    and pull the trigger, right?
15        A    I disagree with that.
16        Q    You think that was an incorrect finding?
17        A    Yes.
18        Q    Okay.  But you acknowledge that you lied to
19    Novitsky?
20        A    Yeah.  When she asked me if I had discussed
21    the investigation, I said no.
22        Q    And you did that because you didn't want to
23    get in trouble?
24        A    I didn't want to bring Chris Shockley in the
25    middle of it.
```

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 47 of 189 PageID #: 3474

1     Q   But before you testified that you didn't want
2   to get in trouble.
3     A   I didn't want to get in trouble for
4   discussing it.
5     Q   Is that something that you've done in other
6   situations, lie about a circumstance to avoid
7   getting in trouble for it?
8     A   No.  This was pretty stressful.  This was a
9   -- that was a rough time.
10    Q   That's the only time you've ever lied to
11  avoid being in trouble?
12    A   No -- yeah.  That is the only time I've lied
13  to avoid being in trouble.  Yes.
14    Q   So in this next evaluation, which is 2011 --
15  actually, I want to go all the way -- there's kind
16  of a second half of it -- I'm sorry.  This is
17  actually back to 2001.  Just skip through 2011.  So
18  2001, which I guess would have been your first
19  evaluation ever.  This is 2004.  Sorry about the
20  2004.  We've got different dates on this thing.
21  This looks like 2004.  My bad.  So it's the next one
22  after 2011.  I think you're looking at it.
23    A   It says 2001.
24    Q   Yeah.  That's what I got confused by, but
25  then up here it's filed stamped 2004.

**CLEETON DAVIS COURT REPORTERS, LLC**
**(615) 726-2737**
47

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 48 of 189 PageID #: 3475

1      A    Okay.

2      Q    I think that 2001 is probably your --

3      A    We're looking at the same thing.

4      Q    Yeah, I think we're looking at the same

5  thing.

6      A    Okay.

7      Q    Page 6 of it is signed and dated for 2004.  I

8  think that's 2004.

9      A    Page 6?

10     Q    Page 6 of this.  Are we looking at 2004?

11     A    Are you talking about the commendation at the

12  top, yes.

13     Q    Is that what you're looking at?

14     A    Yes.

15     Q    Okay.  Great.  So actually let's go back to

16  page 2.  I was just using that to make sure we were

17  looking at the same -- are you guys on track?

18          MR. BATES:  I think so.  The filed stamped

19     2004?

20          MR. MOTHERSHEAD:  Yes.

21          MR. BATES:  June 29, 2004.

22          MR. MOTHERSHEAD:  That one.

23  BY MR. MOTHERSHEAD:

24     Q    So quantity of work at the bottom, it says,

25  Officer Troup exceeds requirements.  Very high

1    arrest numbers, citation numbers, calls for service.

2        A    Hold on.  I've lost the page here.  Right

3    here?

4                MS. DONEGAN:  You need to be on page 2.

5    BY MR. MOTHERSHEAD:

6        Q    Page 2 of 2004.

7        A    I thought you said page 4.  I'm sorry.

8        Q    I know this one was confusing.

9        A    All right.

10       Q    All right.  Let's start that over.  So at

11   quantity of work Officer Troup exceeds requirements,

12   very high arrest numbers, citation numbers, calls

13   for service.  Officer Troup is consistently

14   achieving high work performance.  Was that -- did

15   they track your arrest numbers?

16       A    I don't remember if they did back then or

17   not.  I know that everything is -- everything was

18   able to be pulled.  I received, I think, some

19   commendations during the time that I was in patrol

20   for my productivity.

21       Q    You guys get basically commended if you make

22   more arrests?

23       A    No.

24       Q    Okay.  Well, you got a compliment in your

25   evaluation for making a lot of arrests.

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 50 of 189 PageID #: 3477

 1    A    Okay.  I mean, we don't -- like they don't,

 2  like, give you a trophy for writing a bunch of

 3  tickets or anything.

 4    Q    When it says Officer Troup exceeds

 5  requirement, what's the requirement?  What does that

 6  mean?

 7    A    Just performing my job.  Standard -- I don't

 8  just come to work and ride around and not do

 9  anything.  I come to work to do my job and do it to

10  the best of my abilities.  I did then.

11    Q    Did you take from this comment that -- you

12  got an outstanding for quantity of work.  That's the

13  top rank.  I mean, do you take from this that it was

14  better for you to have very high arrest and citation

15  numbers than, you know, less arrest and citation

16  numbers?

17    A    No.  I just -- I come to work back then and

18  still today.  I was being paid to do a job.  My job

19  was to come to work and enforce the laws of the

20  community, write citations and serve this public.

21  And that's what I did.  I tried to do it to the best

22  of my ability.  I would come to work.  As soon as I

23  get to work, start working and work until my shift

24  was over.

25    Q    Do you write those kinds of comments when

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 51 of 189 PageID #: 3478

1    you're evaluating your subordinates?

2        A    I rate -- well, I wouldn't say specifically

3    that, but I do commend them for good work.

4        Q    Do you talk about, you know, so-and-so got

5    very high arrest and citations numbers?  Do you ever

6    write that in an evaluation?

7        A    I'm sure that I've had.

8        Q    Why do you put that in?

9        A    There's a section in the evaluation for

10   productivity and job performance.

11       Q    And why do you put that in somebody's

12   evaluation?

13       A    Just to let them know that the work that they

14   do doesn't go unnoticed.

15       Q    You want to encourage them to keep making

16   those arrests and citations?

17       A    I want to encourage them to keep doing what

18   we ask of them from the department and encourage

19   them to continue to serve the public the best they

20   can.  I could care less about the number of tickets

21   an officer writes as long as he's addressing

22   problems.

23       Q    What do you think the point of writing that

24   kind of comment?  Do you think it sends a messages

25   to officers that, you know, we do care about your

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 52 of 189 PageID #: 3479

1    arrest and citations numbers?

2        A    No.  I just think it tells the officers that

3    we know that they're proactive.  I don't think it

4    sends any kind of message that they need to go out

5    and just arrest people.  I think it just tells them

6    a good job for working.

7        Q    Let's look at the next evaluation, which was,

8    I think, 2002.  Again, these are just excerpts.  I

9    didn't print off your whole file.

10       A    2002.

11       Q    Yeah.  It should be just the next one.

12       A    If I can find the first page of it.

13       Q    So I'm actually looking at page 4.  Operation

14    of care and equipment.  Did you find that one?

15       A    Okay.

16       Q    So under constructive comments it says, Never

17    let yourself become involved in horseplay with

18    dangerous equipment.  And for this rating period for

19    this one you get the acceptable, satisfactory,

20    middle of the road rating.  Was there some kind of a

21    -- did that comment relate to some kind of

22    situation?

23       A    I have no idea.  2002.  16 years ago.  I have

24    no idea what that's in reference to.

25       Q    And this review was done by the last page.

1   You probably recognize those signatures?

2       A    Lieutenant Earl Hall.

3       Q    Okay.  Is Hall gone now or is he still --

4       A    Yeah.  He's been gone for several years.

5       Q    All right.  You're through looking at your

6   personnel file.

7       A    Okay.

8       Q    That's all Exhibit 1.  All right.  Next,

9   we're going to look at the general orders of

10  Gallatin Police Department.  If you want to take a

11  minute to look through that.

12      A    Okay.

13      Q    Do you recognize what that is?

14      A    It's a policy from the general orders of the

15  Gallatin Police Department.

16      Q    And which policy is it?  What subject?

17      A    GO 400.31 mentally ill subjects.

18      Q    Okay.  Do you know whether -- is that still

19  the policy that's in effect?  This is the one that

20  was issued back in 2008.

21      A    Word for word, I don't know.  I would have to

22  see the -- if there was any new versions of it.

23      Q    Okay.  Are you aware right now that it has

24  been revised?

25      A    I don't know if it has or not.

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 54 of 189 PageID #: 3481

```
 1        Q    It looks like according to this page --
 2        A    Yeah.   There is a revision in 2011 it shows.
 3        Q    Right.   Do you think there's any different
 4   document after 2011 --
 5        A    I'm not sure.
 6        Q    -- for this policy?
 7             MR. BATES:   Do you want to mark this
 8        Exhibit 2?
 9             MR. MOTHERSHEAD:   Mark this as Exhibit 2.
10             (Document marked Exhibit No. 2.)
11   BY MR. MOTHERSHEAD:
12        Q    Can you just kind of in your own words --
13   what's the purpose of this policy?   Why do you guys
14   have this policy?
15        A    How to deal with mentally ill persons.
16        Q    And one of the purposes of the policy is to
17   make sure that your handling of mentally ill persons
18   is constitutionally acceptable --
19        A    Yes.
20        Q    -- in words of the policy?
21        A    Right.
22        Q    And in compliance with the mental health
23   laws, right?
24        A    Yes.
25        Q    Okay.   Under the policy, when can you take
```

1  someone into custody for an involuntary mental

2  health commitment?

3      A   When they pose a danger to themselves or the

4  general public, I believe is the wording.

5      Q   I'm sorry.  Say that again.

6      A   I believe it's when they pose a danger to

7  themselves or the public.

8      Q   Okay.  Just any old danger?

9      A   When they pose a danger to themselves or the

10  general public.

11     Q   Okay.  Are there any other requirements other

12  than they pose a danger to themselves or the general

13  public?

14     A   If they're suicidal, homicidal, the way I

15  read the policy.

16     Q   Does it have to be a present danger or could

17  it be just be a potential future danger?

18             MR. BATES:  Can we let the deponent read

19      the policy?

20             MR. MOTHERSHEAD:  Yes, sir.

21             MR. BATES:  Just take your time and read

22      it.

23     A   Okay.  What was your question?

24  BY MR. MOTHERSHEAD:

25     Q   My question is, if somebody represents kind

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 56 of 189 PageID #: 3483

1    of a potential danger to themselves or the public,

2    is that enough of a reason to take them into

3    custody?

4        A    No, not without them being evaluated.

5        Q    Okay.  Are you saying that if they are

6    evaluated, then someone who is just sort of a

7    potential future danger to themselves and the public

8    could be taken into custody?

9        A    Under the law, yes.

10       Q    That's your interpretation?

11       A    Under the law.

12       Q    Okay.  So if they're not dangerous right now,

13   but there's just a concern that they could become

14   dangerous tomorrow, you would say that if they've

15   been evaluated, then you can take them into custody

16   involuntarily?

17       A    If there's an order -- if there's an order to

18   take them into custody, yes.

19       Q    And by order do you mean --

20       A    By mental health professionals ordering that

21   they go into custody.

22       Q    Okay.  Are you drawing that from this policy

23   or your training or where does that come from?

24       A    Experience.

25       Q    From your experience?

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 57 of 189 PageID #: 3484

1      A    Uh-huh.

2      Q    So that's just been the practice of how the

3  department handles these kinds of situations?

4      A    The policy says -- it talks about dealing

5  with the people who are potentially destructive or

6  dangerous to themselves or others.  So I'm not -- I

7  don't know if I understand what you're asking me.

8      Q    Okay.  Well, I'm asking you what's required

9  under the policy in order to involuntarily commit

10 somebody who hasn't committed a crime but just for

11 mental health reasons.  Maybe the policy doesn't

12 really speak --

13     A    An immediate or a potential danger to

14 himself, the officer, or others.

15     Q    Okay.  So would you say that it does have to

16 be an immediate danger?

17     A    It says potential danger to himself, officer,

18 or others.

19     Q    Okay.  And so you would take that as a

20 potential danger that could be two or three days

21 from now or next week?

22     A    Yes.

23     Q    Next month?

24     A    Yes.

25     Q    Six months from now?  Is that right?

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 58 of 189 PageID #: 3485

1       A    I said yes.

2       Q    Okay.  Thank you.  Because we're -- we've got

3   a court reporter just typing this stuff out.  So we

4   just need to actually verbalize.  So thank you.

5   That's how you read this policy?

6       A    Uh-huh.

7       Q    Let's look at an excerpt of what I understand

8   to be the department's training on this or part of

9   the training.  This was provided to me as a blue

10  PowerPoint.  And I printed it off in black and

11  white.

12      A    Okay.

13      Q    I don't know if you remember going through a

14  training that had a blue PowerPoint that might have

15  looked like this.

16      A    I don't remember what the color was.

17      Q    Okay.  Do these documents look familiar to

18  you?

19      A    They do.

20      Q    Okay.  Wonderful.  Do you remember going

21  through a training that used these slides?

22      A    Yes.

23      Q    Do you remember when you would have gone

24  through that training?

25      A    In-service.  Annual in-service.

1      Q    Like every year you think you go through it?

2      A    Yes.

3      Q    Okay.  You got a refresher on this same topic

4  every year?

5      A    I believe it is required every year.

6           MR. MOTHERSHEAD:  Okay.  All right.  So in

7      the second page of this packet, let's mark this

8      as Exhibit 3.

9           (Document marked Exhibit No. 3.)

10  BY MR. MOTHERSHEAD:

11     Q    It gives some -- just some guidance

12  essentially for dealing with mentally ill persons;

13  is that right?  Is that how you read those?

14     A    Yes.  Officer responsibilities, is that the

15  page you're looking at?

16     Q    Uh-huh.

17     A    Okay.

18     Q    Is one of the principles to not deceive the

19  person that you're dealing with?

20     A    Under D, yes.

21     Q    Do you remember getting trained on that to

22  not deceive mentally ill people?

23     A    I remember reading this PowerPoint, yes.

24     Q    Do you remember who does this training within

25  the office?

1    A    I don't remember who's done it every year.  I

2   remember FTO Washburn and Lieutenant Shockley doing

3   the training one year.

4    Q    Have you ever given this training?

5    A    I have not.

6    Q    Okay.  Okay.  And then the next page it just

7   talks about some actions to avoid.  Did they talk to

8   you about -- this is the page entitled Avoid --

9    A    You skipped letter F.  Can I point that --

10  Refer the individual to medical and/or psychological

11  treatment.  Emergency evaluation, crisis

12  intervention.  You did see that that was on that

13  slide also, right?

14   Q    Sure.

15   A    You pointed out one.  I just wanted to make

16  sure we pointed that out as well.

17   Q    A, C, and E also.

18   A    Okay.  Can we read all of those?

19   Q    Sure.

20   A    Officer responsibilities.  A is be alert -

21  officer safety.  B, Observe behavior closely.

22  C, Provide for safety/security of individuals and

23  others.  D, Do not deceive the person.  E, Use

24  retraining force as necessary.  F, Refer individual

25  to medical and/or psychological treatment.

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 61 of 189 PageID #: 3488

1   Emergency evaluation, and crisis intervention.

2      Q    Okay.  Next page.  Do you want to just read

3   it?

4      A    Avoid these actions.  Circling, surrounding,

5   closing in on or standing too close; sudden

6   movements or rapid instructions in questioning;

7   whispering, joking or laughing in their presence.

8      Q    The next page.

9      A    Avoid these actions.  Direct, continuous eye

10  contact, forced conversation or signs of impatience;

11  any touching; challenges to or agreement with their

12  delusions, paranoia or hallucinations; inappropriate

13  language, such as "crazy," "psycho," or "nuts."

14     Q    Next page?

15     A    Factors to observe and report.  Appearance,

16  posture, conduct, demeanor, work efficiency, health,

17  group interaction, personal hygiene, attitude

18  towards others.

19     Q    The next page, and then if you can -- if you

20  know what -- if you can define what EDP is?

21     A    Emotionally disturbed persons.

22     Q    Okay.  And can you read that?

23     A    Actions to take when responding to EDPs.

24  Document what is said and done, summon assistance,

25  remain calm/respond without anxiety, don't dispute

1    statements or visions, don't provoke or alienate the

2    individual, use simple, precise instructions, treat

3    with respect and courtesy, position self to ensure

4    safety, be patient, move person away from crowded

5    area.

6        Q   The next page.

7        A   Arrest considerations.  Officers should

8    remember that having a mental illness is not a

9    crime.  No individual should be arrested for

10   behavioral manifestations of mental illness that are

11   not criminal in nature.

12       Q   Next page.

13       A   Arrest considerations.  Taking a person who

14   has a mental illness into custody can occur only

15   when:  The individual has committed a crime; the

16   individual exhibits unusual, erratic, or destructive

17   behavior including statements of possible suicide

18   attempts, or making harmful threats toward other

19   persons; or through -- letter C -- through a

20   judicial order of commitment.  33-6-401.  T.C.A.

21   33-6-401.

22       Q   And on that last part of judicial order of

23   commitment, that's -- a judicial order is not the

24   same thing as a mental health professional coming

25   out and filling out a form; is that right?  Do you

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 63 of 189 PageID #: 3490

1    agree with that?

2        A    33-6 -- T.C.A.  The T.C.A. is through the

3    order, the judicial order of commitment.  The

4    T.C.A., if I remember correctly, is written by

5    mental health professionals.  It's signed off on by

6    mental health professionals.

7        Q    Well, I'm just asking you about what's on

8    this training piece that you went through.  Letter C

9    is through a judicial order of commitment.

10       A    Okay.

11       Q    And a judicial order is -- a mental health

12   professional can't issue a judicial order, can they?

13       A    I don't know.

14       Q    I mean, they're not a judge, are they?

15       A    They're not a judge.

16       Q    So they can't issue a judicial order.  Do you

17   agree with that or no?

18       A    I don't know how their orders are written,

19   but they are not a judge.  So I would assume they

20   couldn't do or order something that a judge can

21   order.

22       Q    Okay.  All right.  Let's move on to the next

23   training packet.  Again, these are just excerpts

24   that have been printed off.  Does this one look

25   familiar to you?

```
 1        A    It does.
 2        Q    Do you remember what setting you were trained
 3   on this PowerPoint?
 4        A    I don't remember if I did this in the actual
 5   classroom or if this was online training.
 6        Q    Can you repeat that?  Sorry.
 7        A    I don't remember if this was actually in
 8   classroom or if this was online training.
 9        Q    Okay.  Okay.  And so you may have been
10   required to just do some online session as a --
11        A    Yes.
12        Q    Any idea when you might have gone through
13   this one?  What year?
14        A    I don't remember exactly.  Probably 2013,
15   2014, 2015.  I'm not sure exactly when the last time
16   I read this specific PowerPoint.  I'm sure it would
17   be in my training records.
18        Q    If you want to just take some time to just
19   review this?
20        A    Okay.  (Witness reviewing document.)  Okay.
21        Q    So I just want to actually kind of just hone
22   right in on there are a couple of slides about
23   involuntary psychiatric admissions.  Those are about
24   halfway through, give or take.  I'm sorry I don't
25   have the pages marked.
```

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 65 of 189 PageID #: 3492

1    A    This one (indicating).

2    Q    The next one, yeah.

3    A    Okay.

4    Q    Okay.  And you skimmed through that probably

5    while you were just reading through the whole

6    packet?

7    A    Uh-huh.

8    Q    Do you want to just take one more look at

9    that page and then I'll ask you some questions about

10   it?

11           MR. BATES:  Have we marked this as the

12      next exhibit?

13           MR. MOTHERSHEAD:  This is Exhibit 4.

14           (Document marked Exhibit No. 4.)

15   BY MR. MOTHERSHEAD:

16   Q    Okay.  So in this training piece that -- you

17   went through the training, right?

18   A    Uh-huh.

19   Q    And this says that -- well, it has four --

20   basically four requirements, right?  One is that the

21   person has a mental illness or a serious emotional

22   disturbance.  You have to have that.  That's No. 1.

23   A    Okay.

24   Q    2 is that the person poses an immediate

25   substantial likelihood of serious harm because of

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 66 of 189 PageID #: 3493

1    the mental illness or serious emotional disturbance.
2    Right?
3        A    Okay.
4        Q    3 is that the person needs care, training or
5    treatment because of the mental illness or serious
6    emotional disturbance.  Right?
7        A    Yes.
8        Q    4 is that all available less drastic
9    alternatives to placement in a hospital or treatment
10   resource are unsuitable to meet the needs of the
11   person.  Right?
12       A    Okay.
13       Q    And so did you understand this training to
14   say -- you have to have all four of these things in
15   order for someone to be taken into custody and
16   involuntarily committed?
17       A    I understood the training to say that an
18   agent, physician, or a licensed psychologist must
19   determine these things.
20       Q    So is your thinking that if a doctor tells
21   you to do something, then it doesn't really matter
22   whether it's legal or not, you can just do it?
23            MR. BATES:  Object to form of the
24       question.  Go ahead and answer if you can.
25       A    My understanding of this slide is a person

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 67 of 189 PageID #: 3494

1  must first be evaluated in their community by a

2  prescreening agent, physician, or a licensed

3  psychologist, and they are the ones to determine if

4  that person needs immediate detention for

5  psychiatric treatment.

6  BY MR. MOTHERSHEAD:

7      Q   So did you take from the training that

8  basically your job is just to defer to the mental

9  health professional?

10     A   Not in all circumstances.  I think there are

11 circumstances in which someone who obviously tells

12 me that they want to kill themselves, then I can

13 determine that person right then is a danger to

14 themselves.  These situations, yes, I would defer to

15 the physician or licensed psychiatric personnel.

16     Q   Have you ever looked at the statute that this

17 is referring to?  Have you actually looked at the

18 law?

19     A   I have.

20     Q   So, I mean, you know that the requirement of

21 an immediate substantial likelihood of serious harm

22 is statutory, right?

23     A   I don't remember the exact wording of the

24 statute.

25     Q   You wouldn't dispute that this language in

1    this training about an immediate substantial

2    likelihood of serious harm is coming from the law?

3         A    No, I wouldn't dispute that.

4         Q    Okay.  And so, I mean, what it says is that

5    there -- the danger of serious harm has to be

6    immediate, right?

7         A    Yes.

8         Q    So in other words --

9         A    Or potential.  I thought it said potential

10   earlier in this slide.  The person poses an

11   immediate substantial likelihood of serious harm.

12        Q    Right.  I mean, it has to be immediate,

13   right?

14        A    That's what the law says, yeah.

15        Q    And so, you know, before when we were looking

16   at, I think the policy, I can't remember if it was

17   when we were looking at the policy or the other

18   training piece, you testified that if there's a

19   potential that a mentally ill person could be

20   dangerous six months from now, then you could take

21   them into custody and have them committed.

22        A    If they've been evaluated by mental health

23   professionals.  That's the way I understand the

24   training.

25        Q    Right.  But, so -- I mean, if the requirement

1    is actually that the person has to pose an immediate

2    substantial likelihood of harm, then, I mean, six

3    months from now is not immediate, is it?

4        A    If the psychiatric personnel feel that there

5    is a potential for violence right then, and they

6    order the committal paperwork on them, yes.

7        Q    Well, I'm asking you -- before you testified

8    that if a person that you're dealing with could

9    potentially be dangerous in six months, then they

10   could be committed if there's an evaluation to

11   support it?

12       A    I think you actually said six months kind of

13   under your breath.  I don't remember you saying six

14   months.

15       Q    What do you remember me saying?

16       A    I don't know.  You've asked me a lot of

17   questions.

18       Q    You certainly remember me saying one month,

19   right?  We went through a progression of different

20   times.

21       A    Uh-huh.

22       Q    So you remember me saying the next day,

23   right?

24       A    Uh-huh.

25       Q    Remember me saying a few days later, right?

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 70 of 189 PageID #: 3497

```
 1        A    (Witness moves head up and down.)

 2        Q    A month later?  Do you remember that?

 3        A    Yeah.

 4        Q    And you're saying you don't remember me

 5   saying six months?

 6        A    I don't remember you saying six months.

 7        Q    And you're saying you don't remember

 8   articulating yes when I asked you about six months?

 9        A    I don't remember the question.

10        Q    Whether a person who could be potentially

11   dangerous to themselves or others six months down

12   the road could be taken into custody for involuntary

13   mental evaluation?

14        A    Yeah.  And I think I answered you.  If they

15   are evaluated by mental health professionals and

16   they were determined to be potentially dangerous, if

17   it is six months down the road, that's for them to

18   determine.

19        Q    Right.  So it sounds like what you're saying

20   is, basically if the mental health evaluator says

21   you can commit this person, then you're good to go.

22   You don't really need to worry about, like, whether

23   the law actually supports it?

24        A    I'm going to follow what the mental health

25   professional tells me what needs to be.
```

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 71 of 189 PageID #: 3498

1      Q    You're not going to make your own --

2      A    I'm going to defer to that mental health

3    professional.

4      Q    Okay.  You're not going to make your own

5    independent evaluation of whether you have a legal

6    right to take this person into custody?

7      A    I don't think I'm a mental health

8    professional.

9      Q    Well, I know you're not a mental health

10    professional.

11      A    I'm going to defer to the professional who is

12    the expert in that field.  If they tell me that

13    person needs to be committed and there's an order to

14    do so, then I'm going to defer to their order.

15      Q    Okay.  And so you're not going to make your

16    own assessment of whether the legal criteria for

17    taking the person into custody are met?

18      A    I'm going to defer to the mental health

19    professional.

20      Q    I just want you to say what you're saying.  I

21    think what you're saying is, that's correct, I'm not

22    going to make my own assessment.  But if you could

23    just please articulate that.

24      A    My assessment would be to defer to the mental

25    health professional.  I don't assess -- I'm not a

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 72 of 189 PageID #: 3499

1    mental health professional.  I don't know what is

2    going on in this person's mind.  That's why I'm

3    going to defer to the mental health professional.

4        Q    Right.  So you're not going to make any

5    independent judgment about whether the person poses

6    an immediate risk of substantial harm?

7        A    I think every situation would be different.

8        Q    Well, so sometimes you might make your

9    independent judgment?

10            MR. BATES:  Objection to the form.  Asked

11       and answered.  Go ahead.

12       A    I believe I answered when I said if a person

13   tells me directly and there's not a mental health

14   professional there that they want to kill

15   themselves, then, yes, in those circumstances, I

16   would feel that person is in immediate danger to

17   themselves.

18   BY MR. MOTHERSHEAD:

19       Q    I gotcha.  So there might be some

20   circumstances in which you would go ahead and take

21   the person into custody even without a mental health

22   professional telling you --

23       A    If that person told me they wanted to kill

24   themselves, I think would be one of the very few.

25       Q    But there are not circumstances in which a

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 73 of 189 PageID #: 3500

1   mental health professional says this person meets

2   criteria but you would make your own independent

3   evaluation --

4       A    No, no.

5       Q    -- and so, no, I'm not going to --

6       A    If the mental professional is there, I'm

7   going to defer to them.  I'm not going to make an

8   assessment.  That's -- I'm going to follow what they

9   say.

10      Q    Okay.  All right.  We're through with that.

11           MR. MOTHERSHEAD:  Do you guys want to take

12      a short break or keep going?  Got a ways to go.

13           MR. BATES:  Do you want to take a little

14      break?

15           THE WITNESS:  I'm good.

16           MR. BATES:  Let's take a short break.

17           (A break was taken.)

18           MR. MOTHERSHEAD:  Okay.  Back on.

19  BY MR. MOTHERSHEAD:

20      Q    What year did you first became aware of

21  Patrick Reeners?

22      A    2009, 2010.

23      Q    And do you remember how you became aware of

24  him?

25      A    Random emails that he was sending to the

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 74 of 189 PageID #: 3501

1  police department, to city officers, city hall,

2  things like that.

3      Q    And how many in-person interactions have you

4  had with him over the years?

5      A    Just a couple.

6      Q    Just a couple.  Okay.  Do you remember what

7  year your first in-person interaction with him was?

8      A    Years ago.  Probably here at the police

9  department.  I think filing information requests or

10  something along those lines.

11      Q    Do you remember if it was close in time to

12  when you guys went out and took him to Sumner

13  Regional Medical Center?

14      A    No.  It was well before then.

15      Q    Okay.  I'm going to hand you this packet

16  here.  Does this -- have you seen this before?

17      A    I have.

18      Q    Did you help create this?

19      A    I believe Lieutenant Ballard did this.

20      Q    Okay.  But you've reviewed it before?

21      A    I've seen it, yes.

22      Q    Okay.  What is this that we're looking at?

23      A    Just the timeline of events of interactions

24  or incidents with Mr. Reeners.

25              MR. MOTHERSHEAD:  And so let's mark this

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 75 of 189 PageID #: 3502

```
 1        Exhibit 5.
 2              (Document marked Exhibit No. 5.)
 3   BY MR. MOTHERSHEAD:
 4        Q    Okay.  And so in this timeline, can you mark
 5   which of these events you were personally involved
 6   with in some capacity?
 7        A    On the bottom of the second page where it
 8   says December 3rd, I believe there was also a
 9   section here that should have said a call with him
10   calling or going to a dentist's office asking for
11   enough fluoride to kill a baby.  That happened on or
12   about that same day.  I think that's what he's
13   referring to in here when he's saying he went to a
14   pharmacy.  I don't see that in the timeline.  It was
15   on or about the same time of December 3rd,
16   December 4th of 2012.  When I received a call, and I
17   don't know why it's not documented on this timeline,
18   from Dr. Rodney Runyon where Mr. Reeners had gone to
19   his office and asked for enough fluoride to kill a
20   baby.
21        Q    Okay.
22        A    Should I make a note of that on here or not
23   write that?
24        Q    You can write that.  I think if you look at
25   the next page, on the December 4th entry, there's
```

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 76 of 189 PageID #: 3503

1  some discussion of --

2      A    Yeah.

3      Q    -- a dentist.

4      A    I believe that's it, because he sent an email

5  in that same time also.

6      Q    So you were involved in that?

7      A    Yes.

8      Q    Okay.

9      A    I received that call directly.

10     Q    And what did you do?

11     A    If I remember correctly, I believe Dr. Runyon

12 wanted just a report that this was very odd.  I

13 don't know who the officer was, but I believe I sent

14 officers to go talk with Dr. Runyon about that

15 incident.  He and his staff were concerned about it.

16     Q    Okay.  Did you send anybody to talk to

17 Mr. Reeners about it?

18     A    I didn't.

19     Q    Okay.  All right.  Any charges filed?

20     A    No.

21     Q    Okay.  All right.  Did anything else stem out

22 of that call?

23     A    I don't think so.

24     Q    Okay.  All right.  Anything else on this

25 timeline that you've been personally involved with?

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 77 of 189 PageID #: 3504

```
 1        A    I wasn't directly involved, but on
 2    December 28, 2012, I remember Lieutenant Ballard
 3    having a phone conversation with him about Servpro
 4    making complaints about him.
 5        Q    When you say "him," you're talking about
 6    Mr. Reeners?
 7        A    Mr. Reeners, yes.
 8        Q    Okay.  So Lieutenant Ballard talked to
 9    Reeners about --
10        A    Yeah.  Something about Servpro making reports
11    against him and not wanting him on their property or
12    something along those lines.  Some kind of complaint
13    they lodged against him for harassing them.
14        Q    So the note says, Called to talk to
15    Lieutenant Ballard.  Servpro's false report against
16    him.  Is that Reeners calling?
17        A    It's Reeners calling to Lieutenant Ballard.
18        Q    Okay.
19        A    I wasn't directly in the phone conversation,
20    but I remember Lieutenant Ballard having that
21    conversation with him.
22        Q    Okay.  Was there any follow-up from that?
23        A    I don't recall.
24        Q    Okay.  Did you or Lieutenant Ballard?
25        A    I didn't.  I don't know if Lieutenant Ballard
```

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 78 of 189 PageID #: 3505

1  did or not.

2      Q    Okay.  Any charges get filed against

3  Mr. Reeners?

4      A    Not that I'm aware of.

5      Q    Any others that you were involved with?

6      A    Wasn't directly involved in April 30th of

7  2013, but I do remember either emails or

8  conversation about the state of New York, some

9  police department in the state of New York, I

10  believe it was the New York State Police, calling

11  asking someone to make contact with Mr. Reeners to

12  ask him to stop calling their department.

13      Q    Did anybody from your department follow up on

14  that?

15      A    I believe Lieutenant Ballard did.  I don't

16  know who he spoke with, but I believe he did follow

17  up on it.  I did not.

18      Q    Were any charges filed against Mr. Reeners?

19      A    Not that I'm aware of.

20      Q    Anything else that you were involved with?

21      A    I don't remember this November 23rd where it

22  says, Daron Parker called for Chief, Troup, or King.

23  I don't remember that.

24      Q    Sorry.  What's the date of that?

25      A    November 21st, 2013.  I don't know what that

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 79 of 189 PageID #: 3506

1  is.

2      Q    Okay.

3      A    I vaguely remember him calling in on the

4  April incident and doing an information request for

5  the incident of his chalking and vandalism and

6  public intoxication at city hall.  I believe I was

7  in records when he came in that day to file an

8  information request.  Didn't have any direct contact

9  with him then.

10     Q    Didn't talk to him?

11     A    Didn't talk to him.

12     Q    Any follow-up that you were involved in from

13 the records request or that incident in general?

14     A    Not that I remember.  I know I was in charge

15 of records in CID kind of simultaneously at the

16 time.  And I may have signed off on approving the

17 records for release.  I don't remember.

18     Q    Do you remember which officers were involved

19 in that arrest for the chalking situation?

20     A    I believe it was Officer Cantrell and -- I

21 know Officer Cantrell was there.  I don't remember

22 -- Castleberry, I believe it was.

23     Q    Did you talk to him about that case at all?

24     A    I didn't.

25     Q    Didn't at all?

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 80 of 189 PageID #: 3507

1        A     No.   I wasn't involved in it.

2        Q     Okay.

3        A     I wasn't in charge of them at the time.   From

4    June 9th through at least June 11th, all of this was

5    all email stuff that was going on with him where he

6    was emailing multiple people at city hall and

7    showing up at city hall.   So I would have been

8    involved in email communications during that time

9    with Rosemary Bates, the chief.   I don't know what

10   this called for Mr. Scottsdale in regards to someone

11   lying on a police report.   I don't know what that's

12   in reference to.

13           I recall receiving the emails about the

14   screaming and yelling on or about June 10th right

15   outside city hall at the gazebo.   I remember that

16   incident.   And I remember email communications just

17   about city hall employees and their interactions

18   with him, with Rosemary Bates during that time

19   frame.

20       Q     Okay.   Was there any follow-up on any of

21   those emails that you did on either the 9th, 10th,

22   or 11th?

23       A     When you say "follow-up," what do you --

24       Q     I mean, did you do -- did you take any

25   actions in response to these emails that were going

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 81 of 189 PageID #: 3508

1    around?

2        A    No.

3        Q    Did you talk to anybody about the situation

4    or --

5        A    Yes.  That's when I -- Lieutenant Ballard, my

6    chief, and myself discussed everything that was

7    happening that week.

8        Q    That was on the 12th; is that right?

9        A    Yes, the morning of --

10       Q    Okay.

11       A    -- the 12th.  All that week had been leading

12   up.  There were several emails back and forth

13   between city hall employees, Rosemary, the chief,

14   myself, a lot of interactions with him that week.

15   He was in city hall almost every day that week.

16       Q    Okay.  So prior to that week, had you met

17   Mr. Reeners in person or no?

18       A    Yeah.  Like I said, several years ago I

19   remember him coming in and filing an information

20   request and talking about fluoride.

21       Q    Okay.

22       A    That was about it.

23       Q    And then it went several years before you

24   ever saw him again?

25       A    I was just aware of all of the happenings

1  with him over the years, with all of the emails and
2  calls and things like that.
3      Q   Okay.  And outside of this timeline were
4  there any other incidents that you were aware of
5  during that period?  And when I say "that you were
6  aware of," I'm asking that you were aware of the
7  morning of June 12, 2014?
8      A   I don't know why it's not in the timeline.
9  Would have been about -- sometime around September
10 of 2013, I believe, is when I was -- it was an event
11 held here locally.  Several people attended.  I
12 believe it was L.A. Green that was hosting a big
13 cookout gathering and I was present during a
14 conversation that was taking place between State
15 Representative Debra Maggart, the sheriff, and Bill
16 Sorrells, the assistant chief.  We're all in a
17 group.  Everybody having different discussions.
18         And I remember the discussion with Debra
19 Maggart to the sheriff and Bill Sorrells about
20 Mr. Reeners.  That's where she was asking if they
21 were familiar with him.  And she proceeded to tell a
22 story about him making a threat to the governor.
23 Something about he was going to jump the governor
24 and I remember her saying that she had to put the
25 troopers on him or send the troopers after him.

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 83 of 189 PageID #: 3510

1   Something along those lines.  I was familiar with

2   that conversation.  I was present when it took

3   place.  Wasn't directly involved in the conversation

4   with her.

5       Q   Did that get documented at the police

6   department in any way?

7       A   No.  She was telling them about it.  It was

8   an incident involving her, not inside the City of

9   Gallatin.  It wouldn't have been a report for us to

10  document.

11      Q   Did you follow up, or did anybody from the

12  Gallatin Police Department follow up with the state

13  troopers?

14      A   Not then, no.

15      Q   And no charges were filed against

16  Mr. Reeners?

17      A   Not from us.

18      Q   That you were aware of?

19      A   No, no, not that I'm aware of.

20      Q   And as far as you were aware, no charges were

21  filed by the state?

22      A   No.  I thought charges had been filed.

23      Q   Why did you think that?

24      A   Because of the statement that she made, that

25  she had to send the troopers after him for harassing

1  her.

2      Q   Okay.  Did you ever -- did she say what --

3  where did this conversation with Mr. Reeners happen

4  between Maggart and Mr. Reeners?

5      A   I think it was over the phone.

6      Q   Okay.  Did you check any court records or

7  anything to see if he had been charged?

8      A   I didn't.

9      Q   Okay.  All right.  Any other incidents that

10 are not in this timeline that you were aware of the

11 morning of June 12th, 2014?

12     A   Prior to the morning of June 12th, 2014?

13     Q   Right.

14     A   I remember officers who had dealings with him

15 viewing Facebook posts and things like that that he

16 had made.  When it was, I don't remember.  Someone

17 had pulled up a post, several different posts that

18 he was making on Facebook that were odd and strange

19 types of posts.  Things about children using lethal

20 force on their parents, things like that.

21     Q   Was that Wright that forwarded that to you?

22     A   Pardon me?

23     Q   Wright.  Was it Sergeant Wright?

24     A   I don't remember.  I don't remember who

25 showed that to me.  I just remember seeing those

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 85 of 189 PageID #: 3512

1    posts.  I didn't have Facebook at the time.

2        Q    You didn't have Facebook?

3        A    No.

4        Q    Did you find out about it when somebody else

5    in the department emailed it to, emailed the posts

6    to you?

7        A    I don't remember if someone emailed it to me

8    or showed it to me.  I remember seeing several

9    posts, not just that one.  There were several posts

10   over the years that the officers had been dealing

11   with him.  I think I remember looking at -- someone

12   was looking at his Facebook on a computer in the

13   patrol room just looking at posts that he was

14   making.  And I want to say it was about the time

15   Officer Cantrell and Castleberry had had dealings

16   with him.  Maybe they were looking at his history.

17   I remember Jeff Wright sending me something.  I

18   don't remember if that particular post is what I saw

19   in the email, but I remember seeing that post.

20       Q    Okay.  All right.  So it sounds like you're

21   not sure when you saw the posts; is that right?

22       A    I know it was prior to this incident of

23   June 12th.

24       Q    How do you know that?

25       A    Like I said, it was on or about the time that

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 86 of 189 PageID #: 3513

1    Officers Cantrell and Castleberry had dealt with him

2    back during the chalking vandalism incident.

3        Q   Are you saying that one of them showed it to

4    you?

5        A   I'm saying I don't remember which one of them

6    showed it to me.  I just remember seeing the post.

7        Q   Okay.  But you're saying that either Cantrell

8    or Castleberry showed it to you?

9        A   No.  I'm saying I don't know.  I said it was

10   about the time that they had dealings with him.  I

11   don't remember if they pulled it up or I don't

12   remember if Jeff Wright sent it.  I remember seeing

13   the post about that time.

14       Q   Okay.

15       A   There had been posts -- I mean, I remember

16   Rosemary Bates showing me posts that he had made

17   over the years.  I wasn't able to pull up Facebook.

18   Like I said, I didn't have Facebook.  I just

19   remember different people pulling up things that he

20   would post periodically.

21       Q   Anything else outside this timeline with

22   regards to Mr. Reeners that you were aware of?

23       A   Prior to June 12th?

24       Q   Uh-huh.

25       A   No.

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 87 of 189 PageID #: 3514

1      Q    All right.  And so Mr. Reeners, as far as you

2    were aware, had never been charged with any kind of

3    violent offense?

4      A    Not that I'm aware of, no.

5      Q    And it sounds like you believed that he had

6    been charged with something stemming from Maggart?

7      A    Yes.

8      Q    Is that right?  But you didn't follow up to

9    see?

10     A    No, I didn't.

11     Q    And you understand now there were no charges?

12     A    Yes.

13     Q    Did Maggart say that he had been charged or

14   you just kind of assumed?

15     A    I just assumed when she said she sent the

16   troopers after him for harassing her that charges

17   would have been filed.

18     Q    Mr. Reeners was living in Gallatin at that

19   point at the time period that she was talking about,

20   right?

21     A    I think so.

22     Q    All right.  So those would have been Sumner

23   County charges, if there had been charges?

24     A    I don't know.  I mean, her office, I believe,

25   was downtown in Nashville, so. . .

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 88 of 189 PageID #: 3515

1    Q    Okay.  And so none of the interactions that

2  you had had with Mr. Reeners -- was he violent,

3  right, when you were talking to him?

4    A    No.

5    Q    Or physically aggressive?

6    A    No.  I only had one or two.  It was just

7  interactions about information requests, phone

8  calls, and things likes that.

9    Q    And did you talk to Cantrell at all about his

10  interactions with Mr. Reeners?

11    A    No, I didn't.  I remember reading those

12  reports.

13    Q    Okay.  All right.  Castleberry?

14    A    I didn't talk with him.

15    Q    Never talked to him?

16    A    No.

17    Q    Okay.  Any other officers that you talked to

18  prior to June 12, 2014, about their interactions

19  with Mr. Reeners?

20    A    I'm sure that I did.  But specific dates and

21  times I would have talked to them about him, I don't

22  know.

23    Q    No other officer had reported to you that he

24  had been violent or aggressive in their presence?

25    A    No.  Just in the emails and stuff that I

1  would read is what kept me privy to Mr. Reeners.

2          MR. MOTHERSHEAD:  Let's take a look at

3      this next collective exhibit.  If we could mark

4      that.  Exhibit 6.

5          (Document marked Exhibit No. 6.)

6  BY MR. MOTHERSHEAD:

7      Q   Some of the emails we've been talking about.

8      A   Okay.

9      Q   So if you look at the second page, what's

10 that?

11     A   Are you talking about the one from Amy

12 Summers?

13     Q   No, sir.  Do you have this page?

14     A   Is this --

15     Q   That's weird.

16         MR. BATES:  It's the same one we have.

17         MS. DONEGAN:  What's it dated?

18         MR. MOTHERSHEAD:  Can we go off the record

19     for a second?

20         (An off-the-record discussion was had.)

21         MR. MOTHERSHEAD:  Let's go back on.

22 BY MR. MOTHERSHEAD:

23     Q   So what should be the second page now,

24 looking for inspection of records request from

25 June 10th.

```
 1        A    I don't see a date.

 2        Q    So --

 3        A    I see June 9th.

 4        Q    June 9th is -- it says the name of the

 5   employee --

 6        A    Okay.  I see the date.

 7        Q    All right.  June 10th at 11:55?

 8        A    Yes.

 9        Q    Is that what you're seeing?

10        A    Yes.

11        Q    All right.  So this document, have you seen

12   this one before or no?

13        A    I'm sure that I have.  I don't know.

14        Q    Okay.  Do you think you saw it at the time,

15   like back in June of 2014?

16        A    I don't know.  I don't know when I would have

17   seen it.  He's done so many.

18        Q    Okay.  What about the next page after that,

19   which is Gallatin Police Department request for

20   phone conversation of radio traffic reporting.

21        A    I don't remember seeing this one.

22        Q    Okay.  You don't think you saw that one?

23        A    I don't think so.  If it had come to me, I

24   probably would have signed it.  And there's no

25   signature from me on there.  I don't remember seeing
```

1    this one.

2         Q    Okay.

3         A    I'm sure that I had, but I don't remember

4    when or if it was during that time frame.

5         Q    There's a CAD, the page after that relates

6    June 9th, 2014.  Have you looked at that before?

7         A    I have seen this CAD, yes.

8         Q    Did you look at that back in June of 2014?

9         A    Yes.  I remember this incident.

10        Q    Okay.  Did you look at it prior to June 12th

11   of 2014?

12        A    Yes.

13        Q    Okay.  Did you pull the recordings from it

14   and listen --

15        A    I did not.

16        Q    Did you talk to any officers who were

17   involved?

18        A    I did not.

19        Q    Okay.  Cantrell was involved.  You didn't

20   talk to him at all.

21        A    Yeah, I don't remember talking to him about

22   this.

23        Q    Did you talk to anybody that was involved?

24        A    I just remember myself and Lieutenant Ballard

25   talking about this the morning we were talking with

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 92 of 189 PageID #: 3519

1    the chief, that one of the incidents had happened

2    that week.

3        Q   Okay.  All right.  And so the first time that

4    you remember this coming up was the meeting with the

5    chief on June 12th?

6        A   Yeah.  I think Lieutenant Ballard actually

7    showed me, made me aware of that incident.

8        Q   Okay.  But you didn't pull any of the

9    recordings or talk to any of the --

10       A   I wasn't involved in it, no.

11       Q   Next page is a records activity, June 11,

12   2014.  Is this the type of document that your

13   department keeps?  I know it looks kind of generic.

14   I got it from your lawyers.

15       A   Yeah.  There was times -- there was a time in

16   records where the employees in records had to

17   document their activity for the day on what they

18   did.  And I remember the part on there about false

19   reports project for Lieutenant Troup, is that what

20   you're referring to?

21       Q   That's what I'm trying to get to, yeah.

22       A   I think I was looking into the number of

23   false reports that had been filed with our

24   department at that time.  I don't think that had

25   anything to do with Mr. Reeners.

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 93 of 189 PageID #: 3520

1     Q   Okay.

2     A   If I remember correctly, we had a rash of

3  false reports where people were reporting false

4  robberies, false rapes, things like that.  We were

5  looking into how many false reports had actually

6  been filed with us.

7     Q   I see.  Okay.  All right.  So this was not an

8  investigation of Mr. Reeners' claim of a false

9  report?

10     A   No.

11     Q   So are you saying that it was the morning of

12  June 12th when you became aware of this kind of

13  gazebo incident?

14     A   I don't remember if it was the morning of

15  June 12th.  I just remember Lieutenant Ballard and I

16  discussing it.  But I know that we did discuss it

17  the morning of June 12th as one of the many

18  incidents that happened that week.

19     Q   Okay.  Can you look at the next document

20  dated June 10th filled out by Mr. Reeners?  Have you

21  seen that one before?  It's kind of handwritten.

22     A   I remember the $20,000 thing or statement

23  made by him.  And I think he actually also made that

24  statement in an email.  I don't remember -- I

25  remember seeing this document.  But when, I don't

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 94 of 189 PageID #: 3521

1    remember when I saw it.

2        Q    Okay.  You don't know whether you looked at

3    this prior to June 12th or not or the morning of

4    June 12th?

5        A    I don't remember.

6        Q    Next -- let's back up to the first page of

7    this packet.

8        A    The very first page?

9        Q    Yeah.  So there's an email that was forwarded

10   by Rosemary Bates.  Who is Rosemary Bates?

11       A    She used to work in the mayor's office.  I

12   don't know what her assignment is now at city hall.

13   But she was an assistant to the mayor.  I think her

14   title was special projects manager.

15       Q    She still works for the government?

16       A    Yes.

17       Q    It looks like on June 12th at 8:58 a.m. she

18   forwarded this email from back in April of 2014 to

19   you; is that right?

20       A    Yes.

21       Q    Okay.  Had you seen this email or talked to

22   her about the April situation prior to this being

23   forwarded to you?

24       A    I'm looking at June.  You're saying April.

25   I'm seeing June.

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 95 of 189 PageID #: 3522

1      Q    Right.  So she forwarded it to you on

2  June 12th of 2014.  But you can see, like, she's

3  forwarding an email sent April 21st to Jo Ann Graves

4  and Joe Thompson and Angela Burnside.

5      A    I think we're looking at two different pages.

6           MS. DONEGAN:  At the bottom of that one

7      there should be an April 21st date.

8           MR. MOTHERSHEAD:  Oh, that does look like

9      a different piece of paper.

10          MS. DONEGAN:  You're right.  Sorry.  This

11     one goes after all of the other stuff we just

12     looked at.  I'm sorry.  That one goes after this

13     last handwritten report.

14          MR. MOTHERSHEAD:  Do you want to go off

15     the record again for a second just to --

16     A    All right.

17  BY MR. MOTHERSHEAD:

18     Q    All right.  Okay.  Sorry about that.

19     A    That's all right.

20     Q    It's ultimately my fault.  Okay.  So now

21  hopefully you're seeing an email that was forwarded

22  by you to Mark McGrady, who is a lawyer, and your

23  forward was of a forward from Rosemary Bates to you

24  on June 12th, 2014.

25     A    Okay.

1      Q    Are we together so far?

2      A    Yes.

3      Q    Good.  And what she was forwarding to you was

4  something she sent to Jo Ann Graves, Joe Thompson,

5  Angela Burnside in April 2014; is that right?

6      A    Yes.

7      Q    Okay.  So my question to you is, prior to

8  Ms. Bates forwarding this to you on June 12th, had

9  you seen this email before?

10     A    I don't remember if I saw this specific

11 email.  I just remember seeing emails about his

12 chalking "Stop Murder" on April the 21st.

13     Q    Okay.

14     A    This particular email, I don't remember when

15 I saw it.

16     Q    Okay.  Had you talked to Ms. Bates about the

17 chalking situation prior to June 12th?

18     A    To Ms. Bates, no.  I just remember it being

19 discussed at the police department, the incident

20 that happened.

21     Q    I think we can all agree that "Stop Murder"

22 is a good thing, right?

23     A    Sure.

24     Q    Is there something threatening or alarming

25 about that message in your mind?

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 97 of 189 PageID #: 3524

1    A    No.  It's just kind of odd for people to go

2  around chalking it on government buildings, but I

3  don't think that's a -- the message itself, no.

4    Q    It looks like Ms. Bates forwarded a number of

5  different emails to you that day of June 12th --

6    A    Yes.

7    Q    -- about Mr. Reeners.

8    A    Yes.

9    Q    Did you have some kind of conversation with

10  her?

11    A    I think we spoke on the phone.  And we also

12  spoke in email that morning.  That's the morning

13  that -- all of this stuff had built up over the

14  course of that week with his repeated visits to city

15  hall, the number of emails back and forth from city

16  hall personnel to the police department to the chief

17  about his interactions with the folks at city hall

18  and the level of agitation he was showing them, the

19  repeated visits making people feel uncomfortable.

20  That's what prompted us to discuss -- what are our

21  options?  This guy has everybody on edge up there.

22  Everybody is scared to death of him.  What we can

23  do?  And that's when we discussed contacting mental

24  health professionals.

25    Q    Now how many visits were reported to you that

1    he had made to city hall?

2        A    Well, I know he was there almost every day

3    that week, repeated visits.  I think more than one

4    per day.  He had been up there multiple times that

5    week.  Different offices.  Rosemary's office.  I

6    believe he went to human resources.  It was just

7    frequent.  We were getting bombarded with the

8    complaints about him and the interactions people

9    were having with him, people feeling very uneasy

10   with him and his behavior, the way he was behaving

11   up there.

12       Q    Who complained to you?

13       A    Rosemary did.  And then I guess it was being

14   passed on to the chief.  You know, we were all being

15   made aware of it.  I just remember all of the

16   multiple email communications about him.  He's here

17   again.  He scared me.  He's agitated.  He's here

18   again.  Just nonstop that week.

19       Q    And those were all from Rosemary or from

20   anybody else?

21       A    I don't remember who all was sending emails

22   or who all was complaining about it, but we were

23   being made aware by the mayor's office.

24       Q    So the complaints were all basically coming

25   through an email; is that right?

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 99 of 189 PageID #: 3526

1     A    Yes.  I believe Chief had gotten some phone

2  calls that week as well.

3     Q    Do you know who called the chief?

4     A    I don't.

5     Q    Do you know how many calls he got?

6     A    I don't.

7     Q    So you had this meeting with the chief and

8  Lieutenant Ballard.  Anybody else present for that

9  meeting?

10    A    No.

11    Q    This is the morning of the 12th?

12    A    Yes.  Early morning.

13    Q    What time?

14    A    It was early morning.  It was after we all

15 got to work.

16    Q    And what time do you normally start work?

17    A    8:00.

18    Q    And how long did the meeting run?

19    A    It wasn't really a meeting.  We were just

20 sort of standing in the hallway area discussing

21 everything that had been happening with him.  And

22 just discussing, you know, what is this guy going to

23 do?  Or what can we do?  And that's when we made the

24 determination that we would call mental health

25 professionals to see if they could provide us any

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 100 of 189 PageID #: 3527

1  assistance.

2     Q    What kind of assistance were you hoping to

3  get?

4     A    Just someone to talk with him and find out,

5  you know, what the problem was.  I mean, everybody

6  was scared.  He was scaring everybody.  It's our job

7  to protect people.  These people were afraid of this

8  man.  Made everybody feel uneasy.  I didn't know

9  what his intentions were.  I was worried about what

10 his intentions were.  I believe everybody else was

11 worried about what his intentions were.  That his

12 level of agitation just seemed to be increasing that

13 whole week as evident in the statements in the

14 emails that were sent.  A lot of people were on edge

15 about it.

16    Q    Nobody made any allegations that he had

17 actually attacked anybody or tried to harm anyone?

18    A    No.

19    Q    Or that he had threatened to harm anyone?

20    A    No.

21    Q    Or that he had been armed with any kind of a

22 weapon?

23    A    No, not that I'm aware of.

24    Q    You had never known him to be armed with any

25 kind of a weapon?

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 101 of 189 PageID #: 3528

1    A    I hadn't personally, no.

2    Q    And so what -- did you and the chief and

3  Lieutenant Ballard talk about what could possibly

4  come out of getting a mental health professional

5  involved?

6    A    Just to see if maybe they could offer him any

7  mental health treatment.  I felt like there was

8  problems with him.  Rational people don't behave

9  irrationally like he was that week.  He left a lot

10 of people feeling very uneasy with his increasing

11 agitation and just bombardment.  People just felt

12 uncomfortable at work.  They still do.  We were

13 hoping to get him some help.

14   Q    Had you ever been involved in an

15 involuntarily commitment before this?

16   A    Transporting them, yes.  Most of my

17 experience with involuntary committals was on the

18 patrol level.  We would go to the Mobile Crisis at

19 Cumberland Mental Health offices after they had

20 already gone through the paperwork process and

21 evaluations and just transporting people to the

22 hospital.  I have experienced -- a pretty violent

23 incident in my career involving someone who

24 portrayed the very same behaviors that Mr. Reeners

25 still portrays today.  There was a gentleman named

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 102 of 189 PageID #: 3529

1   Jim Nelson that did these very same things that he
2   does, the repeated emails, repeated phone calls,
3   repeated harassment of government officials over
4   random, frivolous things that make no sense.  This
5   man snapped one day and started shooting up a
6   neighborhood, shot a police officer.  I was present
7   when that happened.  Lieutenant Ballard was present
8   when that happened.  Chief Bandy was present when
9   that happened.  So we've seen what behaviors like
10  this lead to.  And I don't want to see that again.
11  I don't want to see the people that I work with or
12  the people in city hall hurt.  If getting him mental
13  health treatment is what we could accomplish by
14  calling those people, that was my goal.
15      Q   What year was that that that happened?
16      A   I believe that was in 2004.
17      Q   I'm sorry.  His name --
18      A   Jim Nelson, James Nelson, I believe.
19      Q   Did he kill anybody?
20      A   He shot a police officer and shot at several
21  innocent civilians over off of Belvedere Drive,
22  Jacob Heights subdivision.  He did the very same
23  things, like I said, the man was mentally unstable.
24  I remember the incidents involving him with repeated
25  emails and I think some of his emails were even

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 103 of 189 PageID #: 3530

 1    threatening, and --

 2        Q    When you say "his," you mean Nelson's?

 3        A    Yes.

 4        Q    Were threatening.

 5        A    He made a lot of people very uncomfortable, I

 6    remember that, with his repeated visits and

 7    harassment of just everybody.  Exactly the same

 8    thing that Mr. Reeners did and still does.  So, yes,

 9    I was concerned about that happening again.

10        Q    Did you feel like with Nelson that the

11    department kind of missed the signs and could have

12    done something?

13        A    I don't know what the department did or

14    didn't do.  I was a lowly patrol officer at that

15    time.  I wasn't involved in investigations and

16    things like that.  So I don't know what was or was

17    not done involving him.  I just remember all of the

18    incidents involving him and I remember being on

19    patrol that day when the shots started happening,

20    when he started shooting at innocent people and shot

21    a patrol officer that I worked with that day.  I

22    know what that led to.

23        Q    When you guys were having this meeting about

24    Mr. Reeners, did you have on your radar that getting

25    mental health involved could lead to a commitment if

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 104 of 189 PageID #: 3531

1  it goes untreated?

2      A   I was hoping that he could get some kind of

3  treatment.  I don't know -- I thought about

4  committal, but I was hoping someone could offer him

5  some help.  I don't know if committal was in my

6  forethought.  I just -- we had to do something.

7         We were concerned about the people that

8  worked in this building and concerned about the

9  public.  We were concerned about what he may do.

10  Because he was obviously as one person put it

11  "ramped up."  And he seemed to be increasingly

12  agitated.  And it just kept increasing, the

13  frequency of his visits, the frequency of his phone

14  calls was just -- they just kept increasing.  So,

15  yeah, we had some cause for some concern.

16      Q   Had you thought through what you would do if

17  the mental health professional didn't recommend any

18  kind of commitment or anything?

19      A   Would have left.

20      Q   You would have left?

21      A   Yeah.

22      Q   What about your concerns about Mr. Reeners?

23      A   The concerns would have still been there.

24  But I relied on her, relied on the mental health

25  professionals to determine whether or not he needed

1  mental health treatment.

2       On that day when she interviewed him if she

3  had come out of that interview with him and said,

4  not going to sign a 6-401 on him, we would have

5  left. We were at that point just searching for

6  answers.

7       Q   What's a 6-401?

8       A   That's the T.C.A. 33-6-401. It's the

9  paperwork that mental professionals would sign to

10  get him taken to the hospital.

11      Q   Okay. For the involuntarily commitment?

12      A   No, for the assessment at the hospital. The

13  order to transport him for the assessment in the

14  hospital. 6-404, I believe, is the involuntary

15  committal to a mental health facility.

16      Q   It sounds like you were hoping that she would

17  sign a 6-401.

18      A   No. I was hoping that she would get him some

19  help.

20      Q   Did you and the chief and Lieutenant Ballard

21  talk about the possibility of a 6-401 during your

22  meeting that morning?

23      A   I don't remember if that came up. I just

24  remember, what are our options? Should we call

25  mental health professionals? Should we call Mobile

1  Crisis?  And that's what we did.  We didn't talk
2  about whether or not he was going to be committed.
3  That wasn't it.  Our thoughts were, what can we do
4  to get him some help?  What can we do to make these
5  folks in city hall feel more comfortable to be in
6  their workplace, because they weren't comfortable to
7  be in their workplace.  They were afraid.
8      Q    So let's kind of go through the timeline of
9  that day.  So you have this meeting a little after
10 8:00, right?
11     A    Uh-huh.
12     Q    And it lasts maybe half an hour or something?
13     A    Oh, no.  It was brief.  I couldn't give you a
14 time, but it was very brief.  I wouldn't say half
15 hour.
16     Q    Okay.  Did you guys come up with a plan of
17 action from your discussion?
18     A    No plan of action other than I was going to
19 call Cumberland Mental Health, which I did.  They
20 referred me to Mobile Crisis.
21     Q    Is that -- what time of day did you make the
22 call to --
23     A    It was early morning.  Probably 9:00-ish.
24     Q    Okay.  It seems like you also talked to
25 Ms. Bates before 9:00.

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 107 of 189 PageID #: 3534

1    A    I don't remember if I talked to her on the
2    phone or if I emailed her and asked her to send me
3    any emails with any interactions that people had
4    been having with him through that week.   I do
5    remember sending her an email.   I don't remember if
6    I talked to her there on the phone though.
7    Q    But that was -- was that before you called
8    Mobile Crisis or was after that you communicated
9    with Ms. Bates?
10    A    I don't remember if that was before or after
11    the phone call with Mobile Crisis.
12    Q    Why did you ask her to gather up people's
13    emails or other narratives about Mr. Reeners?
14    A    I felt like that was information that mental
15    health professionals would need to know to establish
16    the behaviors that he was exhibiting.
17    Q    We're going to come back to these emails and
18    stuff.
19    A    Okay.
20          MR. MOTHERSHEAD:   So this should be 7.
21          (Document marked Exhibit No. 7.)
22    BY MR. MOTHERSHEAD:
23    Q    This is a transcript that your lawyer had
24    prepared of the call to Mobile Crisis.   If you want
25    to take a look at it and just. . .

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 108 of 189 PageID #: 3535

1    A   So this a typed transcript of me with

2   Ms. Cecil?

3    Q   No.  There's, as I understand it, two calls.

4   There's a call to Mobile Crisis and then you made a

5   separate call to Ms. Cecil.  I have two recordings

6   and two transcripts.

7    A   Okay.

8    Q   Is that what you remember?

9    A   Yeah.  I remember talking with someone at the

10  office first.  And then I remember talking with

11  Ms. Cecil after that.  I think they said they were

12  going to have someone contact me.

13   Q   Okay.  If you want to skim that.

14   A   (Witness reviews document.)  Okay.  I

15  remember this.

16   Q   Does this look familiar?

17   A   It does.

18   Q   If we can just actually go to -- at the

19  bottom it has a page ID.  And what we want is page

20  ID 900.  It's confusing because it's typed over with

21  a couple of different -- but the first line says,

22  Him about three inches thick.

23        MS. DONEGAN:  It's page ID 9,003.

24  BY MR. MOTHERSHEAD:

25   Q   I think it's really page ID 900, but there's

1    something else that's printed over it.  I think the

2    one before that is 899.

3                    MS. DONEGAN:  It makes it look like 9,003.

4                    MR. BATES:  We got it.

5    BY MR. MOTHERSHEAD:

6        Q    And so actually starting at the last line of

7    the prior page you talk about having a file on

8    Mr. Reeners about three inches thick.  What time was

9    this call?  Do you remember what time during the day

10   did you make this call?

11       A    The time out to the right is not accurate.

12   That's 21:00.  So that's at night.  It's probably

13   9:00 in the morning.  It was around 9:00-ish in the

14   morning when I made the phone calls.

15       Q    All right.  So the file that you referred to

16   being about three inches thick, what's that?

17       A    It's a conglomeration of all of the emails

18   and reports and CADs that have been collected over

19   the years involving him.

20       Q    Okay.  No -- well, any criminal charges in

21   that three-inch-thick file that you're talking

22   about?

23       A    The April 21st incident.

24       Q    For chalking?

25       A    Chalking and public intoxication.

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 110 of 189 PageID #: 3537

1      Q    Nothing else?

2      A    Arrests?

3      Q    Yeah, any kind of criminal citations or

4  arrests?

5      A    I think there was crash reports and things

6  like that.  That's about it.  I don't know if there

7  was any traffic citations.

8      Q    On line 4 to line 5 you say, Every day

9  sending emails to the governor.

10     A    I was using that as an example.  He was

11 sending emails to state representatives.  He was

12 sending emails to everybody.  I believe he sent

13 emails to the FBI, us.  He sent emails all over the

14 place about fluoride.

15     Q    Well, I mean, did you have information that

16 he was sending emails every day to the governor?

17     A    No.  Like I said, he was sending emails

18 everywhere.  When I was saying the governor, I was

19 meaning Debra Maggart, state representatives, emails

20 to us.  I was probably talking pretty quickly.

21     Q    And you didn't have any information that he

22 was continuing to email Debra Maggart either, right?

23     A    Yes.

24     Q    You did?  Were you still in touch with her?

25     A    No, not at that time.  It was a year prior

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 111 of 189 PageID #: 3538

1  when she was making the conversation about all of

2  the emails and harassing phone calls that he was

3  making to her.  But currently on this day, no.

4       Q    You hadn't talked to her since September of

5  2015; is that right?

6       A    No.

7       Q    And you didn't attempt to reach her in June

8  of 2014 while you were deciding what to do?

9       A    No, I didn't.

10      Q    Did you have information that Mr. Reeners was

11  sending emails to the mayor every day?

12      A    He was sending emails to the city every day.

13  On the info email -- it wouldn't be every day.  It

14  was just frequent -- it was constant emails and

15  phone calls and showing up, going into city hall.

16      Q    The chalking -- where did he write "Stop

17  Murder"?

18      A    I don't remember.

19      Q    Okay.  I mean, it wasn't on city hall, wasn't

20  it?

21      A    I think it was, like, city hall property.

22      Q    Okay.  But not on the building?

23      A    No.

24      Q    Okay.  But you told this morning that he's

25  resorted to taking chalk and writing on this city

1  hall building?

2      A   Like I said, I wasn't there when that

3  chalking incident happened.  I wasn't directly

4  involved.  I just remember the chalking incident of

5  him being arrested for vandalism of city hall

6  property.  I thought it was on the building.  I

7  didn't know it was on the sidewalk or in the parking

8  lot.

9      Q   Well, I mean, you just said that it wasn't on

10 the building before I asked you this question.

11     A   No.  I know now that it wasn't on the

12 building.

13     Q   So you're saying that when you made this call

14 you didn't know whether it was on the building or

15 not and so you just said it was; is that right?

16     A   I don't know if it was on the building or

17 not.

18     Q   So you didn't look at the report to see where

19 the chalk was?

20     A   I had seen the reports, but I don't remember.

21     Q   And then page ID 901, at line 16.

22          MR. BATES:  Which page?

23          MR. MOTHERSHEAD:  It's confusing.  It's

24     printed over.  I think that these are two

25     separate numbers that are getting, looks like,

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 113 of 189 PageID #: 3540

1     double stamped.  And so I'm using the three

2     digit.  If you use all four it gets totally out

3     of whack.  Do see what I'm saying?

4          MR. BATES:  Uh-huh.

5 BY MR. MOTHERSHEAD:

6     Q   So 901, line 16 you say that he has

7 threatened to arrest the governor.  Is that based on

8 the conversation you had with Debra Maggart in

9 September of 2013?

10    A   Yes.

11    Q   Is there anything else that you were

12 referring to?

13    A   Yeah.  He had made statements that he was

14 going to arrest city council members over the years.

15 I remember talking to Councilman Jimmy Overton about

16 him saying that he was going to arrest him.  I never

17 -- I think this is probably just a misquote when I

18 said I'm going to effect an arrest on the governor

19 because he won't take the fluoride out of the water

20 or saying that in jest.  He was mad because people

21 weren't taking fluoride out of the water.

22    Q   So you think the transcript is wrong, or what

23 do you mean?

24    A   I'm just saying that was probably me saying,

25 you know, as an example, things that he was going to

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 114 of 189 PageID #: 3541

```
 1    do if people take the fluoride out of the water.  I
 2    explained and you should see some of the emails that
 3    he's sent.  He talks about government officials all
 4    of the time in his emails and people needing to be
 5    arrested for murder because they won't take fluoride
 6    out of the water.  There's just been hundreds of
 7    emails.  Just random stuff needing to arrest people
 8    for not taking fluoride out of the water.
 9         Q    There -- sorry.  Go ahead.
10         A    No.  Go ahead.
11         Q    There weren't any emails that he had sent
12    prior to June 2014 in which he threatened anybody,
13    right or wrong?
14         A    No.  I said that he was saying that he was
15    going to arrest people, that people needed to be
16    arrested.  He was going to arrest people.
17         Q    Do we have those emails somewhere?
18         A    They're all of the emails that he sent.  And
19    we forwarded them all to our attorneys.
20         Q    So those are all of the emails we're talking
21    about.  There aren't some other emails out there
22    that have more --
23         A    He had sent hundreds of emails over the
24    years, lots of emails.
25         Q    I understand that.  But just talking about
```

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 115 of 189 PageID #: 3542

1  prior to June 12, 2014.

2      A    Yes.  There are emails where he talks about

3  people needing to be arrested because they won't

4  take fluoride out of the water and we're murdering

5  people and things like that.

6      Q    Right.  And then -- so that call and in the

7  same transcript seemed like then you called Mobile

8  Crisis?

9      A    Yes.  That's who they directed me -- that I

10 needed to call.

11     Q    I'm trying to reach this Tyler Patten?

12     A    Yeah, she suggested that I call him.  I don't

13 even know who that was.

14     Q    And so then -- so we're on page ID 903.  It

15 looks like 9036, 903.  At line 16 you start

16 describing Mr. Reeners again.  And at line 19,

17 Continually sends threatening emails to many members

18 of the city, employment, the mayor, the governor,

19 state representatives.

20          What threats that he's made are you referring

21 to there?

22     A    Just all of the stuff about people needing to

23 be arrested and going to sue, all of those things.

24     Q    But you're not saying that he threatened that

25 he was going to arrest anybody other than the

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 116 of 189 PageID #: 3543

1  governor?  I know there's this comment by Debra

2  Maggart about the governor.  But in these emails

3  that you're talking about needing to be arrested is

4  different than I'm going to arrest?

5       A    No.  He talks about making citizen's arrest

6  on people frequently in several of his emails.

7       Q    So you would say that some of these emails --

8  maybe we'll see them in a minute.

9       A    Some of his emails over the years he talks

10 about --

11      Q    Just talking about up to June 2014.

12      A    Yes, prior to June 2014.  He had emails

13 talking about he needed to make citizen arrests.

14 I've seen all kinds of stuff from him, all kinds of

15 emails from him.

16      Q    And at line 23 you say, He is taking chalk

17 and writing all over the city hall building.

18           Is that referring to the April vandalism

19 charge?

20      A    Yes.

21      Q    Okay.  And, again, so at the time you didn't

22 know where he had chalked.

23      A    I just know it was on city hall property.

24      Q    So you were just kind of, like, embellishing

25 on what --

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 117 of 189 PageID #: 3544

1       A     No.  I said it was on city hall property.  I

2   didn't know if it was on the building.  I knew it

3   was on city hall property.  The building and the

4   property is all one thing to me.

5       Q     Well, you said it was all over the building.

6       A     I probably thought it was on the building

7   then.

8       Q     And then at page ID 905 it looks like 9058.

9   It says, We are -- starting at line 16, We are

10  afraid he's so obsessed with this issue.  I mean, I

11  think that he is going to do something dangerous to

12  try to get his point across.  What were you basing

13  that on?

14      A     Just his level of agitation.  His increasing

15  harassment of everyone.  He seemed to not be getting

16  his way.  And he seemed to be, you know, increasing

17  in his agitation, his harassment of folks.  I didn't

18  know what he was going to do to.

19      Q     Okay.  He hadn't done anything violent to

20  anybody at all, right?

21      A     No.

22      Q     Is that correct?

23      A     Other than when he said he was going to --

24  the statement from Debra Maggart about him going to

25  jump the governor.

1     Q   Other than that, you wouldn't say he had done

2 anything violent to anybody?

3     A   Not that I'm aware of, no.

4     Q   And you were -- weighing on you was this Jim

5 Nelson situation; is that fair to say?

6     A   That was absolutely something that was in my

7 thoughts.  You never forget that.

8     Q   So then -- we're through with that one.

9     A   Okay.

10     Q   Did you call Emily Cecil, like, right after

11 you got off the phone with them?

12     A   I don't know if it was right after.  It was

13 pretty -- you know, it was right close by.  I don't

14 know if it was immediate.

15     Q   Did you do anything else pertinent to this

16 situation in between the calls?

17     A   I don't remember.  I don't know if I read

18 emails, but whatever my daily activities were that

19 day.

20          MR. MOTHERSHEAD:  So let's mark this

21     Exhibit 8.

22          (Document marked Exhibit No. 8.)

23 BY MR. MOTHERSHEAD:

24     Q   This is a transcript that your lawyer had

25 made of your call with Emily Cecil.

```
 1       A    Uh-huh.
 2       Q    So when the call starts, on the first page
 3  which looks like page ID 913, again, we've got this
 4  kind of double-stamping issue, but I'm just using
 5  that three digit.
 6       A    Okay.
 7       Q    At line 17 you asked, Are you familiar with
 8  this guy?  It looks like you hadn't identified
 9  Mr. Reeners during the call.
10       A    We played phone tag a little bit when I first
11  tried to call her or she called me after I'd asked
12  for someone to give me a call back.
13       Q    Got it.
14       A    She called me and I missed her call.  I tried
15  to call back.  She missed my call.  And somehow we
16  got contacted again.
17       Q    Okay.
18       A    And I think I had left a recording or a
19  message for her what I was calling about.
20       Q    Okay.  So she knew who you were talking
21  about?
22       A    At this point I believe she did.
23       Q    So then on the next page, starting at line 7
24  you're saying, He harasses the mayor's office; he
25  harasses the police department.
```

```
 1          What was he doing that you were referring to
 2   as harassment?
 3      A    Constantly going into their office and, for
 4   lack of better word, fussing at them about fluoride
 5   in the water.
 6      Q    Okay.  So that week -- let me ask you this.
 7   I think you've testified that week leading up to
 8   this he was going in more often than he had been?
 9      A    Yeah.  I think he had gone up there every day
10   frequently more than one time in a day.  Just
11   repeatedly.
12      Q    So prior to this gazebo incident he was not
13   going up there every day?
14      A    He was going up there quite a bit.  He showed
15   up at city hall quite a bit, quite often and it was
16   quite regular.
17      Q    And this week running up to the 12th, I mean,
18   did you understand that when he was going up there,
19   a lot of what he was talking about was the gazebo
20   situation in which he felt that somebody made a
21   false report against him?
22      A    No.  I wasn't aware that that's what he was
23   going up there about.  I kept getting notifications
24   that he's up there making people feel uncomfortable
25   again.  He's ramped up.  He's agitated.  He's
```

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 121 of 189 PageID #: 3548

1  normally nice when he comes up here, but he seems

2  different this week, were some of the emails.

3      Q   Okay.  And we can -- we sort of looked

4  through these documents before where you made the

5  record request June 9th which was the -- or rather

6  June 10th, the day after the gazebo, and then also

7  this $20,000 demand June 10th.  So had you -- I

8  mean, had you looked at those at this point at all,

9  like, when you were having this conversation with

10 Ms. Cecil?

11     A   Looked at what?

12     Q   The records request and his demand for

13 compensation?

14     A   No.  We had been discussing him all that week

15 about the emails and phone calls that chief was

16 getting about the repeated visits and things that I

17 had knowledge of.  I don't recall seeing those

18 records request.

19     Q   Okay.  All right.  You didn't look to see if

20 either of the things that he actually filed that

21 week --

22     A   No.

23     Q   Did anybody talk to you about him asking for,

24 you know, records on the gazebo situation or

25 demanding that he be compensated for --

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 122 of 189 PageID #: 3549

1      A    No.

2      Q    Who did you talk to to try and find out what

3    he was so agitated about?

4      A    Just the emails and stuff about him coming up

5    there, the phones call to the chief or Lieutenant

6    Ballard.  Just the incidents that had been happening

7    all that week.

8      Q    So it sounds like you didn't talk to anybody

9    to find out?

10     A    I just said I talked to Chief Bandy and

11   Lieutenant Ballard and about all of the incidents

12   they were aware of.

13     Q    So where you're talking about him like coming

14   up to the mayor's office every day, about harassing

15   people about fluoride, I mean, would you agree in

16   hindsight that he's actually, at least that week, a

17   lot of what he was coming up for was to complain

18   about what happened at the gazebo and to demand

19   compensation for --

20     A    I don't know what he was going up there about

21   the gazebo incident.  I just know he always goes up

22   there about this fluoride stuff and making people

23   feel uncomfortable.  He's -- in the descriptions

24   that have been given to me, it's always just random

25   stuff, just never making any sense.  Just making

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 123 of 189 PageID #: 3550

1  people feel uncomfortable with his level of

2  agitation with the city and all kinds of stuff.

3      Q   You don't dispute that he filed this record

4  request or that he submitted this written demand for

5  compensation for what happened at the gazebo?

6      A   No, I don't dispute it.  There's a copy of it

7  right there.

8      Q   You don't dispute that that is a different

9  topic than fluoride?

10     A   No, I don't dispute that.

11     Q   You weren't aware of it at the time you were

12 making these calls?

13     A   No.

14     Q   And so it sounds like you kind of assumed

15 that it was all just the same fluoride issue?

16     A   No.  I didn't know what his issues were.

17 Like I said, it's always random stuff.  You never

18 know what he's complaining about or what he is

19 fussing about.  It's just always random stuff.

20 Generally it's fluoride.

21     Q   So then you say that he has sent a number of

22 threatening emails to the governor.  What did you

23 base that on?

24     A   Just the emails that I had seen of him

25 sending to everybody.  He sent emails everywhere.

1    Like I said, I remember seeing the emails that he

2    had sent to TBI, FBI, police department, city

3    officials, Debra Maggart explained the emails that

4    she got from him all of the time.  She's a state

5    representative.  She talked about his, like I said,

6    his threat to jump the governor.  She said she got

7    emails from him all of the time.  I remember her

8    saying that her secretary had a file on him of

9    emails that he had sent to her.

10        Q    You're talking here about threatening emails.

11   You say here that he was sending a number of

12   threatening emails to the governor, to state

13   representatives, and to the senate.

14        A    Any reference is to the statements that he

15   made to Ms. Maggart about jumping the governor,

16   emails about the fluoride issues and arresting

17   corrupt government -- governmental officials.  I've

18   seen all of that.  I've seen those emails where he

19   said he was going to do citizen's arrest and things

20   like that.

21        Q    You've seen emails to state officials saying

22   he was going to arrest them?

23        A    Pardon me?

24        Q    Are you saying you've seen emails to state

25   officials which he says --

1    A   I've seen emails where he just randomly

2  speaks about effecting citizen's arrest on --

3  everybody.  There's so much.  He just goes all over

4  the place.  None of his emails make sense.  I've

5  seen all kinds of stuff from him.  That's about all

6  I can explain that I'm saying that in there.

7    Q   What threats have you seen made in an email

8  that was sent to a state official?  What threats has

9  he made in an email sent to a state official?

10   A   I can't be specific.

11   Q   Have you seen any emails that he has sent to

12  state officials?

13   A   Just the emails that were described to me by

14  Debra Maggart.  Like I said, I've seen random emails

15  from him over the years of random crazy stuff about

16  making citizen's arrest on people.  Who he was

17  specifically referring to, I can't remember.  It's

18  just been random stuff all the time.

19   Q   And you would agree that there's a

20  distinguish between threatening some kind of lawsuit

21  or legal action versus threatening like a physical

22  threat of violence?

23   A   Yeah.  Kind of like the threat he made to

24  jump the governor, is that what you mean?

25   Q   And so -- I mean, if someone had sent, as you

1   put it, a number of threatening emails to the

2   government, to state representatives, and to the

3   senate, and these were physically threatening

4   emails, I mean, you would expect that the state law

5   enforcement would do something, right?

6        A    Yes.

7        Q    You would expect that they would arrest that

8   person and charge them with harassment.

9        A    I thought that he had been.

10       Q    Well, I think he would have been charged many

11  times because of all of these different emails,

12  right?

13       A    Yeah.

14       Q    And that's, you know, presumably what

15  Ms. Cecil would have thought with you telling her

16  this, right?

17            MR. BATES:  Object to the form of the

18       question.

19  BY MR. MOTHERSHEAD:

20       Q    Well, that's the message that you're -- what

21  you said would convey to somebody is that --

22            MR. BATES:  Object to the form.  Go ahead.

23       A    She asked me.  And I told her I think he's

24  been dealt with on those issues.  In fact, I think I

25  said that he's basically been charged with

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 127 of 189 PageID #: 3554

1    harassment.  I thought that he had been charged.

2    BY MR. MOTHERSHEAD:

3        Q    So the only thing that you knew he had

4    actually been charged with was just the public

5    intoxication and vandalism from April of 2014?

6        A    Yeah.  And I thought that he had been charged

7    with harassment when Debra Maggart -- she sent

8    troopers after him.

9        Q    At line 23 and 24 you said, It's almost daily

10   now that we have to deal with him and he's never

11   really breaking the law.  Do you think that's an

12   accurate transcription?  I haven't listened to that

13   recording recently, but --

14       A    Yeah.  It's not like he was going up there

15   assaulting and committing acts of violence when he

16   was going up there.  He was making people feel

17   uneasy.

18       Q    So he was not breaking the law; is that

19   right?

20       A    Other than harassing them.

21       Q    So then the next page at line 13 you again

22   said, He's taking chalk and writing all over the

23   city hall building.

24       A    Uh-huh.

25       Q    And now you know that's not a true statement,

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 128 of 189 PageID #: 3555

1    right?

2        A    Yes.

3        Q    And it sounds like at the time you didn't

4    know where he had chalked?

5        A    I know that he had chalked at city hall, at

6    the city hall building.

7        Q    So then at line 23 you say, I mean, it's

8    getting to the point where I think he is going to

9    become increasingly violent.  Right?

10       A    Yes.

11       Q    And so what were you basing that on?

12       A    The concerns of the public and the people in

13   city hall and my experiences with people like this.

14       Q    With Jim Nelson?

15       A    Yes.

16       Q    So then the next page, Ms. Cecil basically

17   asked you, Still having a hard time -- she says, Let

18   me ask you this.  I don't mean this in a sarcastic

19   way, but is threatening the governor and the state

20   representative, isn't that against the law?  And you

21   tell her, He has been dealt with on those events.

22   He's basically charged with harassment?

23       A    Yes.

24       Q    So that you're referring to just the Maggart

25   situation?

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 129 of 189 PageID #: 3556

1      A    Yes.

2      Q    And you were assuming incorrectly that he had

3   been charged with harassment for that?

4      A    Yes.

5      Q    So what you said here is basically that he

6   was charged with harassment for threatening the

7   governor and the state representatives; is that

8   right?

9      A    I said he wasn't threatening to kill them or

10  anything like.  He was just calling down there and

11  sending repeated emails that he is going to arrest

12  the governor.  So he's been charged with several and

13  then she interrupted me.  She said, He hasn't, like,

14  said he's going to kill them or anything?  I said,

15  no, he hasn't said anything about killing anybody or

16  anything like that.  It's just been ongoing with

17  him, I guess, federal government, state government

18  isn't dealing with him much anymore.  I think

19  they've started ignoring him, but he lives here

20  locally and he has access to just walk in the city

21  hall.  I go on from there.

22     Q    So you just read through a big chunk.  So

23  she's asking you about threats to the governor and

24  state representatives.  And you essentially told her

25  he had been charged with harassment for all of the

1    above; is that right?

2        A    That's not what I said.

3        Q    Well, you said he has been dealt with on

4    those events.  He's basically charged with

5    harassment.

6        A    Yeah.  I didn't say that he was charged with

7    harassment for threatening the governor and the

8    state representatives.  That's not what I said.  I

9    said, He has been dealt with on those events.  He's

10   basically been charged with harassment.  I thought

11   he had been charged with harassment for the

12   statement that he made to Debra Maggart about

13   jumping the governor.

14       Q    And then at line 15 you say, He was just

15   calling down there and sending repeated emails that

16   he's going to arrest the government?

17       A    That's what she said had said.

18       Q    You don't have those emails?

19       A    No.

20       Q    Have you seen any emails like that?

21       A    No.

22       Q    So page 917 you talk about two detectives

23   seeing him at the gas station.  Who were the

24   detectives?

25       A    Bobby Harris and Daniel Soto.

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 131 of 189 PageID #: 3558

1     Q   And did they do any kind of report about what

2 they saw?

3     A   No.  They were just telling me about it one

4 morning when they came into work in the criminal

5 investigations division.  And I just -- the way

6 Bobby was describing it, I guess he was trying to

7 make it -- he was just trying to describe what he

8 called humping the counter.  Said he was standing

9 there and he described it, had his hands up like

10 this (indicating) going back and forth against the

11 front of the counter.  That's the way Bobby

12 described it.  I wasn't there.  I didn't see it.  He

13 was relaying what was described to me by two

14 detectives.

15     Q   Do you remember when they told you that

16 story?

17     A   I don't remember.

18     Q   But it was -- do you remember what year?

19     A   Yeah.  It was in 2014.

20     Q   Okay.  But you don't know what month it was

21 in?

22     A   No, I don't.

23     Q   And so then at 918 -- starting at the last

24 line at 917 you say, We are just really worried, to

25 what extreme he is going to go.  And that's -- is

    1   that again kind of thinking about Jim Nelson?
    2        A    (Witness moves head up and down.)
    3        Q    Do you mind articulating?
    4        A    Yes.
    5        Q    Thank you.  And so then she tells you that
    6   she can go out and do an assessment and if he's that
    7   psychotic then she probably write a 6-401?
    8        A    Yes.
    9        Q    And you knew what that meant?
   10        A    Yes.  She just said that was a possibility.
   11   She goes on to even say that, I'm not saying that's
   12   how it's going to play out.  She just said that was
   13   a possibility.
   14        Q    So then you guys start talking about kind of
   15   the logistics of, you know, how to kind of get this
   16   assessment going.  And she's talking about maybe
   17   some officers could help make sure he doesn't leave
   18   his house.  And then at 920, page 920, line 2, you
   19   present the idea of, What if I can convince him to
   20   come up to the police department?  Do you remember
   21   that?
   22        A    Uh-huh.
   23        Q    What was your thinking on that?
   24        A    Just to get him to a place because she said
   25   that it was going to take her a while to respond in

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 133 of 189 PageID #: 3560

1    our conversation.  And she didn't want to drive all

2    the way down here and waste a trip and not be able

3    to make contact with him.  So we were just trying to

4    know where he's going to be about what time so she

5    would know when to head down.  I don't recall

6    exactly where she said she was going to come from --

7    be coming from.  I think she said it was going to

8    take her about 45 minutes to an hour to get here and

9    she just didn't want to make the trip and not be

10   able to have contact with him.

11       Q    Then at line 6 you talk about, He's asked for

12   a lot of information.  Like he's filed an open

13   records request.  I could play it off and say, hey,

14   we have got the documents you requested, do you want

15   to come to the PD and pick it up, and then just

16   stall him when he gets here, or would you rather do

17   it in the home?

18            Do you remember that?

19       A    Yeah.  I knew that he had filed a bunch of

20   open records requests that week.

21       Q    And so when you were talking about playing it

22   off as be a way to get his records and then stalling

23   him --

24       A    Until she got here to talk with him.

25       Q    So that essentially kind of a way to like

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 134 of 189 PageID #: 3561

 1  trick him into being at the department for a while?

 2      A   No.  I even said that I would rather not have

 3  him here at the department.  I'd rather you do it in

 4  his home.  Whatever was easiest for her to make

 5  contact with him.  I was just throwing her options.

 6  I told her I could do that or we could find out if

 7  he is going to be in his house.  Then you could go

 8  there.  And then she goes on to explain that if she

 9  did it at the house, wherever she did it, she wanted

10  law enforcement there with her.

11      Q   I mean, why would you not just have the

12  option be, I could ask Mr. Reeners if he could come

13  to the police department so that he could meet with

14  you and do an evaluation?

15      A   I didn't think that he would cooperate.  I

16  honestly didn't.

17      Q   And so instead you suggested that you could

18  play it off as a records request?

19      A   Uh-huh.

20      Q   And then just stall him to try to keep him

21  there?

22      A   Until she got here to talk with him.

23      Q   So, I mean, you would be tricking Mr. Reeners

24  into being there?

25      A   No.

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 135 of 189 PageID #: 3562

1      Q    You don't think that's tricking?

2      A    No, because he had requested documents that

3   morning.  I just didn't want him in the police

4   department because he's already made people feel

5   uncomfortable and I explained that to her, that I'd

6   rather him not be at the police department.  Because

7   he already made the ladies in records feel

8   uncomfortable.  I was trying to be make it easy for

9   her to be able to have access to him to do her

10  evaluation of him.  I was just giving her different

11  options.

12     Q    Let's just kind of review.  So you didn't

13  suggest just telling him the truth about, you know,

14  can you just come down here so Ms. Cecil can

15  evaluate you because you didn't think he would

16  comply?

17     A    Yes.

18     Q    And so instead you came up with this idea

19  telling him he could come down to get his records

20  and then stalling down there?

21     A    If we needed to stall until she got there,

22  yes.  I wanted to give her enough time to be able to

23  make her trip.  She said it was going to take 45

24  minutes to an hour to get there.  So whatever I

25  needed to do to help her have access to him, that's

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 136 of 189 PageID #: 3563

1    what we needed to do.

2        Q    And so the purpose of doing this records

3    thing to get him down there, as opposed to just

4    telling him the truth, is because you didn't think

5    he would cooperate if you told him the truth?

6        A    I didn't think he would cooperate and talk

7    with her.

8        Q    And so, I mean, this is -- in terms of you

9    and Mr. Reeners, not you and Ms. Cecil, that's

10   between you and Mr. Reeners, I mean, you are

11   tricking him into being there, right?

12       A    I wouldn't say tricking him, no.  That's your

13   words.  That's not my words.  I'm not tricking him

14   into being there.  I'm trying to make sure he's at a

15   certain place at a certain time for her to have

16   assess to him.

17       Q    The purpose of telling him that it was for

18   records is to give him something he would want to be

19   there for, right?

20       A    Uh-huh.

21       Q    Because an evaluation is something he would

22   not want to be there for.

23       A    Right.  If you feel like that's tricking him,

24   so be it.

25       Q    Okay.  You don't want to own it as a tactical

1  way to mislead him?

2      A    I wanted to make sure that he was going to be

3  at a location so she didn't waste a trip down here.

4      Q    Okay.  On the next page at line 15.

5      A    Okay.  Yeah, I see it.

6      Q    She says, And that could escalate things too,

7  make him feel like he was deceived, you know.  And

8  you say, Right, and he may act out.

9          I mean, you do acknowledge or at least then

10  you acknowledge that doing your plan about the

11  records request would make him feel deceived?

12      A    Uh-huh.  Yes.

13      Q    You still wouldn't own it as just a trick?

14      A    I didn't want him to be deceived.  I wanted

15  him to be in a place where she could have access to

16  him.  I wanted him to be evaluated by her.  I didn't

17  want him to act out.  I didn't want him to not be

18  here or not be at his house for no reason.

19      Q    And the training that we've looked at earlier

20  says, Don't deceive mentally ill people, right?

21      A    Is he mentally ill?  Is that what you're

22  saying?

23      Q    You thought he was mentally ill?

24      A    Yes.

25      Q    And your training says don't deceive mentally

1    ill --

2        A    I was trying to get the man treatment.  I was

3    trying to get someone to evaluate him so that he

4    would stop harassing people in this building.  So if

5    you feel like I was deceiving him, that is not my

6    intent.  My intent was for him to be in a place

7    where she could have access to him.

8        Q    Well, why did you say that he might act out

9    then if you didn't think that what you were plotting

10   to do would be deceiving?

11       A    I don't know if he was going to act out or

12   not.  I was hoping that he wouldn't.

13       Q    All right.  So what happened next?

14            MR. BATES:  Do you want to take a break?

15            MR. MOTHERSHEAD:  Yeah, let's take a

16       break.

17            (A break was taken.)

18   BY MR. MOTHERSHEAD:

19       Q    All right.  So you get off the phone with

20   Ms. Cecil and then what happened next?

21       A    Mr. Reeners had come to city hall a number of

22   times that day.  I think I actually got an email or

23   a phone call from Rosemary that he was there now.  I

24   think Lieutenant Ballard and maybe Officer Jones

25   made contact with Mr. Reeners at city hall.  That's

1    where they made arrangements for him to go home,

2    that someone was going to come there to talk to him

3    about fluoride.

4        Q    And what time of the day are we talking

5    about?

6        A    Late afternoon.  Probably 2:00 when they made

7    contact with him at city hall.

8        Q    Okay.  So this, I mean, there's kind of a

9    time gap between -- you made these calls with mental

10   health starting at, like, 9:00 in the morning,

11   right?

12       A    Uh-huh.

13       Q    And now we're into late afternoon.  Did

14   anything happen during those intervening hours?

15       A    No.  Just my normal duties throughout the

16   day.

17       Q    Okay.  I mean, did you have anybody out

18   looking for Reeners?

19       A    I don't recall if anybody was looking for him

20   or not.  I think they were.

21       Q    Okay.  I'm going to hand you -- make sure

22   these are right, but I think what these are, are

23   Officer Jones's incident report from the 12th and

24   then also your separate report.

25       A    Yes.

CLEETON DAVIS COURT REPORTERS, LLC
(615) 726-2737
139

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 140 of 189 PageID #: 3567

1        MR. MOTHERSHEAD:  Mark this as Exhibit 9.

2        (Document marked Exhibit No. 9.)

3   BY MR. MOTHERSHEAD:

4     Q   And so on the second page of Officer Jones's

5   report he says that at 13:00, 1:00 in the afternoon,

6   Corporal Helson advised to attempt to locate Patrick

7   Reeners to help Mobile Crisis interview him.  Had

8   you done something to kind of set these wheels in

9   motion?

10    A   I think I did.  I think I did tell them that

11  they were trying to locate him to see if he was

12  going to be at home.  I even told her that I was

13  going to send officers by his house to see if he was

14  there.  I think I probably did tell Corporal Helson

15  if he showed up, let me know, and I would notify

16  Mobile Crisis.  I know they had calls for service

17  throughout the day.  I don't think they just

18  dedicated themselves just going out searching for

19  him.  I don't remember how all of that happened.  I

20  do remember telling them that the Mobile Crisis was

21  going to come out and talk with him.  If he showed

22  up, let me know.  He kept a lookout for him.

23    Q   Okay.  Are you saying that you didn't tell

24  Helson to find Mr. Reeners, or what are you saying?

25    A   I'm saying that I told him to look for him.

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 141 of 189 PageID #: 3568

1    If he showed up, let me know.  But, like I said, I

2    know they have calls throughout the day on patrol.

3    So I don't expect them to just go solely look for

4    him.

5        Q    Okay.

6        A    Then I told her I was going to send officers

7    by his house.  And I'm sure I did tell them to go

8    see if he was at home.

9        Q    And where were you at 1:00 that day?

10       A    Probably at the police department.

11       Q    Okay.  And so then how did you find out what

12   was going on between Officer Jones and Mr. Reeners?

13       A    I think city hall actually called about him

14   being over there and officers were dispatched over

15   there.  When I heard about that or when I was made

16   aware of that, I don't remember how I was made aware

17   or if I heard the call, that's when I notified

18   Ms. Cecil that he was going to be going home.

19       Q    Okay.  And then did you go over to Reeners'

20   house?

21       A    I did.

22       Q    Okay.  And you knew where he lived already or

23   how did you know where to go?

24       A    From previous incident reports I knew what

25   his address was.

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 142 of 189 PageID #: 3569

1      Q    Okay.  Just from reading them you mean?

2      A    Yeah.

3      Q    All right.  And so do you remember what time

4  you got to Mr. Reeners' house?

5      A    It was late in the afternoon.  Probably,

6  3:00, 2:30, 3:00, something like that.

7      Q    Okay.  And so Officer Jones had some kind of

8  an audio recorder that he wore; is that right?

9      A    Uh-huh.

10     Q    Was this a thing that all of the patrol

11  officers were wearing in 2014?

12     A    Yeah.  We didn't have body cameras back then.

13  Everybody had in-car cameras and everybody was

14  issued digital recorders to use just in case they

15  were too far away from their cars or something or

16  inside a call for service, where the car didn't pick

17  up, they would always have a backup recorder.

18     Q    And so was it standard to just always kind of

19  have that recorder on?

20     A    Yes.

21     Q    Because, like, Cantrell's was on for the

22  gazebo situation also?

23     A    Uh-huh.

24     Q    Did you have one or no?

25     A    No, I didn't.

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 143 of 189 PageID #: 3570

1        Q    Okay.  Just patrol officers?

2        A    Well, I think I had one, but I didn't have it

3    on me that day.

4        Q    Okay.  I mean, was the policy just that

5    patrol officers would use them during their

6    interviews?

7        A    If you had interactions with the public, not

8    just for patrol officers.

9        Q    Okay.  Anybody that had interactions with the

10   public?

11       A    Yes.

12       Q    Okay.  And everybody had one issued to them?

13       A    Yes.

14       Q    Okay.  When you got to Mr. Reeners' house did

15   you drive with anybody?

16       A    I think I road with Lieutenant Ballard.

17       Q    Okay.  And who was there when you arrived?

18       A    I think we were the first ones there.  I

19   think Officer Jones might have been there.  Emily

20   Cecil shows up right about the time we were getting

21   there.

22       Q    Okay.

23       A    I think it was kind of simultaneous.

24       Q    Okay.  And was Mr. Reeners there yet?

25       A    He came, like, within seconds of us getting

1   there, like within moments he came in his driveway.

2       Q   Okay.  And how did his demeanor seem when he

3   got home?

4       A   He was agitated about us being there.  I

5   didn't speak to him.  Lieutenant Ballard did.  I

6   think he got out of the vehicle.  He made some

7   statement to Lieutenant Ballard.  I don't know

8   exactly what he said to him, but something along the

9   lines of us needing to leave.  I know Lieutenant

10  Ballard said she wants to talk to you about

11  fluoride.  I remember his demeanor.  He said,

12  Certainly, and immediately walked towards Ms. Cecil.

13      Q   And then did you kind of back off and let

14  them talk?

15      A   I did.  I kind of just hung out in the front

16  yard.  I think he had some trees out there, and I

17  was just kind of out in the front yard.  They were

18  -- she was sitting on the porch.  When I say "she,"

19  Ms. Cecil and Mr. Reeners were sitting on the front

20  porch.

21      Q   Did any officer sit up on the porch with

22  them?

23      A   No.

24      Q   And how many -- how many of you were there?

25  How many officers?

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 145 of 189 PageID #: 3572

1      A     Myself, Jamie Helson, Brad Jones, and

2   Lieutenant Ballard.

3      Q     Okay.  And so you were all kind of just in

4   the yard?

5      A     Uh-huh, yes, sir.

6      Q     Okay.  About how far away?

7      A     I moved around a little.  I think I went and

8   got in my car.  Probably 15, 20 feet for the most

9   part.

10     Q     So then Mr. Reeners and Ms. Cecil sat and

11  talked for quite a while?

12     A     Quite a while.

13     Q     Maybe an hour, give or take.

14     A     I think it was a little over an hour.

15     Q     And nothing disruptive or violent or anything

16  like that happen?

17     A     I didn't hear everything that they were

18  saying.  Like I said, that was her conversation with

19  him.  I was just there close by.  All of us were

20  there close by because she said she wanted law

21  enforcement there with her.  I could hear things

22  that were said, but I didn't hear the entire

23  conversation.  I could hear bits and pieces.  If

24  they spoke up or if I got closer to them, I could

25  hear some things that he would say to her and some

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 146 of 189 PageID #: 3573

1    things that she would say to him, but I didn't hear

2    every bit of their conversation.

3        Q   You didn't see him do anything violent?

4        A   No.

5        Q   You didn't see him do anything that was

6    physically aggressive towards her or to any of the

7    officers?

8        A   No.

9        Q   He wasn't armed or anything like that?

10       A   No.

11       Q   You didn't hear him make any threats to

12   anybody?

13       A   No.

14       Q   He didn't make any threats to hurt himself?

15       A   I don't know what he said to her.

16       Q   Well, just that you heard?

17       A   Yeah.  That I heard, no.

18       Q   And nobody reported to you that he had

19   threatened to hurt himself?

20       A   No.

21       Q   And nobody reported to you that he had

22   threatened anybody else?

23       A   No.

24       Q   So Ms. Cecil, do you remember her getting

25   into her car and getting on the phone?

1      A    Yes.  After she spoke with him, she said she

2   was going to call her supervisor.  She got in her

3   car.  She was in her car for a little while.  I

4   don't remember exactly how long, but it wasn't

5   short.  It was -- I don't know maybe 10, 15 minutes.

6      Q    Do you remember Officer Jones talking to

7   Mr. Reeners about possibly working with the

8   department as a cooperator?

9      A    At the time I don't remember what they were

10  talking about.  I just know they were talking.

11     Q    Okay.  So you couldn't hear what they were

12  talking about?

13     A    No.

14     Q    Do you remember -- was Officer Jones up on

15  the porch with them or were they just parked in the

16  yard?

17     A    I don't remember where they were.  I think

18  they were just standing in the front yard close to

19  the porch.

20     Q    Okay.  Were you kind of watching the whole

21  time or just --

22     A    At that time I think I went back and got in

23  my car.

24     Q    Okay.  Okay.  Did Mr. Reeners at that point

25  seem calm still?

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 148 of 189 PageID #: 3575

1     A   Yes.

2     Q   Do you remember any conversation about

3  gardening?

4     A   No.

5     Q   And so -- there wasn't anything else that

6  happened why you guys were out at the house that was

7  violent or threatening?

8     A   No.

9     Q   And so did you approve the decision to take

10  him into custody?

11     A   Emily Cecil did.

12     Q   Okay.  I mean, let's just tease that out a

13  little bit.  Emily Cecil came back and said she

14  would do a request for an involuntary evaluation,

15  right?

16     A   Yes.

17     Q   And then -- so you made it happen; is that

18  fair to say?

19     A   I didn't make it happen.  I don't even recall

20  giving anybody an order.  I wasn't even close by

21  when handcuffs were put on him.  I think I was near

22  them, but I wasn't right on top of him.  I want to

23  say that I told -- I may have told Jamie Helson what

24  she had just told me that she was going to sign a

25  6-401, and I think that's when he was taken into

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 149 of 189 PageID #: 3576

1    custody.

2        Q    Okay.  You and Ballard were, obviously, the

3    highest ranking officers on the scene?

4        A    Uh-huh.

5        Q    And Helson and Jones wouldn't have taken him

6    into custody without your --

7        A    That's what I'm saying.  I think I told Jamie

8    that she was going to be signing a 6-401 on him so

9    he was going to be going into custody.  So, yeah.

10   If you consider me making me happen, yes, I'm going

11   by her orders.

12       Q    They had your blessing?

13       A    Yes.

14       Q    Which you were basing off what Ms. Cecil

15   said?

16       A    Yes.  If she had told me anything

17   differently, I wouldn't have allowed them to take

18   him into custody.

19       Q    Do you remember any discussion between

20   Mr. Reeners and Jones about asking for the cuffs to

21   be in front instead of behind his back?

22       A    No, I don't.  I've since heard the recording

23   about that at the hospital, I believe is when that

24   took place.

25       Q    Is there a policy about that at the

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 150 of 189 PageID #: 3577

1  department?

2      A    I don't recall exactly what it says, but I

3  know we cuff pregnant female in the front.  I don't

4  remember exactly what the policy is.

5              MR. MOTHERSHEAD:   Luckily -- so mark this

6        as Exhibit 10.   This is the transportation

7        policy.

8              (Document marked Exhibit No. 10.)

9  BY MR. MOTHERSHEAD:

10     Q    So what I'm looking is under procedure, which

11  is Roman numeral III, handcuffing.

12     A    Under B?

13     Q    B.4.c.  An officer may elect to handcuff an

14  individual with his/her hands in front or utilize

15  other appropriate restraining devises when the

16  prisoner has injuries that could be aggravated by

17  standard handcuffing procedures.

18     A    Yes.

19     Q    Okay.  So that is permitted if somebody

20  complains that their wrist hurts, can you do this in

21  front?

22     A    Yes.

23     Q    The rules allow for Officer Jones to do that?

24     A    Yes.

25     Q    Is that fair?  That's all I wanted to look at

1    that for.

2        A    Okay.

3        Q    Okay.  Were you in touch with the chief

4    during while you guys were at Mr. Reeners' house?

5        A    The chief and the captain, I believe I sent

6    them either an email or a text message to let them

7    know that he was being transported to the hospital

8    for a 6-401.

9        Q    Okay.

10       A    And I think the chief said, okay, let me know

11   in a reply or something along those lines.

12       Q    Okay.  And so, I mean, when your officers

13   took him into custody, there wasn't anything

14   happening in that moment that was an immediate

15   threat of danger right then and there, right?

16       A    No.

17           MR. BATES:  Object to the form of the

18       question.

19   BY MR. MOTHERSHEAD:

20       Q    You can answer.

21       A    I don't know what he said to her.

22       Q    I mean, you didn't observe anything happening

23   on the scene that would have led you to conclude

24   this man is about to hurt somebody right now?

25       A    No.  I didn't see anything like that.

1    Q   None of the circumstances suggested that he
2  was about to hurt somebody immediately?
3    A   I don't know what his conversation with Emily
4  Cecil entailed.
5    Q   Right.  But just of what you were aware of.
6    A   From what I saw, no.
7    Q   And Ms. Cecil didn't report anything to you
8  saying, I think he's about to attack somebody.  We
9  need to take him into custody?
10    A   She said she was going to talk to her
11  supervisor.  She did.  That's when she got out of
12  the car and said that she was going to be doing a
13  6-401.  She did not go into detail with me about
14  their conversation.
15    Q   And there wasn't anything that you were aware
16  of that suggested he was going to try to self harm
17  or commit suicide in the immediate future?
18    A   I didn't hear any of their conversation, so I
19  don't know what he said to her.
20    Q   So nothing that you were aware of suggested
21  that he was about to hurt himself or commit suicide?
22    A   Not that I heard, no.
23    Q   Why did you do the separate incident report,
24  separate from Officer Jones's report?
25    A   It's not a separate.  It's a supplement.

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 153 of 189 PageID #: 3580

1       Q    A supplement?

2       A    Yeah.

3       Q    Why did you do that supplement?

4       A    Well, I mean, I think everybody should have.

5   We do that on follow-up investigations if you're

6   involved in a case, even on burglary cases that

7   multiple officers go on the scene, they need to

8   document what their actions were.  And that's what I

9   did.

10      Q    Did you ask the department to keep your

11  supplement confidential?

12      A    No.  Well, I sent Jamie Sullivan an email.  I

13  thought this report was going to be into the

14  confidential report files, which it's an RMS report

15  file where undercover narcotics investigations and

16  things like that take place.  I did send Jamie

17  Sullivan an email and told her to put mine in the

18  confidential files.  I thought that's what this

19  report was going to be documented under.

20      Q    Why would this report be documented as a

21  narcotic undercover investigation?

22      A    Because of the medical involvement in this,

23  the mental health aspect of it.  I didn't think it

24  was something the public needed to know about him.

25      Q    Okay.

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 154 of 189 PageID #: 3581

1      A    I thought his medical and mental privacy

2   should remain intact.

3      Q    Did that turn out to be erroneous that this

4   is supposed to not be in the confidential --

5      A    Pardon me?

6      Q    Did you later learn that this type of

7   incident report does not belong in the confidential

8   file?

9      A    I thought that it had to be because of the

10  medical stuff being discussed in there.

11     Q    Okay.  Did you go to the Sumner Regional

12  Medical Center?

13     A    I did not.

14     Q    Okay.  What other follow-up did you have on

15  the 12th with Jones or --

16     A    I didn't have any with Jones.  Helson either

17  emailed me or text messaged me later that evening

18  and informed me that 6-404 he was being signed and

19  he was going to be transported to Middle Tennessee

20  Mental Health Institute.  And I relayed that

21  information to the chief and Captain Novitsky.

22     Q    All right.  And then anything else on the

23  12th that you did, any other follow-up?

24     A    No.

25     Q    Okay.  What time did your shift end?

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 155 of 189 PageID #: 3582

1      A    I got off -- I was already off by the time he

2    was taken.  I mean, my shift was over.  So I went

3    home.

4      Q    Okay.  On the 13th did you followup on this?

5      A    I did.

6      Q    What did you do on the 13th?

7      A    Rosemary Bates had sent me an email.  I think

8    another city employee had sent her an email about

9    their interaction with him.  And that's when I

10   notified her that he had 6-404'd that night and sent

11   to Middle Tennessee Mental Health.  I think Emily

12   Cecil called me the next morning.  That's where she

13   informed me that the case worker at Middle Tennessee

14   Mental Health would need some supporting

15   documentation from someone like the chief or the

16   district attorney, the major's office to kind of

17   bring them up to speed to about what our dealings

18   with him were about.

19     Q    I'm sorry.  Say that --

20     A    She told me that the case worker at Middle

21   Tennessee Mental Health wanted a letter detailing

22   some of the incidents that we had had with him,

23   describing, you know, what our interactions with him

24   were.

25     Q    Emily Cecil called you?

1    A    I think she called me or I may have called

2   her.  I can't remember.  I just know she told me

3   that, that they needed that at Middle Tennessee

4   Mental Health.  I may have called her.  I don't

5   remember.

6    Q    Okay.  And what was your understanding of

7   what they would have needed that for?

8    A    To describe our interactions with him.

9   That's all she explained to me.

10    Q    Okay.  Did Emily Cecil give you any kind of

11  an update on the status of the commitment when you

12  talked to her?

13    A    I don't think she did.  She just said he was

14  down there where the case worker was and who to

15  address the letter.  She didn't give me an update on

16  his status or anything or how long he was going to

17  be there or anything like that.

18    Q    Was there anybody else that you talked to on

19  the 13th from MTMHI?

20    A    I don't remember.

21    Q    Okay.

22    A    The name Baker sounds familiar.  I think that

23  was the case worker at the time.

24    Q    You might have talked to the case worker?

25    A    No.  I'm just saying the name Baker for some

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 157 of 189 PageID #: 3584

1    reason is jumping out at me.  I think that's who the

2    case worker -- I think I got that information from

3    Emily, but I don't remember talking to anybody at

4    MTMHI.

5        Q    Barker?

6        A    Barker.

7        Q    So this is going to a collective exhibit of

8    the fax to Kristina Barker at MTMHI with a letter on

9    city letterhead by the chief and then an email

10   exchange between you and the chief.

11       A    Yes.

12       Q    I think this is what we've been talking

13   about?

14       A    Yeah.

15       Q    Did you gather the information to draft this

16   letter?

17       A    I did.

18       Q    Did you write this letter?

19       A    I did.

20       Q    Okay.  And then basically just forwarded it

21   to the chief for him to sign off on?

22       A    He reviewed it and signed it.

23       Q    Okay.  And then I think what you're saying is

24   you did that after talking to Ms. Cecil?

25       A    Yes.

1      Q   Did you get any kind of response from MTMHI

2   after forwarding this?

3      A   I did not.

4      Q   Did you have any other contact --

5           MR. MOTHERSHEAD:  Did we mark that as an

6      exhibit?

7           COURT REPORTER:  Not yet.

8           MR. MOTHERSHEAD:  It will be 11.

9           (Document marked Exhibit No. 11.)

10  BY MR. MOTHERSHEAD:

11     Q   Did you get any other response from MTMHI

12  while Reeners was there?

13     A   No, I didn't.

14     Q   When you and Ms. Cecil and the other officers

15  were at Mr. Reeners's house on the 12th, did you

16  look at her 6-401?

17     A   I did not.

18     Q   Okay.  When is the first time you actually

19  saw her 6-401?

20     A   I don't know that I've ever seen it.

21     Q   All right.  Let's look at this packet which

22  was an affidavit and some attachments that you

23  filed.  We're going to be going back and forth.  So

24  just look at the last -- let's mark this as

25  Exhibit 12.

```
 1              (Document marked Exhibit No. 12.)
 2    BY MR. MOTHERSHEAD:
 3        Q    Look at the last page.  It should be the
 4    6-401.
 5        A    Yes.
 6        Q    Is this right now today the first time you've
 7    ever seen this document?
 8        A    No.  I've seen this packet, but I don't know
 9    if I went all the way to the last page.  Yeah.  I do
10    believe this is probably the first time I've seen
11    this particular document.  I've read my affidavit,
12    the reports, the attachments in here, but I don't
13    think I've ever read this 6-401.
14        Q    So you have seen this before but not at the
15    time?
16        A    Right.
17        Q    Okay.
18        A    Talking about on June 12th, no, I didn't.
19        Q    Didn't see it on June 12th?
20        A    No.
21        Q    Okay.  If we go back to Exhibit 6, the last
22    few pages there are some Facebook posts, some kind
23    of social media post.
24        A    This one?
25        Q    Right.  And we testified earlier or you
```

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 160 of 189 PageID #: 3587

1  testified earlier talking about seeing some social

2  media posts and you were little unsure when you had

3  seen them.

4      A    What was your question?

5      Q    I was asking you earlier about, you know, was

6  there anything else outside the timeline that wasn't

7  referenced in the timeline.  And you mentioned some

8  social media posts.  Are these the posts that you

9  were talking about or is this something else?

10     A    Probably one of many or few of many.  I've

11 seen tons.

12     Q    And these posts were forwarded to you on

13 June 17th by J. Wright.  Whoever J. Wright --

14     A    June 17th.

15     Q    Yeah.

16     A    Like I said, I don't remember when I got

17 them.

18     Q    Okay.  Well, if you look at the page right

19 before -- there's an email from -- what does

20 J stand for?

21     A    Jeff.

22     Q    Jeff Wright June 17th.

23     A    Okay.

24     Q    And it has subject:  Patrick Reeners FB post

25 with some screen captures attached.

1    A    Okay.

2    Q    Which apparently are these documents.    Then

3  you respond to him that those were before he got

4  committed, the last page.    But you can see from the

5  dates on the posts.

6    A    Okay.

7    Q    So this -- I mean, was this when you first

8  saw these?

9    A    I don't know if I was asking him a question

10  when I said those were before he got committed.    No.

11  I had seen -- I just saw so much.    I just went

12  through a lot of his postings.    These look like

13  posts that I have seen before.

14    Q    Okay.    And you didn't mention these posts at

15  all in any of your discussions with Mobile Crisis or

16  Emily Cecil, right?

17    A    I don't remember if I did or not.    I don't

18  think I did.

19    Q    Okay.    And you didn't mention them in any

20  incident reports or anything like that?

21    A    No.

22    Q    Why wouldn't you mention something like these

23  posts if you were --

24    A    Because there was so much.    There were so

25  many emails.    And a lot of this stuff that would

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 162 of 189 PageID #: 3589

1    come in emails would be copies of memes.  There was

2    so much.  There was so much stuff.  It was hard to

3    keep up.  It was mostly emails.

4        Q   Okay.  But the stuff that you had seen would

5    have all been attached to e-mails?

6        A   No.  I'm just saying there was some stuff

7    that was attached to emails.  And I said earlier

8    that I didn't have Facebook.  I remember seeing some

9    posts where officers had pulled the stuff up.  They

10   were looking at his Facebook stuff.  I think

11   Rosemary Bates had even showed me some stuff.  I

12   remember seeing stuff in emails about some of his

13   posts.

14       Q   Like discussion in emails about the posts?

15       A   No.  This is something he's posted.  Look at

16   this, that kind of thing.

17       Q   Okay.  So, I mean, it sounds like there

18   should be some emails that we could track down that

19   talk about that?

20       A   There should be hundreds of emails.

21       Q   One of the things that Rosemary emailed to

22   you that day of the 12th is a reference to Reeners'

23   folder on the P.D. common drive.  What's that?

24       A   That's a file folder that I had asked for any

25   emails that they had gotten from him.  And there

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 163 of 189 PageID #: 3590

1    were so many that she couldn't just forward them all

2    to me.  She had to create a file folder to put them

3    on the common drive.  It's a server with the city.

4    So you can access to see all of his emails that he

5    had sent to her that she was aware of.  I asked her

6    for any emails that she was aware of.

7        Q    Okay.  So what's in that -- what was in that

8    common drive are just emails; is that right?

9        A    I don't know what all was in there.

10       Q    Did you review the common drive or no?

11       A    I tried to look at some of those emails.

12   There was just so many.  I didn't have time to look

13   at everything he ever said.  He said so much.  I

14   think she said it was like 15 megabytes or something

15   like that.  It was a pretty big file.

16       Q    So if we could go back to Exhibit 12.

17       A    Okay.

18       Q    So if we could look at paragraph 13 of your

19   affidavit.

20       A    Okay.

21       Q    And the second half of that paragraph, It is

22   my understanding when Mobile Crisis requests a

23   transport for a mental evaluation, it is the

24   responsibility of the Gallatin Police Department by

25   state statute to transport the individual to

1    whatever hospital we are informed Mobile Crisis to

2    transport the person.

3        A    Uh-huh.

4        Q    And we've kind of been talking about this all

5    day.  Is it your understanding of your training and

6    the policy that, you know, if Emily Cecil requests a

7    6-401, then you just need to do it?

8        A    Yes.  Training, policy, and the law.

9        Q    Without --

10       A    Defer completely to her.

11       Q    Okay.  And it's not your job or wouldn't even

12   be appropriate for you to make your own assessment

13   of whether Mr. Reeners presented an immediate danger

14   of --

15       A    I couldn't because I didn't hear their

16   conversation.  I don't know what he said to her.

17       Q    Did Ms. Bates have any kind of mental health

18   training or anything like that, Rosemary?

19       A    I don't know.

20       Q    Okay.  Is there anything in that affidavit

21   that you filed that you think is inaccurate or

22   should be corrected?

23       A    No.

24       Q    So just again to summarize, I think we've

25   agreed when you gave your blessing to Jones to take

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 165 of 189 PageID #: 3592

1    Mr. Reeners into custody to the hospital, you didn't

2    have any information reflecting that he was in

3    immediate threat of harm to somebody else; is that

4    right?

5        A    Can you repeat that?

6        Q    You didn't have any information reflecting

7    that Mr. Reeners was an immediate threat of harm to

8    somebody else?

9        A    No.  I was relying on Emily Cecil's

10   assessment.

11       Q    Okay.  Give me just a moment.

12           MR. MOTHERSHEAD:  Can we just go off the

13       record?

14           MR. BATES:  Sure.  Take a break.

15           (A break was taken.)

16           MR. MOTHERSHEAD:  All right.  We're good.

17       Thanks.

18           MR. BATES:  We're back on the record.  I

19       have just a few follow-up questions.

20                        EXAMINATION

21   BY MR. BATES:

22       Q    On June 12th of 2014 when all of these events

23   happened that we've been talking about, were you

24   aware of what a 6-401 was?

25       A    Yes.

1    Q   Okay.  And how were you aware of that?

2    A   Just previous dealings with Mobile Crisis and

3  Cumberland Mental Health and previous transports of

4  mental health patients.

5    Q   Okay.  Had you personally been involved in

6  situations dealing with the detention and

7  transportation of mental health patients?

8    A   Just the people that had already been

9  assessed and orders written up, but never assessed

10  or present when they were assessed.

11    Q   Okay.  Tell me the prior circumstances that

12  you just alluded to.

13    A   Just multiple occasions over the years of

14  being in patrol.  If they would call for a transport

15  of a mental health patient for a 6-401, that's what

16  we would do.  We transport them from their office to

17  the hospital under the 6-401 orders.

18    Q   And who are you saying would call?

19    A   Mobile Crisis, Cumberland Mental Health,

20  different folks, mostly the Mobile Crisis folks.

21    Q   Had you personally gotten those orders

22  before?

23    A   Pardon me?

24    Q   Had you personally gotten those orders before

25  to transport?

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 167 of 189 PageID #: 3594

1      A    Yes.

2      Q    And how many different prior occasions?

3      A    I couldn't tell you.  Numerous over the years

4    when I was a patrol officer.

5      Q    Okay.  And where did the orders come from?

6    Did they come through dispatch?

7      A    No.  They would be the possession of the

8    Mobile Crisis folks.  I would be dispatched to the

9    call.  They would call the police department for an

10   officer to be dispatched for the transport.

11     Q    Okay.  And then you would do what after you

12   received these orders?

13     A    Transport them to the hospital.

14     Q    Okay.  And when you did these prior

15   transports that you've testified to, did you have

16   the order or paper evidencing an order in hand?

17     A    No.

18     Q    Okay.  What did you have?

19     A    The mental health people stating that they

20   had orders to detain that person.  I relied on

21   their --

22     Q    And these were based on verbal

23   communications?

24     A    Yes.

25     Q    Now, on June 12, 2014, were you aware of the

 1   statute 33-6-401?

 2       A   I was aware of it.  I couldn't tell you word

 3   for word what it says.

 4       Q   Okay.  Were you aware of the fact that the

 5   terms 6-401 came from 33-6-401?

 6       A   Yes, sir.

 7       Q   Okay.  I'm going to read this statute and ask

 8   if you are familiar with the terms of 33-6-401 on

 9   June 12th, 2014.  If and only if (1) a person has a

10   mental illness or serious emotional disturbance and

11   (2) the person poses an immediate substantial

12   likelihood of serious harm under 33-6-501 because of

13   the mental illness or serious emotional disturbance,

14   then (3) the person may be detained under 33-6-402

15   to obtain examination for certificate of need for

16   care and treatment.  Were you aware of the wording

17   of this statute --

18       A   Yes, sir.

19       Q   Let me finish -- - on June 12th, 2014?

20       A   Yes, sir.

21       Q   Okay.  And I'll ask the same question about

22   statute 33-6-501 which reads, If and only if (1)(A)

23   a person has threatened or attempted suicide or to

24   inflict serious bodily harm on the person, or (B)

25   the person threatened or attempted homicide or other

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 169 of 189 PageID #: 3596

1  violent behavior, or (C) the person has placed

2  others in reasonable fear of violent behavior and

3  serious physical harm to them, or (D) the person is

4  unable to avoid severe impairment or injury from

5  specific risks; and (2) there is a substantial

6  likelihood that the harm will almost occur unless

7  the person is placed under involuntary treatment,

8  then (4) (as stated) the person possesses (as

9  stated) a substantial likelihood of serious harm for

10  purposes of this title.  Are you familiar with that

11  statute?

12      A    Yes.

13      Q    Okay.  How are you familiar with that

14  statute?

15      A    Just in previous dealings.  Our training, the

16  in-service training, 6-401 transports.

17      Q    Okay.  On June 12th, 2014, when these events

18  started to unfold, did you have knowledge of whether

19  Mr. Reeners had a mental illness or a serious

20  emotional disturbance?

21      A    Did I have knowledge?

22      Q    Yes.

23      A    I had beliefs.

24      Q    Did you know for a fact whether he had a

25  mental illness or a serious emotional disturbance?

1       A    No.

2       Q    Okay.  You're not a psychologist?

3       A    No, sir.

4       Q    Okay.  You're not a mental health

5   professional?

6       A    No, sir.

7       Q    You're not psychiatrist?

8       A    No, sir.

9       Q    Okay.  You've had no psychological or medical

10  training about mental illness, right?

11      A    No, sir.

12      Q    Okay.  So these are things you did not know,

13  correct?

14      A    Right.

15      Q    Okay.  And did you know on June 12th, 2014,

16  whether Mr. Reeners posed an immediate substantial

17  likelihood of serious harm because of a mental

18  illness or serious emotional disturbance?

19      A    I did not.

20      Q    Did you call Emily Cecil to make these

21  determinations on your behalf?

22      A    I did.

23      Q    Okay.  Did you have reason to believe that

24  she was competent to make these determinations?

25      A    Yes, sir.

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 171 of 189 PageID #: 3598

1     Q    Why?

2     A    Because of the field that she works in, the

3   business that she worked for in previous dealings

4   with them.  That's who I called.  She is who they

5   sent.

6     Q    Had you known Emily Cecil before?

7     A    Never met her, no, sir.

8     Q    Okay.  But you had dealt with other

9   individuals of Mobile Crisis?

10    A    Yes, sir.

11    Q    And you had confidence that they could make a

12  determination under the statute regarding

13  involuntary commitment?

14    A    Yes, sir.

15    Q    I'm going to refer you briefly to Exhibit 12,

16  which has been introduced as your affidavit.  And in

17  paragraph 7 it reads -- turn to paragraph 5 of your

18  affidavit.

19    A    Okay.

20    Q    Which reads, The City of Gallatin has taken

21  no steps to stop treating the drinking water with

22  fluoride and prior to June 12, 2014, city employees

23  voiced their concerns to the police department that

24  they were afraid that Mr. Reeners may "snap" and

25  felt he presented a risk for violent behavior,

 1    especially on days he was in a bad mood.

 2            Is that correct?

 3        A    Yes.

 4        Q    Okay.  And it goes on to say, As illustrated

 5    by the following emails, A, on December 9th, 2010,

 6    Rosemary Bates, assistant to the mayor, emailed the

 7    Gallatin Police Department that Reeners was

 8    concerned with snakes in Florida as well as fluoride

 9    in the water and would copy the chief in case

10    Reeners, "were to become upset again and perhaps act

11    out."

12            Is that correct?

13        A    Yes.

14        Q    Okay.  B, on January 18, 2011, Rosemary Bates

15    emailed Chief Bandy expressing her concerns that

16    Reeners "may snap."

17            Is that correct?

18        A    Yes.

19        Q    Okay.  C, on December 4, 2012, Rosemary Bates

20    emailed Chief Bandy and stated about Reeners, "I

21    think he been ramping up to an episode."

22            Is that correct?

23        A    Yes, sir.

24        Q    D, on April 21, 2014, Rosemary Bates emailed

25    the mayor and city attorney about an incident where

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 173 of 189 PageID #: 3600

1    Reeners chalked "Stop Murder" on a brick planter at

2    city hall.  Reeners was arrested for public

3    intoxication.  Rosemary Bates stated, "I know from

4    personal experience Patrick can get very hateful

5    verbally.  This is the first time I've known him to

6    act out, so it has escalated."

7          Is that correct?

8    A    Yes.

9    Q    These were all events you were aware of?

10   A    Yes.

11   Q    Number 7, on June 12th, 2014, at

12   approximately 9:23 I received an email from Rosemary

13   Bates about an incident where Reeners came to city

14   hall on June 10th in an "assertive, serious,

15   agitated mode."  Reeners went to Angela Burnside's

16   office in the mayor's suite and Rosemary Bates "did

17   not want to leave Angela alone with him."

18         Is that correct?

19   A    Yes.

20   Q    And this is an event you were aware of,

21   correct?

22   A    Yes, sir.

23         MR. BATES:  Let's introduce the affidavit

24   of Rosemary Bates.  What number exhibit are we

25   on?

```
 1              MS. DONEGAN:  Number 13.

 2              (Document marked Exhibit No. 13.)

 3              THE WITNESS:  Are we done with 12?

 4              MR. BATES:  Yeah.

 5    BY MR. BATES:

 6        Q   Okay.  I'm going to read you some statements

 7    made from the affidavit of Rosemary Bates,

 8    Exhibit No. 13, and ask you if you are aware of what

 9    she has testified to.

10              On paragraph 8, Throughout the years in

11    dealing with Reeners, I have on more than one

12    occasion, and based upon my own concerns, called the

13    Gallatin Police Department while Reeners was in my

14    office area and asked them if they could send

15    someone over and escort Reeners out.

16              Are you aware of that situation that she's

17    testified to?

18        A   Yes.

19        Q   Speak up.

20        A   Yes.

21              MR. MOTHERSHEAD:  Do you have a copy of

22        this for me?

23              MR. BATES:  It's attached to the motion

24        for summary judgment.  I didn't make a copy.

25              MS. DONEGAN:  It's Document 1925.
```

```
 1              MR. BATES:  I'll wait until you pull it up
 2      if you like.
 3              MR. MOTHERSHEAD:  Okay.
 4  BY MR. BATES:
 5      Q    Okay.  On any occasion did you personally go
 6  over and escort Mr. Reeners out of city hall?
 7      A    I don't think I did.
 8      Q    Okay.  Are you aware that other officers did?
 9      A    Yes.
10      Q    Number 9, One of my successors in the mayor's
11  office, Angela Burnside, was made very uncomfortable
12  by Reeners and his erratic behavior, so I would
13  never allow her to be alone with him.
14          Were you aware of this fact?
15      A    Yes.
16      Q    Okay.  And how were you aware of this fact?
17      A    By Rosemary.
18      Q    10, up to and on or near June 12, 2014, I and
19  other city employees voiced our concerns to the
20  Gallatin Police Department that we were concerned
21  that Reeners may "snap."  I personally felt he
22  presented a potential risk for erratic and possible
23  violent behavior, especially days he was in a bad
24  mood.  Additionally, his erratic behavior had been
25  noticeably escalating after the "chalking" incident
```

1    in April of 2014.  Were you aware of this fact?

2        A    Yes.

3        Q    And how were you aware of this fact?

4        A    By Rosemary.

5        Q    Rosemary Bates told you this?

6        A    Yes.  I've seen it in emails to the chief and

7    phone calls to the police department.

8        Q    11, of my own accord, I would email

9    Lieutenant Troup at the Gallatin Police Department

10   and would copy the chief or assistant chief and

11   others, regarding some of the incidents and concerns

12   I had regarding Reeners to make them aware of

13   Reeners unannounced visits, phone calls or emails to

14   me.

15            Is that correct?

16       A    Yes.

17       Q    And did you personally receive some of these

18   communications?

19       A    I did.

20       Q    Okay.  And were you aware that Rosemary Bates

21   was also communicating with the chief of police?

22       A    Yes.

23       Q    12, Specifically on December 9, 2010, I

24   emailed the Gallatin Police Department that Reeners

25   was concerned with snakes in Florida as well as

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 177 of 189 PageID #: 3604

```
 1   fluoride in the water and I mentioned that I was

 2   copying the chief in case Reeners "were to become

 3   upset again and perhaps act out."

 4           Are you aware of this?

 5       A   Yes, sir.

 6       Q   13, On January 18, 2011, I emailed Chief

 7   Bandy expressing my persons that Reeners "may snap."

 8           Were you aware of that?

 9       A   Yes.

10       Q   14, On December 4th, 2012, I emailed Chief

11   Bandy and stated about Reeners, "I think he may be

12   ramping up to another episode."

13           Were you aware of that?

14       A   Yes.

15       Q   Okay.  And how were you aware of that?

16       A   Through Rosemary and emails.

17       Q   15, On April 21, 2014, I emailed former Mayor

18   Jo Ann Graves and former City Attorney Joe Thompson

19   about an incident where I had seen Reeners chalking

20   "Stop Murder" on the brick planter at city hall.  I

21   stated in the email that "I know from personal

22   experience Patrick can get very hateful verbally.

23   This is the first time I've known him to act out, so

24   it has escalated."

25           Were you aware of that?
```

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 178 of 189 PageID #: 3605

1     A   Yes.

2     Q   Okay.  And how were you aware of that?

3     A   Through the emails and the incident that

4  happened where he was arrested.

5     Q   16, As I previously stated, Reeners makes

6  Ms. Angela Burnside very uncomfortable.  So on

7  June 10, 2014, as I was leaving the mayor's office,

8  I saw Reeners headed toward the mayor's office so I

9  turned around and followed him back in the mayor's

10  office.  I decided to stay with Ms. Burnside while

11  Reeners was there as he was visually upset.  I tried

12  to keep him calm and spoke to him calmly to keep him

13  from getting any more agitated.  I considered

14  calling the Gallatin Police Department then to have

15  him removed, but he eventually left on his own.

16        Were you aware of that?

17     A   Yes, sir.

18     Q   And how were you aware of that?

19     A   By Rosemary.

20     Q   On June 12, 2014, at approximately 9:23, I

21  emailed Lieutenant Troup about the incident where

22  Reeners had come into the mayor's office and I told

23  Lieutenant Troup in that email that "I did not want

24  to leave Angela alone with him."

25        Is that correct?

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 179 of 189 PageID #: 3606

1       A    Yes, sir.

2       Q    And you received this email?

3       A    Yes, sir.

4       Q    18, On or near June 12, 2014, Reeners again

5   came into my office unannounced and was highly

6   agitated.  I did contact the Gallatin Police

7   Department and ask that they come to my office to

8   ask him to leave.  A member of the Gallatin Police

9   Department came to my office whereupon Reeners was

10  escorted from my office.

11          Were you aware of that event?

12      A    Yes, sir.

13      Q    Paragraph 7 of Rosemary Bates' affidavit, The

14  mayor's office and other offices in city hall are

15  equipped with panic buttons at our desks that rang

16  directly to the Gallatin Police Department.

17  Whenever Reeners would come into my office area, I

18  would always sit at my desk and have my hand or

19  finger either near, or actually on, the panic button

20  in case Reeners became too aggressive, angry, or

21  threatening, or violent.

22          Were you aware of that?

23      A    Yes.

24      Q    Okay.  And how were you aware of that?

25      A    Rosemary told me that.

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 180 of 189 PageID #: 3607

1        Q    Paragraph 5, There were many occasions that

2    Reeners and I spoke in person and I could tell

3    immediately what type of mood Reeners was in and

4    whether or not it would be a good or a difficult

5    meeting.  Reeners' mood swings would be quite severe

6    from one day to the next.  There were days he would

7    come to city hall and speak with me or with one of

8    the others in my presence and he would be in a good,

9    friendly and "upbeat" type of mood.  Other days he

10   would obviously be in a bad mood and he would be

11   agitated and angry that the city hadn't stopped

12   using fluoride in the water.

13        Were you aware of that?

14   A    Yes.

15        Q    And how were you aware of that?

16   A    Through Rosemary and emails and conversations

17   with her.

18        Q    Now on June 12, 2014, about how close were

19   you between where Reeners and Emily Cecil were

20   talking?

21   A    It varied because I moved around a little.

22   Probably 15 feet for the most part.

23        Q    And when Emily Cecil and Mr. Reeners were

24   talking, where were they physically?

25   A    On the porch, the front porch of the house.

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 181 of 189 PageID #: 3608

1    Q    Okay.  Were they seated in chairs on the

2  porch?

3    A    No.  They were sitting on the porch.  It's

4  sort of a low stoop, like one step up to it, where

5  you could sit down and feet still be on the ground.

6    Q    Okay.  And you have read the transcript of

7  the audio recording of Brad Jones' recorder,

8  correct?

9    A    Yes.

10    Q    Okay.  And you testified a little while ago

11  you did hear some of the conversation between

12  Mr. Reeners and Emily Cecil, correct?

13    A    Yes, just bits and pieces.

14    Q    How much -- can you give a little bit more

15  detail?  How much of the conversation could you

16  hear?

17    A    Not a lot.  I remember him telling her that

18  he had worked with the FBI and solved the collapse

19  of the World Trade Center.  I remember him saying

20  something about creating a miracle wax or inventing

21  a miracle wax that you could put on a car and never

22  have to wash it again.

23        And then he starting talking about something

24  of ridding the world of beetles, something along

25  those lines.

1      Q    Were you attempting to hear the conversation

2  that took place between Mr. Reeners and Emily Cecil?

3      A    No.  He talks loud.  I wasn't trying to hear

4  -- that was her conversation with him.  I didn't

5  want to be involved in her conversation with him.

6  No.  I wasn't trying listen in on what she was

7  discussing with him.

8      Q    Okay.  It's my understanding, is this

9  correct, that Emily Cecil notified you that she was

10  going to call her supervisor?

11      A    Yes, sir.

12      Q    Okay.  When Emily Cecil -- do you know where

13  Emily Cecil went to talk to her supervisor?

14      A    She went to her vehicle.

15      Q    Okay.  Could you hear anything she said to

16  her supervisor?

17      A    No, sir.

18      Q    Okay.  And when Emily Cecil exited her

19  vehicle and came back to the scene, did Emily Cecil

20  say anything to you about what her conversation to

21  her supervisor entailed?

22      A    No, sir.

23      Q    Okay.  Did you ask Emily Cecil what she

24  talked to her supervisor about?

25      A    No, sir.

1     Q    Okay.  And why not?

2     A    That's her business.  To me, that was a

3  medical situation for her to talk with her boss

4  about.  It wasn't for me to intervene.

5     Q    All right.  And what did Emily Cecil say to

6  you and the other officers before Mr. Reeners was

7  seized?

8     A    I just remember her saying that a 6-401 was

9  going to be signed and he needed to go to the

10  hospital.

11     Q    And did she say anything more?

12     A    No, sir.

13     Q    All right.  And did you ask her anything

14  about the 6-401 or the transportation or anything

15  else?

16     A    No, sir.

17          MR. BATES:  Okay.  That's all.

18                    EXAMINATION

19  BY MR. MOTHERSHEAD:

20     Q    You testified that you have subsequently

21  reviewed the transcript of Jones' body audio; is

22  that right?

23     A    Yes, sir.

24     Q    I mean, there's nothing in there that would

25  have constituted a threat from Mr. Reeners on the

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 184 of 189 PageID #: 3611

1    scene; is that right?

2        A   Nothing --

3             MR. BATES:  Object to the question.  Go

4        ahead and answer.

5        A   Nothing that I heard.  I didn't hear him make

6    any threats.

7    BY MR. MOTHERSHEAD:

8        Q   And so before when I asked you about if the

9    circumstances, you know, at the time when you gave

10   blessing to this detention, there was nothing that

11   you were aware of that suggested that Mr. Reeners

12   was about to hurt somebody but you kind of gave a

13   caveat that you didn't know what he said to

14   Ms. Cecil?

15       A   Right.

16       Q   There's nothing that's on that body wire that

17   would add anything, any reason to believe he was

18   about to hurt somebody?

19       A   No.

20       Q   Is that correct?

21       A   Yes.

22       Q   The statute that you guys reviewed, 33-6-401,

23   requires that the person pose an immediate

24   substantial likelihood of serious harm, right?

25       A   Yes.

1    Q    Okay.  And immediate means immediate, right?

2    A    Yes.

3    Q    And so these various communications from

4    Rosemary over the course of, like four years, right,

5    I mean, when she's sending these messages over the

6    course of four years, right?

7    A    Yes.

8    Q    So, you know, for instance, in her affidavit

9    she talks about paragraph 13 on January 18, 2011, I

10   emailed Chief Bandy expressing my concerns that

11   Reeners "may snap."  Would you say that once she

12   makes that statement then kind of at any time the

13   police department can go take him into custody

14   because you never know, he may snap?

15   A    No.  I don't know what her level of mental

16   health training is.

17   Q    Rosemary's?

18   A    Yes.

19   Q    Right.

20   A    I didn't think she was qualified to make the

21   statement that he needed to be locked up or mentally

22   evaluated.  She was just expressing her concerns and

23   her fears of what he may do.

24   Q    Okay.  So you wouldn't think it would be

25   appropriate to rely on her kind of opinion

1  essentially about what the possibility that

2  Mr. Reeners could snap?

3      A   I think a reasonable person should take her

4  fears into consideration that she feared him.

5      Q   Right.  Her predictions about, you know, he

6  may snap, he may be ramping up, you would agree that

7  you shouldn't -- she doesn't have the qualifications

8  to make those kind of predictions?

9      A   I would say that she doesn't have the

10 qualifications to say that he needed to be locked

11 up.  I rely on her dealings with him.  She had a lot

12 of experiences with him as she explained.  She knew

13 when he was in a good mood and she knew when he was

14 in a bad mood.  She felt like he was a danger.

15     Q   So, I mean, would you say that at any point

16 time in 2014 there was enough from Rosemary feeling

17 uncomfortable and thinking he was a danger that you

18 could have just gone and taken Mr. Reeners into

19 custody?

20     A   No.  Because she couldn't give me an order on

21 a 6-401 to do so.

22              MR. MOTHERSHEAD:  That's all.

23                       EXAMINATION

24 BY MR. BATES:

25     Q   Is it fair to say that what Rosemary Bates

Case 3:15-cv-00625  Document 245-2  Filed 09/16/19  Page 187 of 189 PageID #: 3614

1    told you and what you learned from Rosemary Bates

2    was a factor in your decision and the police

3    department's decision to call Mobile Crisis?

4        A    Yes, sir.

5        Q    And that's really why you called Mobile

6    Crisis.

7        A    Because of the fear that he was placing on

8    Rosemary and other workers in this building, yeah.

9            MR. BATES:  Okay.  That's it.  Thank you.

10            (Deposition concluded at 2:41 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:15-cv-00625   Document 245-2   Filed 09/16/19   Page 188 of 189 PageID #: 3615

```
 1                C E R T I F I C A T E

 2

 3          I, Lisa K. Henderson, Licensed Court

 4    Reporter for the State of Tennessee, do hereby

 5    certify that I recorded to the best of my skill and

 6    ability by machine shorthand the proceedings

 7    contained herein, that same was reduced to computer

 8    transcription by myself, and that the foregoing is a

 9    true, accurate, and complete transcript of same.

10          I further certify that I am not an

11    attorney or counsel of any of the parties, nor a

12    relative or employee of any attorney or counsel

13    connected with the action, nor financially

14    interested in the action.

15          This 29th day of October, 2018.

16

17                    Lisa K. Henderson

18    _____

19    Lisa K. Henderson

20    LCR No. 406, Exp:  6/30/2020

21

22

23

24

25
```