**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **PATRICK REENERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 3:15-cv-00625** |
| **RICKEY TROUP** *et al.*, | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM</u>

Before the court are (1) a Second Motion for Summary Judgment (Doc. No. 248) filed by defendants Rickey Troup, Lamar Ballard, Bradley Jones, Jamie Helson, and the City of Gallatin, Tennessee; and (2) plaintiff Patrick Reeners' Motion for Summary Judgment as to Liability (Doc. No. 244). For the reasons set forth herein, the court will grant in part and deny in part both motions.

Specifically, for the reasons set forth herein, the court will deny the defendants' Motion for Summary Judgment on the issue of the individual defendants' entitlement to qualified immunity for effecting a mental health detention of the plaintiff in the absence of probable cause to believe that he posed a risk of harm to himself or others. The defendants' motion will be granted in all other respects. The court will grant the plaintiff's Motion for Summary Judgment as to the individual defendants' liability for his detention in violation of the Fourth Amendment but deny the motion in all other respects.

## I.     PROCEDURAL BACKGROUND

This case has been pending since June 2015, when Reeners, then acting *pro se*, filed his first Complaint asserting claims under 42 U.S.C. § 1983 and state law against numerous defendants, including several police officers with the Gallatin, Tennessee Police Department,

arising from his being arrested because of mental health issues, transported to the Sumner Regional Medical Center for an evaluation, and involuntarily committed to the Middle Tennessee Mental Health Institute for a period of six days in June 2014. (Doc. No. 1.) The case was referred to the magistrate judge, who recommended that the claims against defendant Volunteer Behavioral Health Services be dismissed but that the remaining claims against the remaining defendants be permitted to proceed. (Doc. Nos. 7, 8.)

Over the course of the subsequent four years, counsel was appointed to represent the plaintiff. (Doc. No. 61); the claims against defendants Middle Tennessee Mental Health Institute and Sumner County Medical Center were dismissed (Doc. Nos. 59, 77); the plaintiff was permitted to amend and/or correct his pleading several times, such that the operative pleading is now the Fifth Amended Complaint (Doc. No. 169); and the defendants' first Motion for Summary Judgment, seeking dismissal of all claims on the grounds of qualified immunity, was granted as to Gallatin Police Chief Donald Bandy in his individual capacity, but denied as to the other defendants (Doc. No. 221).

Having been granted leave to do so, the plaintiff filed his Motion for Summary Judgment as to Liability on September 16, 2019, along with a supporting Memorandum of Law, Statement of Undisputed Material Facts, and a separate Statement of Additional Disputed Facts Not Contested for the Limited Purpose of Plaintiff's Summary Judgment Motion. (Doc. Nos. 244–47.) Along with these documents, the plaintiff also submitted nine deposition transcripts and numerous other exhibits. (Doc. Nos. 245-1 through 245-28.) On the same day, the defendants filed their Second Motion for Summary Judgment, supporting Memorandum of Law, Statement of Undisputed Facts, and two Notices of Filing, to which were attached numerous additional

affidavits, deposition excerpts, and other exhibits.[1]

Each party filed a Response in Opposition to the other's motion and Responses to each other's Statement of Undisputed Facts, the plaintiff filed additional exhibits, and both parties filed Reply briefs. (Doc. Nos. 258, 259, 261, 262, 262, 264, 274.) In light of the complexity of the case, the length of time it has been pending, the magistrate judge's indication that his crowded docket would prevent him from being able to consider the motion promptly (*see* Doc. No. 273), and the fast-approaching trial date, the undersigned withdrew the reference to the magistrate judge in order to rule directly on the pending motions. (Doc. No. 279.)

## II.     STANDARD OF REVIEW

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of informing the court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case. *Id.* Accordingly, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to any of the essential elements of its claims.

Once the moving party makes its initial showing, the burden shifts to the non-moving party to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a

---

[1] The defendants also rely on affidavits submitted in conjunction with their first Motion for Summary Judgment.

genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *Ferro Corp. v. Cookson Group, PLC*, 585 F.3d 946, 949 (6th Cir. 2009). "[S]ummary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (citations omitted).

## III.   STATEMENT OF FACTS

The facts set forth herein are drawn from all the materials submitted by both parties and are basically undisputed unless otherwise noted.

Patrick Reeners is an adult resident of Gallatin, Tennessee who considers himself an

activist trying to make the world a better place. (Doc. No. 245-1, at 29.)[2] The defendants are, or were at all relevant times, sworn law enforcement officers with the Gallatin Police Department ("GPD"). Defendants Troup and Ballard were lieutenants, Helson was a corporal, and Jones was a patrol officer. (Doc. No. 262 ¶ 2.)

Over the course of several years preceding the June 2014 incident that is the subject of this lawsuit, Reeners had contacted officials with the City of Gallatin ("the City") and the GPD numerous times in an effort to persuade the City to cease fluoridating its public water supply, based on his belief that fluoride is toxic to humans and particularly harmful for children. (*See* "GPD Timeline," Doc. No. 258-1; Doc. No. 262 ¶ 5; Doc. No. 259 ¶ 1.) For instance, on December 3, 2012, Reeners emailed the GPD, advising that he had attempted to purchase fluoride from a dentist in order to prove the dangerousness of fluoride to the City Council. (Doc. No. 245-3.) Several members of the GPD, including Troup, Ballard, and Police Chief Donald Bandy, received the email. (Doc. No. 262 ¶ 7.) The dentist also contacted the GPD and spoke with Troup, telling him that Reeners had contacted his office asking to buy enough fluoride to kill a baby, which the dentist found "very odd." (Doc. No. 245-2, at 76–77.) Troup did not assign any GPD officers to follow up on this incident, however, and no charges were filed against Reeners related to it.[3] (Doc. No. 245-2, at 77.) In early 2013, Ballard had a conversation with Reeners on the steps of the police department about the incident. Like Troup, Ballard took no steps to have the matter investigated further and did not file charges against Reeners. (Doc. No. 245-3, at 12–20, 27–29.)

---

[2] Nearly every deposition transcript filed as an exhibit in this case includes an unnumbered cover page, as a result of which the original pagination of the transcript is inconsistent with the page number assigned by this court's docketing system, CM/ECF. In every citation herein, the court will use the CM/ECF pagination.

[3] Reeners explained in his deposition that the whole point of his asking the dentist for fluoride was to prove that he could not get it from the dentist because of the danger it poses. (*See* Doc. No. 245-1, at 32–33.)

In February 2013, Reeners called the GPD and spoke to defendant Helson to complain about a company called ServPro. ServPro also called to complain about Reeners, and Reeners called again to complain about ServPro. In June 2013, Helson advised both Reeners and ServPro that their conflict was civil rather than criminal and did not need to involve the police department. (Doc. No. 262 ¶¶ 12–14.)

In the summer of 2013, Tennessee State Representative Debra Maggart complained to the Tennessee State Trooper's Office that she had had a telephone conversation with Reeners in which he threatened to conduct a "citizen's arrest" of the governor if the governor did not discontinue public water fluoridation in Tennessee. The State Trooper's Office investigated Maggart's allegation and determined that it was unfounded. (Doc. No. 262 ¶¶ 15–16.)

In August 2013, Maggart complained to the Hendersonville Police Department that Reeners was continuing to contact her. The Hendersonville Police Department contacted Reeners, who indicated that he would not contact her again. No charges were filed against Reeners in relation to his contacts with Maggart. (Doc. No. 262 ¶¶ 17–19.)

In April 2014, Reeners chalked "Stop Killing" and "Fluoride is Murder" on the sidewalk in front of the District Attorney's Office and City Hall. GPD Officers Castleberry and Jones responded to a complaint about the chalking; Castleberry arrested Reeners for the offense of public intoxication. A few days later, GPD Officer Cantrell was dispatched to the GPD lobby to talk to Reeners, who was there to complain about having been arrested in relation to the chalking, because he had previously gotten permission from the GPD to chalk. Cantrell then issued Reeners a citation for vandalism for the chalking. (Doc. No. 262 ¶¶ 20–23.)

At some point between the chalking incident and early June, defendant Jones was called out to the local hospital to ask Reeners to leave the property. Jones responded to the call and spoke

with Reeners; Reeners cooperated with Jones' request and left the hospital without incident. (Doc. No. 262 ¶¶ 24–26.)

On June 9, 2014, Reeners went to a gazebo outside City Hall to work on a complaint letter to the City about the chalking arrests. A City employee overheard Reeners talking about his complaint as he wrote and called the GPD to report that Reeners was "talking 90 miles a minute" about how the GPD had kidnapped him. The caller also emphasized that Reeners was not harming anything or anyone. (Doc. No. 262 ¶¶ 27–29.) The dispatcher misconstrued the call as a report that someone was "yelling at people walking around the gazebo." (Doc. No. 262 ¶ 30.) Officer Cantrell responded to the call, spoke with Reeners, and left. (Doc. No. 262 ¶ 31.)

On June 10, 2014, Reeners went to City Hall and spoke with Human Resources Coordinator Amy Summers. He claimed that the April arrests and the June 9 false report about his "yelling" had violated his constitutional rights. In order to resolve the claims, he wanted the City to buy his house for $20,000 so he could leave town. (Doc. No. 262 ¶¶ 32–33.) Reeners submitted a public records request for the dispatch report ("CAD") from the June 9 incident. (Doc. No. 245-13; Doc. No. 245-10.) On June 11, 2014, Reeners returned to City Hall and told Summers that he was making a complaint to the Department of Justice. (Doc. No. 262 ¶ 35.)

The defendants contend generally that Reeners displayed increasingly greater agitation and frustration in his public protests, social media postings, and conversations with City employees over time. In support of this statement, the defendants supply the Affidavit of Rosemary Bates, a long-time City employee who has dealt with the plaintiff many times over the years. She avers in the Affidavit submitted in July 2016 that sometimes Reeners was friendly and upbeat and, at other times, he was "agitated and angry." (Doc. No. 125 ¶ 5.) She states that she is familiar with mental illness, and with paranoid schizophrenia in particular, having a family member who suffers from

this disorder, based on which she attests to her belief that "Reeners has the potential for violent behavior." (*Id.* ¶ 6.) She continues:

> Over the years in dealing with Reeners, I have noticed that his agitation has escalated and his cycling of up and down moods has increased. Prior to June 12, 2015, he has had more angry moods and stages more often than he previously did. I also believe it is merely a matter of time before Reeners will have an uncontrollable episode and may hurt someone.

(*Id.*) According to the timeline supplied in the June 30, 2016 Affidavit by defendant Rickey Troup, Rosemary Bates reported concerns about Reeners in December 2010, January 2011, December 2012, and April 2014, each time expressing a concern that he might "snap," "act out," or "have an episode."[4] (Doc. No. 124 ¶ 5.) She never expressly reported that she was afraid of him.

In his deposition, Reeners responded specifically to Bates' allegations, stating that the only time he was "agitated" in his contact with Bates was when he was complaining on June 10, 2014 about an inaccurate report made on June 9, 2014 that he was "yelling and screaming" while at the City Hall gazebo. (Doc. No. 245-1, at 115–16.) Reeners does not dispute that Bates communicated to GPD that she was concerned that Reeners might "snap," but he denies that he was objectively at risk of becoming violent or "snapping" or that he ever gave Bates a reason to feel threatened. (Doc. No. 245-1, at 116, 120–25.)

In addition to writing "Fluoride is Murder" in chalk in the District Attorney's parking lot and "Stop Murder" on a brick planter at City Hall (Doc. No. 259 ¶ 6), Reeners admits that he made social media posts in January 2014 and April 2014, stating that he was looking into whether he could arm children to murder their criminal parents for poisoning them with fluoride and that

---

[4] Troup's Affidavit refers to City employees, in the plural, but he references only the emails from Bates. (Doc. No. 124 ¶ 5.) Bates states that she had personally received complaints about Reeners from colleagues and co-workers at the City from 2009 up to and including June 12, 2014, but she does not provide any details about these complaints. (Doc. No. 125 ¶ 3.)

parents deserve to be murdered for killing their young children with fluoride. (Doc. No. 259 ¶ 7.) It is unclear, however, whether any of the defendants was aware of the social media posts prior to June 12, 2014. Officer Troup testified that he "was aware" of these postings (Doc. No. 124 ¶ 6), but he does not actually state when he became aware of them. It appears that they were forwarded to him on June 17, 2014, after the event in question here. (*See* Doc. No. 146-20.) Regardless, there is no evidence that Reeners ever engaged in any violent behavior in association with these posts or otherwise.

On June 11, 2014, GPD Investigator Bobby Harris informed defendant Troup that he had observed Reeners "'humping' the counter at a Mapco gas station earlier that day." (Doc. No. 251-2 ¶ 3.) Reeners denies the truth of Harris' report. (Doc. No. 258-2 ¶ 1.)

On June 12, 2014, defendants Ballard and Troup and Chief Bandy discussed their "concerns about the mental health of Patrick Reeners." (Doc. No. 124 ¶ 8.) Troup claims that he was "concerned" that Reeners was "becoming more aggressive" and that the police department had been called to City Hall in the past when Reeners was "agitated and would not leave." (*Id.*) They discussed Reeners' recent City Hall contacts and history, broadly including the 2013 Hendersonville report about Maggart's claim. Reeners denies that he had ever become violent, that his behavior was somehow "escalating" or that he had ever refused to leave City Hall when asked. (Doc. No. 254-1, at 124; Doc. No. 258-1.) Nonetheless, according to Bandy, the team agreed that "the right thing to do" was to get a mental health professional involved and to request that Reeners be evaluated. (Doc. No. 245-15, at 56.)

Following the conversation among Troup, Ballard, and Bandy, Troup "took the reins." (Doc. No. 262 ¶ 39.) Troup first contacted City Hall employee Rosemary Bates and asked her to send him "emails with any interactions that people [at City Hall] had been having with [Reeners]

through that week." (Doc. No. 245-2, at 108.) He believed this was information that mental health professionals would need to know. (*Id.*) In an email dated June 12, 2014, Rosemary Bates reported to defendant Troup that Reeners had arrived at City Hall on the afternoon of June 10, 2014 in what Bates described as an "assertive, serious, agitated mode [sic]." (Doc. No. 124-8.) Bates stated that she did not want to leave her colleague, Angela Burnside, alone with him, because Burnside had not had much, if any, contact with Reeners. Bates noted that there had been times in the past when Reeners had been in a bad mood and she felt she "might need to call the police to get him to leave." (*Id.*) She did not recall whether she had actually done so. (*Id.*)[5] Her main concern, as voiced in her email, appeared to be that, when Reeners started talking, it was difficult to get him to stop. (*See id.* (noting that, even when he was in a good mood, Reeners would "still talk a long, long time" and that, that day, she just "let him talk, just listened to him" and he "talked for more than 30 minutes").) Bates also gathered and forwarded to Troup several emails from other City Hall staff members. (Doc. No. 262 ¶ 41.) None of the emails alleged any violence, threats of violence, or actual physical harm by Reeners. (Doc. No. 262 ¶ 42.)

Troup also called Cumberland Mental Health Services to inquire about referring Reeners for a mental evaluation. (Doc. No. 124 ¶ 9.) He informed the person he spoke with there that the GPD had been "dealing with" Reeners for about two years, that he was getting "progressively worse and worse," and that they wanted to "get this guy some help because he keeps getting himself into more and more trouble." (Call Transcript, Doc. No. 124-9, at 3.) Troup stated that "we," apparently meaning the GPD, thought Reeners was "just going to get worse," and Troup was afraid that Reeners was "going to do something dangerous." (*Id.* at 4.) Cumberland Mental

---

[5] However, in her July 11, 2016 Affidavit, she affirmatively stated that she had called the GPD on more than one occasion to ask the police to escort Reeners from her office area. (Doc No. 125 ¶ 8.)

Health Services referred Troup to the Mobile Crisis Hotline. (*Id.* at 5.)

Troup called the number given to him by Cumberland Mental Health Services and reached Emily Cecil, a clinician for the Mobile Crisis unit of Volunteer Behavioral Health Services. They arranged for Cecil to speak with Reeners in order to evaluate his mental state. (5th Am. Compl. ¶¶ 13, 15.) Troup told Cecil that Reeners had gotten worse and worse over the years and that GPD was "really, really worried" about "how far Reeners would go to get his point across." (Doc. No. 124-10, at 3–5.) He told her that Reeners had been threatening the governor and state officials, that nothing Reeners had done in the past was as bad as what he had been doing recently, that the GPD believed Reeners needed to be evaluated, and that Troup personally believed Reeners was "going to become increasingly violent." (Doc. No. 124-10, at 5.) He clarified that Reeners had not threatened to kill anyone or "anything like that," but he also incorrectly claimed that Reeners had been charged with harassment of state officials. (Doc. No. 124-10, at 6.) Cecil agreed to do a mental assessment of Reeners, but she expressed concern that Reeners might be so psychotic that she might not be able to assess him. (Doc. No. 124-10, at 8.) Cecil explained to Troup that, in that scenario, she would "write a 6-401," which would allow the police to take Reeners into custody for the purpose of transporting him to a hospital so that he could be evaluated medically, and the emergency room doctors could then certify him for involuntary in-patient commitment.[6] (*Id.*)

Defendants Ballard, Helson, and Jones had no knowledge of the specific content of Troup's conversation with Cecil. (Doc. No. 259 ¶ 17.) In addition, Helson and Jones were not aware of the

---

[6] As discussed in greater detail hereafter, "6-401" refers to Tenn. Code Ann. § 33-6-401, the statute outlining the requirements for an involuntary mental health detention of a person for the purpose of an "examination for certification of need for care and treatment." *Id.* References herein to "6-404" are to Tenn. Code Ann. § 33-6-404, which outlines the procedure healthcare professionals are to follow to determine whether someone should be temporarily involuntarily committed to a hospital or treatment facility for "emergency diagnosis, evaluation, and treatment." *Id.* § 33-6-404(3)(B)(ii).

conversation Bandy, Ballard, and Troup had previously had about Reeners. (Doc. No. 259 ¶ 19.)

Troup communicated to Bandy and the GPD the plan to get Reeners to meet with Cecil. At approximately 1:00 p.m. on June 12, 2014, defendant Helson instructed defendant Jones to locate Reeners so that he could be interviewed by Mobile Crisis. (Doc. No. 259 ¶ 18.)

Jones did not find Reeners at his home, but he was informed by dispatch that Reeners was at City Hall. (Doc. No. 259 ¶ 20.) Jones located Reeners at City Hall, speaking with Ballard. Reeners agreed to meet with Jones and Ballard at his home at 3:00 p.m. that afternoon. (Doc. No. 126 ¶ 4.) It does not appear that the officers informed Reeners that he would be meeting with Cecil or that the purpose of the meeting was for her to conduct a mental health evaluation.

Ballard, Troup, Jones, and Helson (collectively, "the Officers") and Emily Cecil arrived at Reeners' house around 3:00 that afternoon, and Reeners arrived shortly thereafter. Reeners agreed to speak with Cecil but refused to let her inside his house, so they spoke on his porch for approximately an hour while the Officers stood by in Reeners' yard. (Doc. No. 259 ¶¶ 22–23.)

During the entire incident, Jones' GPD-issued body microphone was on and recording. (Doc. No. 126 ¶ 7; Doc. No. 245-18.)[7] Jones stated in his July 2016 Affidavit, two years later, that he was not particularly aware of the conversation between Reeners and Cecil while it was occurring. (Doc. No. 126 ¶ 7.) He testified in his deposition simply that he "did not recall much of any of their conversation," but he also admitted that, if his recorder picked up the conversation, he himself could hear it. (Doc. No. 245-5, at 36.) The defendants concede, for purposes of their motion, that Troup and Jones stayed "on the scene" (Doc. No. 259 ¶ 24), and Troup testified that he mostly stood about in the yard, fifteen or twenty feet away from Reeners' porch. (Doc. No. 245-

---

[7] A compact disc of this recording (hereafter, "audio recording" or "audio file") (*see* Doc. No. 176) and an accompanying transcript (Doc. No. 245-18) are in the record. The court has both read the transcript and listened to the audio recording.

2, at 145–46.) He "didn't hear everything they were saying," but he was "close by." (*Id.* at 146.) He continued, "All of us were there close by." (*Id.*) He could hear parts of the conversation but not "every bit of [it]." (*Id.* at 147.) The conclusion that he and other officers could hear is confirmed by the fact that they interjected statements into the conversation between Cecil and Reeners at least once. (*See, e.g.*, Doc. No. 245-18, at 34.) In addition, the Officers participated in a substantial portion of the discussion, when Cecil asked them to explain to Reeners what they wanted him to do. (Doc. No. 245-18, at 47–69.) During this part of the conversation, one of the Officers actually stated to Reeners that he had been listening to earlier parts of the conversation. (Doc. No. 245-18, at 53–54.)

Very shortly after Reeners and Cecil began speaking on his front porch, the Officers noticed someone inside the house peeking out the windows. Reeners told them it was just his roommates, both of whom had been living in the house for about six months. Jones asked if Reeners had "any kind of weapons or anything like that in there." (Doc. No. 245-18, at 8.) Reeners assured him the only thing he had was a "hunting gun." (*Id.*) Jones asked Reeners if he could talk to the people inside, to which Reeners responded, "I don't know if they want to talk to you, but hold on." Jones and Ballard then spoke with the two men inside, checked their IDs, and asked them some questions. Ballard asked one of them, "Is everything okay? [Reeners] seemed like – the first time I met him today he was a little agitated, so I just wanted to make sure he was okay." (Doc. No. 248-18, at 12.) The roommate assured him that Reeners was "always hyper," that that was "normal" for him and that he "just had issues with authority." (*Id.*) They stated that Reeners was not on medication and that the only weapon in the house was Reeners' shotgun. (*Id.* at 12–15.)

After that interruption, Reeners and Cecil spoke for some time, with Reeners explaining about his fluoride crusade and Cecil questioning him about his personal history, mental health, and

drug use. (Doc. No. 245-18; Doc. No. 262 ¶ 62.) The audio recording establishes that Reeners remained calm and cordial throughout the discussion, and eventually Cecil persuaded him to agree to drop the fluoride issue, stop going to City Hall, and stop calling the police unless a new emergency came up. Cecil also tried unsuccessfully to persuade Reeners to obtain counseling. (Doc. No. 262 ¶¶ 63–65.)

Once Cecil had concluded her evaluation of Reeners, she stated that she needed to call her supervisor. She sat in her vehicle to make the call. (Doc. No. 259 ¶ 27.) During this call, Jones and Troup continued to speak with Reeners for the next thirty minutes or so. Among other topics, Jones and Reeners discussed the possibility of Reeners' becoming a confidential informant for the police. (Doc. No. 262 ¶¶ 69–74.)

Meanwhile, Cecil was speaking with her clinical reviewer, Albert Edmond, in accordance with Mobile Crisis's established procedure. She testified in her deposition that she gave Edmond "the condensed version" of her conversation with Reeners and her conversations with law enforcement, and Edmond agreed with Cecil's assessment that involuntary detention of Reeners pursuant to Tenn. Code Ann. § 33-6-401 was appropriate. (*See* Doc. No. 245-22, at 59 ("[Edmonds] agreed that a 6-401 needed to be written and that [Reeners] needed to be transported to the ER for further evaluation.").) Cecil stated that it was her expectation that, if she signed what she referred to as the 6-401, Reeners would receive "a more in-depth medical and psychiatric evaluation at the hospital." (Doc. No. 245-22, at 57.) She testified that, when she made the decision, she "believed it was probable that Mr. Reeners was a danger to himself or others . . . subject to further evaluation at the hospital." (Doc. No. 245-22, at 58.) However, she also acknowledged that she did not know for a fact that Reeners had engaged in "threatening" behavior but, based on what he admitted to, which "coincided with what [she] was told by law enforcement,"

she believed that his conduct "rose to the level of at least harassment." (*Id.*)

After exiting her vehicle, Cecil returned with a completed form entitled "Request for Immediate Examination for Emergency Admission" (hereafter, "6-401 form"). (Doc. No. 245-19, at 143; Doc. No. 262 ¶ 75.) The preprinted boilerplate language of the 6-401 form was directed "TO: Any law enforcement officers; licensed physician; licensed psychologist where authorized by law" and various other licensed professionals. It then states, "I request that [blank], referred to below as 'person,' be detained for emergency admission under Tenn. Code Ann. § 33-6-401 for the purposes of emergency diagnosis, evaluation, and treatment." (*Id.*) Cecil had written Reeners' name into the blank space provided on the form.

The preprinted boilerplate language continues:

> In making this request, I have observed the following behavior by the person. (*Specifically include behavior which shows threats or attempts at homicide, suicide, other bodily harm, or behavior placing others in reasonable fear of violent behavior, or which shows that person is unable to avoid severe impairment or injury from specific risks.*)

(*Id.*) In supposedly identifying the behavior that justified detention, Cecil wrote the following in the blank space provided on the form:

> Law enforcement has been dealing w/ ct. for 3 yrs over delusions that babies & people are being killed due to the fluoride in the water. His harassment of LE [law enforcement], City Workers, the Mayor, etc has continued to escalate and law enforcement believes he's a danger to the community. He has clearly voiced various "activist" issues he is taking on such as working w/ the FBI on 9/11, Bark beetles and sueing [sic] Sprint. Ct. needs immediate evaluation and may be using drugs.[8]

(Doc. No. 245-19, at 143.)

---

[8] Notably, although Reeners admitted occasionally using marijuana and that he "was not discriminatory against having a good time," he also told her that he did not sell drugs and was not "selling [his] stuff" for it or anything. (Doc. No. 245-18, at 34–36.) His roommates told the Officers that they had never seen him use cocaine or methamphetamines and had not seen him use any drugs that day. (*Id.* at 13–14.) It is unclear whether Cecil was given that information.

Asked about the fact that the form only indicates that law enforcement, not she herself, believed that Reeners posed a danger to the community, Cecil stated in her deposition that that was "just a matter of the words [she] chose to put down here" but that the fact that she filled out the form "in and of itself [established her] belief that he's a danger and needs to be further evaluated." (*Id.*) She averred that she had personally come to the conclusion that "it was probable that Mr. Reeners was a danger to himself or others." (Doc. No. 245-22, at 61.)

Although this conversation was not caught by Jones' recorder, Cecil reported to Troup that she had requested an immediate mental health evaluation on Reeners and that he was to be transported to the Summit Regional Medical Center ("SRMC") for further evaluation. (Doc. No. 259 ¶ 29.) There is no indication that she told him or any of the other Officers that she had concluded that Reeners posed a substantial risk of harm to himself or others. Nonetheless, the Officers all testified that they understood that Cecil's request made the GPD responsible, by statute, for transporting Reeners to SRMC. (Doc. No. 251-2 ¶ 5; Doc. No. 251-3 ¶ 6; Doc. No. 251-4 ¶ 7; Doc. No. 251-10 ¶ 6.)

It is unclear whether the Officers other than Troup actually saw the 6-401 form completed by Cecil. When Cecil came back within the range of Jones' recorder, Jones can be heard asking, "Is it ready to go?" Another officer responded, "I think so." And Cecil asked, "Do you want me to explain what it is?" (Doc. No. 245-18, at 110.)

At that point, an officer later identified as Troup stated to Reeners:

> What's going to happen, we feel [sic] for your mental state, okay, so we're going to take you to the ER, okay? You don't have a choice. We're going to take you up there just for you to talk to a professional. Okay? Let them evaluate your mental state. Okay? So just cooperate with us.

(Doc. No. 248-18, at 110; Doc. No. 262 ¶ 77.) Reeners calmly responded, "Oh, for sure." He added: "That's fine. It's under duress too, I don't agree to go like this." (Doc. No. 245-18, at 110;

Doc. No. 262 ¶ 79.) He did not resist arrest or become angry. He simply expressed his opinion that his arrest was without "suspicion of probable cause." (Doc. No. 245-18, at 111.)

Based on Cecil's instruction to transport Reeners to SRMC, Jones handcuffed Reeners with his hands behind his back. The audio recording confirms that Reeners remained calm and cooperative while being handcuffed. (*See id.*) According to Jones, he noticed that Reeners was wearing a compression sleeve or some type of wrap on his right wrist and was careful not to tighten the cuffs too tightly. He also double-locked the cuffs so that they would not tighten further during transport. (Doc. No. 126 ¶ 9.) As Jones began to put the cuffs on, Reeners asked to be cuffed in front of his body because his wrist was sore. Jones responded that GPD policy required him to cuff Reeners with his hands behind his back, but that he would double lock them so they would not tighten. (Doc. No. 245-18, at 110–11.) In fact, GPD policy permits hands to be cuffed in front in several situations, including to avoid exacerbating an existing injury. (Doc. No. 245-20 § III.B.4.)

Jones cuffed Reeners' hands behind him and placed Reeners in his patrol car. Jones accepted a document from Cecil to give to the emergency room admitting staff to facilitate Reeners' involuntary mental evaluation. (Doc. No. 259 ¶ 32.) Cecil told Jones that she would meet the Officers at the SRMC emergency room. Jones communicated with Helson, notified dispatch of his intention, and then transported Reeners to the SRMC emergency room. (Doc. No. 259 ¶ 33.) Reeners remained calm during the ride to the hospital, asserting to Jones that his constitutional rights were being violated. (Doc. No. 262 ¶ 86.)

Reeners never complained at any time during the transport that the cuffs were too tight or were hurting his wrist. (Doc. No. 245-18, at 110–21; Doc. No. 259 ¶ 34.) Once they arrived at the hospital, Jones' body recorder kept recording. Until Jones' shift ended, Jones remained with Reeners while he waited for a doctor to see him. (Doc. No. 245-18, at 120–202.) Helson remained

either in the emergency room or just outside of it. (Doc. No. 259 ¶ 35.)

Shortly after arriving at SRMC, Reeners informed a nurse that he "might need some medicine" because his wrist "ha[d] been hurting." (Doc. No. 245-18, at 129.) The nurse left to retrieve something and Reeners told Jones that his wrist "hurt so bad." (*Id.*) Jones told Reeners he would move the cuffs to the front of his body as soon as the nurse was finished. (*Id.*) Reeners told Jones that he had "busted [his] tendons here a couple of weeks ago" and "it [had] just started getting better." (*Id.*) When Jones asked him how he had injured himself, Reeners explained that he had "messed up his tendons" when he bent his wrist back too far when shutting the tailgate to his truck. (*Id.* at 129–30.)

The nurse returned at that point and took Reeners' temperature. As soon as she finished, Jones recuffed Reeners with his hands in front of him. (Doc. No. 245-18, at 130.) He also repeated to Reeners that he would double lock them so they could not tighten further. (*Id.*) Approximately five minutes later, after Reeners and Jones had been chatting amiably about poker and other things, the nurse returned to ask him some questions. Reeners responded that he was pleading the Fifth Amendment so he could not respond to any questions, but he also added, "These cuffs really hurt my . . . my wrist is really, really, really sore." (Doc. No. 245-18, at 135.) He showed Jones that his wrist was "way swollen" and that the tendons were "all damaged right there from going back like this" while lifting the tailgate up. (Doc. No. 245-18, at 136.) A little while later he repeated to the nurse that his wrist was "really killing" him, because he had damaged some tendons. (Doc. No. 245-18, at 141.) Jones did not remove the cuffs for another forty-five minutes or so, at the end of his shift. (Doc. No. 262 ¶ 102.)

Jones asked him if he had sought medical attention for his wrist. Reeners told him that he did not have insurance and had only been using Epsom salts. (Doc. No. 245-18, at 135.) When the

hospital staff later asked Reeners if he had taken any medication, he advised that he had taken six naproxen the night before. (*Id.* at 195.) He also disclosed that, because the naproxen had not helped the pain, he had asked a friend if he had something better than naproxen. He had purchased (for $5.00) and took an unknown pill from his friend to help with the pain. (*Id.* at 196.)

When asked during his deposition what injury he claimed as a result of the handcuffs, Reeners responded: "Pain way more than it was when my tendons were damaged." (Doc. No. 245-1, at 86.) He had not sought medical treatment for any injury associated with the handcuffing. He does not present any proof that any damage to his tendons was exacerbated by the handcuffing.

When Jones and Reeners arrived at SRMC on June 12, the emergency room intake staff member asked Jones why Reeners was being brought in, and Jones referred her to Cecil. (Doc. No. 262 ¶ 89.) Cecil initially told the emergency room staff that Reeners was being admitted because law enforcement had been "dealing with him for two or three years," to which hospital staff responded, "So what?" (Doc. No. 245-18, at 122.) Cecil then asked to speak with staff privately. (*Id.*) Cecil testified that, once Reeners was transported to the SRMC emergency room, she had a conversation with hospital personnel during which she gave them "kind of a synopsis of what [had] happened." (Doc. No. 245-22, at 65.) She also completed the "appropriate paperwork" that enabled the hospital to "deal with the client" from that point forward. (*Id.*) It is also at this time that she completed the Mobile Crisis team consultation form for the hospital's record. Once she completed that form and gave the hospital staff her "paperwork," her part in the admission process ended. The process took some time, however, so she did not leave immediately. (Doc. No. 245-22, at 66.)

At some point, she explained to Reeners:

[I]f there is nothing wrong with you mentally, okay, and what you're saying is true, you're not going to have an issue today. . . .

What I'm trying to explain to you is that if I – if we are wrong – what we're concerned about is not to get you in trouble, but to make sure that you're healthy, and if you are, you don't have anything to worry about.

(Doc. No. 245-18, at 145–46.) Reeners responded that he already had a problem, because he was being kidnapped. He also noted that his refusal to go to counseling did not provide justification for kidnapping him. He reiterated his belief that he was being kidnapped in retaliation for his having exercised his First Amendment rights. (Doc. No. 245-18, at 145–49.)

Cecil's shift ended before the paperwork for Reeners' admission was completed, so she "transferred" oversight of the admission to her colleague, the person on the "next shift" who would follow up on what the hospital's findings were. (Doc. No. 245-22, at 66.) She had no specific involvement after that, except to contact the person whose shift followed hers, in order to verify that a "6-404 was completed" and that Reeners had ultimately been transferred from the SRMC to the MTMHI. (Doc. No. 245-22, at 66–67.)

Reeners, accompanied by Jones, was eventually moved to a private room. (Doc. No. 262 ¶ 92.) Helson joined them for some period of time. (Doc. No. 262 ¶ 93.) Jones remained with Reeners for the first hour or so at the hospital, throughout which Reeners remained calm. (Doc. No. 262 ¶ 94.) Helson left the room shortly after Jones moved the cuffs to the front and stayed by the nurse's station until his shift ended. (Doc. No. 262 ¶ 98.)

Around 5:45 p.m., hospital staff took a blood sample without Reeners' permission. (Doc. No. 262 ¶ 108.) Reeners allowed the blood draw but stated that it was "under duress." (Doc. No. 262 ¶ 110.) At 5:54 p.m., hospital staff gave Reeners two medications, Ativan, an anti-anxiety medication, and Zyprexa. (Doc No. 245-18, at 190–91.)

Jones left around 6:00 p.m., after removing Reeners' cuffs and explaining to the nurse that Reeners had sprained his wrist. (Doc. No. 262 ¶ 113.) At that point, no doctor had yet spoken with

Reeners. (Doc. No. 262 ¶ 115.) At 7:20 p.m., Reeners demanded to speak with a supervisor. He remained calm, and, at 7:58, staff noted that he was "resting quietly." (Doc. No. 262 ¶¶ 117–18.) By 9:01 p.m., Reeners was noted to be "agitated" and "angry." (Doc. No. 245-23, at 19.) At 9:28 p.m., he wanted to make a formal complaint about not having seen a doctor by then. (Doc. No. 245-23, at 20.)

At 9:29, Reeners was given Norco and Zyprexa, apparently for pain and anxiety. (Doc. No. 245-23, at 20.) He was taken for x-rays of his right wrist around 9:30 p.m., which revealed a possible non-displaced fracture. (Doc. No. 245-23, at 11.)

At 11:22 p.m., he was noted to be yelling that he had been detained illegally, yelling for a supervisor, yelling to see the doctor, and complaining that the hospital had "stolen" his blood. (Doc. No. 245-23, at 20.) Apparently because he would "not remain calm" or "follow instructions," even after having been informed of "the process" the hospital was taking, he was medicated with Geodon and Versed[9] around 11:35. (Doc. No. 245-23, at 20.) By 12:30 a.m. on the morning of June 13, Reeners was noted to be in no apparent distress and appeared to be sleeping (Doc. No. 245-23, at 20), having by then been given doses of Ativan, Zyprexa, Narco, Geodon, and Versed within the course of less than six hours.

Dr. Scott Bradley was the attending physician at the SRMC emergency room the night Reeners was brought in. Although board certified in emergency medicine, Bradley had no specialized training on the grounds in Tennessee for a patient to be involuntarily detained for a mental health evaluation. (Doc. No. 245-25, at 10, 12.) He testified that he spoke with law enforcement officers, and he remembered that they had "specific concerns" about "the safety of

---

[9] Dr. Bradley testified that Geodon is an antipsychotic medication, and Versed is an antianxiety medication. (Doc. No. 245-25, at 68.)

city officials." (Doc. No. 245-25, at 48.) He also spoke with Reeners at some point, to explain that he was being committed and that he should be cooperative with the MTMHI doctors. (Doc. No. 245-25, at 47–48, 57–58.) He also testified, however, that, because Reeners came in having already been assessed by Mobile Crisis as posing a risk of danger to himself or others, "[his] job was really to support that assessment." (Doc. No. 245-25, at 55.) He explained: "So the policy and procedure is that Mobile Crisis or other mental health professionals have more training and understanding in mental health conditions than we do. So we respect their recommendations and try to support their assessment." (Doc. No. 245-25, at 16–17.) He was familiar with the process of getting a "6-401" from Mobile Crisis and, although his assessment following a 6-401 referral was independent "[w]ithin a degree," he did not recall ever having countermanded a recommendation by Mobile Crisis. (Doc. No. 245-25, at 17.) At most, he would ask for a repeat assessment by Mobile Crisis if circumstances changed, but he "do[es] not go against an assessment by a mental health professional." (Doc. No. 245-25, at 17–18.) So, rather than a psychiatric evaluation, his role is to conduct a "medical screening exam" on the patient, "which is a limited medical assessment to determine if there's any dangerous or life-threatening illness present" and to rule out a medical cause for the psychiatric condition. (Doc. No. 245-25, at 22.)

He also claimed that he believed he saw Reeners a "half an hour to an hour" after he was "medically stable" (Doc. No. 245-25, at 55), but it is unclear what he meant by "medically stable" or when that actually occurred. He completed the certificate of medical need for involuntary commitment under Tenn. Code Ann. § 33-6-404, apparently before he ever saw Reeners. (*See* Doc. No. 245-19, at 178 (Certificate of Need, noting date and time as 6/12/2014 5:37:12 PM).)[10] He

---

[10] The Certificate of Need includes a certification that the physician's report was based on a face-to-face examination of the patient that would have occurred by 5:37 p.m. on June 12. (Doc. No. 245-19, at 179.) The transcript of Jones' recorder, however, establishes that Dr. Bradley did

testified that the information on the Certificate of Need came from Mobile Crisis. (Doc. No. 245-25, at 39.) The Emergency Room Report dictated by Bradley on June 13 states in relevant part, under the heading "Emergency Room Course and Medical Decision Making," as follows:

> This is a 41-year-old male evaluated by mobile crisis prior to arrival and he was determined to have met inpatient treatment criteria. Based on this, a 6404 was placed with concerns that he was a danger to himself and possibly to others. The patient was observed during his evaluation process and unfortunately his behavior escalated while in the emergency department. He actively taunted police officers and became threatening many times exhibiting inappropriate behaviors including singing, demanding repeated visits by the supervisor, yelling, and repeated knocking on the doors. In spite of multiple attempts at redirection and oral medications on initial presentation for anxiety and agitation, eventually the patient's behavior degenerated and he was given intramuscular medications to assist in behavior control as he appeared to be threatening to the staff in the emergency department. This was witnessed by police department and multiple persons within the emergency department. After medications, patient did become much more calm, and eventually medically cleared to be placed in a psychiatric facility for formal evaluation. Of note he was told at multiple times the process and the reasons for why the medical evaluation was being completed and that he would be evaluated and possibly released by psychiatric professional after a formal evaluation, however, this did not adequately control his agitation or redirect his behavior.

(Doc. No. 245-23, at 14.) Bradley testified that his notes were based on events he had personally observed and that, by the time Reeners' behavior had escalated, he presented a threat to the ER staff. (Doc. No. 245-25, at 29–30.) Bradley also recalled that, although he tried to explain the process, Reeners was "not very cooperative with the psychiatric evaluation," was "fixated on fluoride and his First Amendment rights," and "wouldn't really engage in a meaningful

---

not speak to Reeners at any time prior to Jones' departure and the cessation of recording around 6:00 p.m. (*See generally* Doc. No. 245-18, at 127–202; *see also* Report & Recommendation, Doc. No. 177, at 10 n.4 (observing that the question of whether Dr. Bradley conducted a face-to-face evaluation was in dispute and that it was "concerning that the audio recording from Defendant Jones' bodycam does not evidence Dr. Bradley's alleged assessment of Plaintiff").) As indicated above, the hospital's records show that Reeners was complaining loudly about not having seen a doctor by around 9:30 p.m. and was still "yelling" to see a doctor around 11:20 p.m. (Doc. No. 245-23, at 20.)

conversation." (Doc. No. 245-25, at 30.)

In the same report, under the heading "History of Present Illness," Bradley stated:

This is a 41-year-old male with NO known psychiatric diagnosis presenting today with Mobile Crisis and Gallatin police department. He was brought in having been evaluated by Mobile Crisis. According to their statement, law enforcement contacted mobile crisis due to symptoms concerning for delusions[,] paranoia and increasing harassment of individuals in the community. . . . Apparently there are complaints relating to harassment of city officials. In addition according to Mobile Crisis statement he has had contacts with the FBI regarding harassment of the governor in the past. Mobile crisis has conducted a formal assessment. According to the records they made the determination that he meets inpatient criteria for psychiatric treatment. The patient . . . repeatedly states he has first amendment rights. He reports that he is being kidnapped by myself and police officers. He reports that he will be actively pursuing lawsuits.

(Doc. No. 245-23, at 13.) Bradley's clinical impression included "paranoia with delusions." (Doc.

No. 245-23, at 14.) He testified that that impression was largely based on the prior assessment by

Mobile Crisis. (Doc. No. 245-25, at 32.) Because Reeners would not engage with him or participate

in a meaningful conversation, the doctor "wasn't able to have any alternative information" and

therefore "believe[d] that their assessment was correct." (Doc. No. 245-25, at 32.) The doctor

acknowledged that he himself did not feel threatened during his interactions with Reeners and that

Reeners did not express any threats to harm himself either. (Doc. No. 245-25, at 58, 72.) Absent

the information provided by Mobile Crisis, Bradley did not personally find anything in his

interactions with Reeners that would have independently justified an involuntary detention. (Doc.

No. 245-25, at 61; *see id.* at 61–62 ("My interactions, the limited ones I had, were not good

interactions, but he did not say anything specifically disorganized or threatening that I would have

independently placed him on a hold. However, if someone had said he had made a threat, could be

a family member or city official and they were concerned, that would have been sufficient. *But

absent that specific threat, then someone acting unusually and bizarrely does not mean that they

need inpatient psychiatric assessment.*" (emphasis added)).)

Bradley recalled having a conversation with Emily Cecil, the gist of which was her communicating to him that Reeners needed a "6-404" and "medical clearance so he can have placement." (Doc. No. 245-25, at 34.) Finally, Bradley noted that Dr. Brooks at MTMHI was better qualified than he to evaluate Reeners for involuntary commitment, because "[t]hat is his job." (Doc. No. 245-25, at 40.)

On cross-examination, Bradley agreed that, when a patient is brought to the hospital involuntarily with a "formal assessment already in place," "if there is a concern by someone that [the person is] a danger to [himself] or others . . . , essentially they do lose their rights," even before they arrive in the emergency room. (Doc. No. 245-25, at 43–44.) "They're not allowed to leave [and, i]f they do leave, the police are called to bring them back." (Doc. No. 245-25, at 44.) The "sum total" of Bradley's involvement was to provide a medical clearance and a safe environment. (Doc. No. 245-25, at 47.)

The hospital's record notes that, on June 13 at 1:18 a.m., ER care was "complete" and Reeners' transfer to MTMHI had been "ordered by MD." (Doc. No. 245-23, at 20.) Shortly thereafter, the police were notified of the need to effect the transfer (*id.*), and Reeners actually arrived at MTMHI around 2:30 a.m. (Doc. No. 245-19, at 59.) Dr. Phillip Brooks conducted an initial assessment of Reeners. He noted that the patient was "very delusional and agitated," had paranoid ideation and preoccupations, bizarre delusions, poor judgment, poor impulse control, and poor reliability, but no noted risk of violence and only low risk of self-harm. (Doc. No. 245-19, at 19 –23.) Dr. Brooks nonetheless issued a Certificate of Need for involuntary commitment on the basis that the patient was at that time "at risk of harm to self due to acute psychosis and paranoid delusions." (Doc. No. 245-19, at 142.)

Although the actual decision to admit Reeners involuntarily to the MTMHI was made by

Dr. Brooks at 3:00 a.m. on the morning of June 13, 2014 (Doc. No. 259 ¶ 50), it must be noted that, well before that, around 5:35 p.m. on June 12, SRMC staff faxed a request to the Middle Tennessee Mental Health Institute ("MTMHI"), asking if MTMHI had a room available for an in-patient commitment. (Doc. No. 245-19, at 165.) At 5:37 p.m., Nurse Autumn Hutchinson entered a note in Reeners' records stating: "Patient will be an involuntary commitment." (Doc. No. 262 ¶ 107.) At 9:29 p.m., Troup emailed Chief Bandy to let him know that Reeners was "being 6404," meaning that he was going to be involuntarily committed to MTMHI, pursuant to Tenn. Code Ann. § 33-6-404, and that they were waiting on "SO to get transport order." (Doc. No. 245-24.)

Later on the morning of June 13, 2014, MTMHI's attorney, Robert Mininski, filed by fax with the General Sessions Court of Davidson County, Tennessee a motion for an *ex parte* order to hold Reeners for emergency diagnosis, evaluation, and treatment under Tenn. Code Ann. § 33-6-413. (Doc. No. 259 ¶ 51.) Judicial Commissioner Thomas Edward Nelson ordered the commitment on June 13, 2014, at 9:28 a.m., pending a probable cause hearing set for June 18, 2014. (Doc. No. 259 ¶ 52.)

Around 9:52 a.m. on June 13, 2014, Troup sent an email to Bandy, relaying Cecil's suggestion that anyone concerned about Reeners' behavior send a letter to the social worker at MTMHI assigned to evaluate Reeners during his admission there. (Doc. No. 124 ¶ 16.)[11] According to Troup, Cecil specifically recommended that the letters come from the Chief, Mayor, DA, City Attorney or Judge. (*Id.*)

Bandy faxed a letter to the social worker later the same day, explaining his concern about Reeners' "increasingly disturbing and obsessive" behavior and his desire to ensure that City

---

[11] Reeners purports to deny that Cecil made this suggestion, but the fact that she did not testify specifically about it during her deposition does not establish that she did not.

employees and citizens not be placed "in a state of fear" because of Reeners' conduct. (Doc. No. 245-19, at 146.) He asked that Reeners receive "in-depth psychological evaluations and treatments that will assist him in dealing with his emotional and mental state concerning his obsessive behavior with his issues," with the ultimate goal of "ensur[ing] that Mr. Reeners receive the help that he desperately needs." (*Id.*)

Reeners was involuntarily confined at MTMHI until the morning of June 18, 2014. He was released just prior to the scheduled judicial hearing. (Doc. No. 262 ¶ 140.) Throughout his confinement, Reeners was subject to forced medications, therapy and treatment. (Doc. No. 262 ¶ 141.)

## IV. THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Fifth Amended Complaint (Doc. No. 169) states claims against Troup, Helson, Ballard, and Jones under 42 U.S.C. § 1983 and Tennessee common law for false arrest (Counts I and II); claims against Jones and Helson, under § 1983, for the use of excessive force (Count III); and claims against the City of Gallatin for false arrest based on Chief Bandy's official sanctioning of the arrest and based on the City's failure to train its police officers on the law governing involuntary mental health detentions (Count I) and for Reeners' false imprisonment at MTMHI based on Chief Bandy's role as final policymaker and his impact on MTMHI's involuntary detention of Reeners from June 13–18, 2014 (Count IV).[12]

The City and the individual defendants seek summary judgment in their favor on the grounds that (1) the individual defendants had probable cause to detain Reeners for a mental

---

[12] The claims against Chief Bandy individually, based on Reeners' false imprisonment at MTMHI, were dismissed, but the defendants withdrew any claim for the dismissal of the claims against the City of Gallatin in connection with their first Motion for Summary Judgment, so this issue was not addressed at that time. (*See* Doc. No. 174, at 2 (noting the parties had agreed to withdraw that portion of their motion seeking dismissal of the municipal liability claims).)

evaluation; (2) even if probable cause was lacking, the defendants are entitled to qualified immunity with respect to the claims under both § 1983 and Tennessee common law; (3) because the officers are not liable in their individual capacity, there is no basis for municipal liability against the City of Gallatin; (4) even if a constitutional violation is shown, the City did not fail to train its officers and did not ratify an unconstitutional policy; (5) the City of Gallatin cannot be liable for Reeners' commitment at MTMHI because, among other reasons, Chief Bandy's letter was not the proximate cause of Reeners' detention at MTMHI; (6) Helson and Jones did not use unreasonable force in handcuffing Reeners and the use of handcuffs was objectively reasonable; (7) there is no evidence that Reeners suffered a physical injury from the handcuffing; and (8) Helson himself did not use any force against Reeners and had no reason to know that excessive force was being used;

### A.     Section 1983 False Arrest Claims Against Individual Officers

#### 1.     Legal Standard Governing Qualified Immunity

To recover on a claim under 42 U.S.C. § 1983, a plaintiff must establish a violation of his constitutional rights by a person acting under color of law. *Gillis v. Miller*, 845 F.3d 677, 693 (6th Cir. 2017). That straightforward principle is complicated, however, by the doctrine of qualified immunity, which shields government officials from actions seeking civil damages under § 1983, so long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Lanman v. Hinson*, 529 F.3d 673, 683 (6th Cir. 2008). Qualified immunity is an affirmative defense that, once asserted, shifts the burden of proof to the plaintiff to show that the defendant is *not* entitled to qualified immunity. *Lanman*, 529 F.3d at 683. The application of qualified immunity is determined on a "fact-specific, case-by-case basis." *Id.* (citation omitted). In addition, "it is well-settled that qualified immunity must be assessed in the context of each individual's specific

conduct." *Stoudemire v. Mich. Dep't. of Corrs.*, 705 F.3d 560, 570 (6th Cir. 2013).

In *Saucier v. Katz*, 533 U.S. 194, 200 (2001), the Supreme Court prescribed a mandatory sequential process for assessing whether an official is entitled to qualified immunity. Under *Saucier*, a court was required first to decide whether the facts alleged or shown by the plaintiff made out a violation of a constitutional right. If so, the court was then to decide whether the right was "clearly established" at the time of the defendant's alleged misconduct. *Id.* at 201. In *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Court held that the sequence of this analysis, though often beneficial, was not mandatory and that courts can use their discretion in determining which question to address first.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2019) (internal quotation marks and citation omitted). The Supreme Court has repeatedly emphasized that, while there does not need to be a case precisely on point in order for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate. In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks and citations omitted). The Court has also reiterated the "longstanding principle that 'clearly established law' . . . must be 'particularized' to the facts of the case." *Id.* (internal citations omitted). If genuine issues of material fact exist as to whether the government actors' actions constituted a violation of a clearly established right, then summary judgment is inappropriate. *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017).

The Sixth Circuit has recently discussed the degree to which the right needs to be clearly established:

[T]o determine if the law is clearly established . . . , we look principally to the law of this circuit and to the Supreme Court. . . . Clearly established law is not defined at a high level of generality but must be particularized to the facts of the case. The Supreme Court has emphasized:

[T]he legal principle [must] clearly prohibit the offic[ial]'s conduct in the particular circumstances before him. The rule's contours must be so well defined that it is clear to a reasonable offic[ial] that his conduct was unlawful in the situation he confronted. This requires a high degree of specificity. . . . [C]ourts must not define clearly established law at a high level of generality, since doing so avoids the crucial question [of] whether the official acted reasonably in the particular circumstances that he or she faced. A rule is too general if the unlawfulness of the offic[ial]'s conduct does not follow immediately from the conclusion that the rule was firmly established.

*District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quotation and editorial marks omitted). The dispositive inquiry, undertaken in light of the specific context of the case, and not as a broad general proposition, is whether the violative nature of particular conduct [wa]s clearly established.

*Korthals v. Cty. of Huron*, No. 19-1119, 2020 WL 131337, at *2–3 (6th Cir. Jan. 13, 2020) (most internal quotation marks and citations omitted).

### 2. Legal Standards—The Existence of Probable Cause in the Context of a Mental Health Detention

"It is clearly established that an officer may not [effect] a mental health seizure without probable cause." *Dolbin v. Miller*, 786 F. App'x 52, 56 (6th Cir. 2019) (quoting *Fisher v. Hardin*, 398 F.3d 837, 849 (6th Cir. 2005)). More particularly, the officer must have probable cause "to believe that the person is dangerous to himself or others." *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997). Even if probable cause was lacking, however, for purposes of qualified immunity, the operative question is whether the officers had a "reasonable, but mistaken, belief that they had probable cause." *Dolbin*, 786 F. App'x at 57 (citing *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 591 (2018)); *see also Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (noting that the qualified immunity analysis asks "the objective (albeit fact-specific) question whether a reasonable officer could have believed [the plaintiff's warrantless detention] to be lawful, in light of clearly

established law and the information the searching officers possessed").

The cases in which this standard has been applied make it clear that, for probable cause to conduct a mental health detention to exist, the arresting officer must have probable cause to believe that the person actually poses a relatively immediate or imminent threat of danger to himself or others—thus requiring emergency treatment—and not merely a hypothetical possibility of danger at some point in the indefinite future. *See Monday*, 118 F.3d at 1102 ("In this case, we agree with the District Court that Oullette had probable cause to believe that plaintiff was attempting to commit suicide, or at least might injure himself if not taken to a hospital."). Danger in the "near future" appears to satisfy this standard, and the likelihood of harm, notably, need only be probable, not inevitable. *See Simon v. Cook*, 261 F. App'x 873, 881 (6th Cir. 2008) ("[P]robable cause requires only a 'probability or substantial chance' of dangerous behavior based on the circumstances of each case. Even if Simon did not present a substantial chance of immediate danger to Cook, his stated intent to follow the police and get to the bottom of the alleged attacks against him indicated a substantial chance of irrational and dangerous behavior in the near future."); *Glass v. Mayas*, 984 F.2d 55, 55–56 (2d Cir. 1993) (finding probable cause for mental health seizure, in part, because of reports that the plaintiff had been reported to be in possession of a gun, had threatened others with it, and continued to be "verbally abusive, suspicious, paranoid, and showed impaired judgment").

The defendants argue that probable cause in this context does not require probable cause of "*present* dangerousness" and that they reasonably believed that Reeners posed a risk of harm, within a period of time that the defendants do not define. (Doc. No. 261, at 12.) While *Simon* appears, to some extent, to support the conclusion that the risk of harm does not need to be immediate, it does not support the conclusion that the risk of harm may be entirely speculative and

hypothetical. In *Simon*, the officer seeking qualified immunity was aware that a "'signal 10' officer safety alert" had been issued, and he actually spoke at length with the plaintiff. 261 F. App'x at 880. The plaintiff made "bizarre and improbable" assertions to him, including that "the coroner was following him; that men in black, whom he speculated may have been police, had attacked him; that unknown persons had backed a car's tailpipe up to a phone booth Simon had been using in an effort to poison him with carbon monoxide; and that multiple government agencies were complicit in these actions." *Id.* Although the Sixth Circuit credited the plaintiff's assertion that he did not initially seem dangerous, the plaintiff admitted that matters escalated during the conversation. *Id.* The plaintiff pointed a finger in the officer's face and asked, "how would you like it if I followed you around?" *Id.* The court recognized that finger pointing presented a low risk of harm but concluded that the plaintiff's behavior represented a "high level of irrationality" in conjunction with that "relatively low level of dangerousness." *Id.* The court sought to distinguish between "mental illness and merely obstreperous behavior," and it expressed a reluctance "to set the bar for probable cause so low that the merely obnoxious are detained for mental evaluation." *Id.* Based on all of the circumstances of that case, the court concluded:

> [P]robable cause requires only a "probability or substantial chance" of dangerous behavior based on the circumstances of each case. Even if Simon did not present a substantial chance of *immediate* danger to Cook, his stated intent to follow the police and get to the bottom of the alleged attacks against him indicated a *substantial chance of irrational and dangerous behavior in the near future*. While such a statement might not suffice on its own, we must view the statement in the context of Simon's apparently paranoid statements about the police. Thus, taken together, Simon's words and actions created probable cause to believe that Simon was mentally ill and dangerous.

*Id.* at 881 (emphasis added). In other words, the court found that the officer had probable cause to believe that the plaintiff posed a real, rather than hypothetical, risk of harm in the near future, not in some speculative and indeterminate future.

Tennessee's statutory scheme—the constitutionality of which the plaintiff does not challenge—appears to be at least as stringent as federal law. It too requires the threat of danger posed by a mentally ill individual to be relatively imminent in order to justify detention. First, Tenn. Code Ann. § 33-6-401 states that a person may be detained under § 33-6-402 "to obtain examination for certification of need for care and treatment," "IF AND ONLY IF (1) [the] person has a mental illness or serious emotional disturbance, AND (2) the person poses an *immediate substantial likelihood of serious harm* under § 33-6-501 because of the mental illness or serious emotional disturbance." Tenn. Code Ann. § 33-6-401(1)–(3) (capitalization in original; emphasis added). Section 33-6-402 states:

> If an officer authorized to make arrests in the state, a licensed physician, a psychologist authorized under § 33-6-427(a), or a professional designated by the commissioner under § 33-6-427(b)[13] has reason to believe that a person is subject to detention under § 33-6-401, then the officer, physician, psychologist, or designated professional may take the person into custody without a civil order or warrant for immediate examination under § 33-6-404 for certification of need for

---

[13] Section 33-6-427(b) provision states:

> (b) The commissioner may designate a person to take any action authorized and perform any duty imposed on a physician by §§ 33-6-401 – 33-6-406 to the extent the duties are within the scope of practice of the profession in which the person is licensed or certified, if the person:
>
> (1) Is a qualified mental health professional under § 33-1-101 or is a licensed physician assistant with a master's degree and expertise in psychiatry as determined by the department based upon training, education or experience;
>
> (2) Is licensed or certified to practice in the state if required for the discipline; and
>
> (3) Satisfactorily completes a training program approved and provided by the department on emergency commitment criteria and procedures.

Tenn. Code Ann. § 33-6-427(b).

Emily Cecil testified that she is a person designated by the commissioner under § 33-6-427(b) and meets the listed criteria for being such. (Doc. No. 245-22, at 30; *see id.* at 9–15 (testifying that she has a master's in social work, has experience in the area of mental health, is licensed in the state of Tennessee, and completed a training program on the evaluation of persons that may be detained for involuntary mental health evaluations and commitments).) There is no evidence that she informed the Officers of her credentials at the time of Reeners' detention, however.

care and treatment.

Section 33-6-501 provides that a person "poses a 'substantial likelihood of serious harm'" for purposes of § 33-6-401:

> IF AND ONLY IF
>
> (1) (A) a person has threatened or attempted suicide or to inflict serious bodily harm on the person, OR
>
> (B) the person has threatened or attempted homicide or other violent behavior, OR
>
> (C) the person has placed others in reasonable fear of violent behavior and serious physical harm to them, OR
>
> (D) the person is unable to avoid severe impairment or injury from specific risks, AND
>
> (2) there is a substantial likelihood that the harm will occur unless the person is placed under involuntary treatment . . . .

Tenn. Code Ann. § 33-6-501 (capitalization in original).

Section § 33-6-403 is almost identical to § 33-6-401, except that it has an additional requirement: that "the person need[] care, training, or treatment because of the mental illness or serious emotional disturbance," and, rather than merely authorizing detention for the purpose of an examination for certification of the need for care and treatment, it authorizes involuntary admission and detention by a hospital or treatment resource for "emergency diagnosis, evaluation, and treatment," if its criteria are met. Tenn. Code Ann. § 33-6-403(5). And Section 33-6-404 requires a licensed physician, psychologist or other designated professional to whom a person taken into custody under § 33-6-402 is brought to "immediately examine the person and decide whether the person is subject to admission to a hospital or treatment resource under § 33-6-403." Tenn. Code Ann. § 33-6-404(1)–(2). If not, the person is to be released; if so, then the professional conducting the assessment is to complete a certificate of need, documenting the "factual

foundation for the conclusions on each item of § 33-6-403." *Id.* § 33-6-404(3)(B)(ii).

### 3. The Absence of Probable Cause in this Case

In applying these standards to the facts presented here, the court notes that the defendants are now taking their third bite at the qualified immunity apple, the first being with their first Motion for Summary Judgment and the second being their objections to the magistrate judge's recommendation that their initial motion be denied. With their second Motion for Summary Judgment, the defendants seek to avoid application of the law-of-the-case doctrine by insisting that the present motion is supported by new arguments and new evidence, specifically the numerous depositions taken following the denial of the first Motion for Summary Judgment, along with other evidentiary material. The defendants now argue that, even without relying on Cecil's assessment, they had independent probable cause to believe that Reeners presented a "probability or substantial chance of dangerous behavior." (Doc. No. 249, at 14 (quoting *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1977)).) They also argue that Cecil, without relying on the information provided to her by Troup, had an independent basis for believing that there was probable cause to perform a mental health detention of Reeners.

The defendants also argue that the Law of the Case doctrine is an "amorphous concept" that directs a court's discretion but does not limit its power and that it is subject to exceptions—including when substantially different evidence is available. (Doc. No. 274, at 2.) They claim that they have raised key pieces of substantially different evidence, including: evidence regarding the "details and bases of Cecil's decision-making"; the assessments by Dr. Bradley and Dr. Brooks and the reasoning behind their assessments; Dr. Keith Caruso's expert opinion that the decision to detain Reeners was reasonable; Troup's, Bandy's, and Ballard's awareness of Reeners' past behaviors and subjective belief in Reeners' worsening condition; and Ballard's, Jones', and Helson's lack of knowledge of the content of Troup's conversation with Cecil prior to her

evaluation of the plaintiff.

The court finds that Dr. Caruso's expert opinion on the question of probable cause is both irrelevant and inadmissible. It is irrelevant, because the court must "evaluate the existence of probable cause from the perspective of a reasonable and objective person in the position of the seizing official." *Fisher*, 398 F.3d at 843 (citing *Oullette*, 118 F.3d at 1102). Dr. Caruso was not the "seizing official." The opinion is inadmissible, even if it were relevant, because the existence of probable cause is a question of law for the court, or a mixed question of law and fact, and not properly the subject of expert testimony. *See, e.g.*, *Rizzo v. Edison, Inc.*, 172 F. App'x 391, 395 (2d Cir. 2006) ("The judge is both uniquely qualified and uniquely tasked to make the legal determination of what constitutes probable cause; an expert cannot assist in this task, at the summary judgment phase or at trial."); *Estes v. Moore*, 993 F.2d 161, 163 (8th Cir. 1993) (holding that the district court properly excluded expert testimony on the issue of probable cause, stating: "While the existence of probable cause is a mixed question of law and fact, the ultimate conclusion is a question of law. The proposed testimony was, therefore, not opinion testimony but rather it was a statement of a legal conclusion."); *see also Hubbard v. Gross*, 199 F. App'x 433, 443 (6th Cir. 2006) (holding that the district court did not abuse its discretion in excluding expert testimony on the issue of reasonable force, "[b]ecause testimony about whether the officers used reasonable force is a legal conclusion and may confuse the trier of fact").

Dr. Bradley's testimony is also irrelevant to establish the requisite probable cause in this case. First, the Officers' determination of probable cause, made hours before Dr. Bradley examined Reeners, was not based on anything Bradley did or said. Moreover, Bradley clearly testified that he accepted Cecil's assessment and that his role was to conduct a "medical screening exam" on the patient, "which is a limited medical assessment to determine if there's any dangerous or life-

threatening illness present" and to rule out a medical cause for the psychiatric condition as assessed by Cecil. (Doc. No. 245-25, at 22.) He apparently completed the certificate of medical need for involuntary commitment—before he ever saw Reeners—based solely on the information provided to him by Mobile Crisis. (Doc. No. 245-25, at 39.) Thus, he simply ratified or adopted Cecil's prior determination that Reeners posed a risk of harm to himself or others. (*See* Doc. No. 245-25, at 61–62 ("[I]f someone had said he had made a threat, could be a family member or city official and they were concerned, that would have been sufficient [to justify detention for a mental health assessment]. But absent that specific threat, then someone acting unusually and bizarrely does not mean that they need inpatient psychiatric assessment.").) His completion of the Certificate of Need therefore contributes nothing to the probable cause equation.

Likewise, Dr. Brooks' assessment, which took place on June 13, 2014, hours after the initial detention, is not relevant. Dr. Brooks' evaluation indicated that the plaintiff, at the time he saw him, did not appear to pose a risk of harm to others or a serious risk of harm to himself. It is not clear that this assessment established probable cause or even a reason to continue to detain the plaintiff at that time, much less probable cause to detain him approximately ten hours previously. Moreover, even if Dr. Brooks reasonably found probable based on Reeners' irate behavior after having been held at SRMC for many hours without seeing a doctor, that decision would contribute nothing to the information in the Officers' possession at the time of Reeners' initial detention.

The defendants rely on other new evidence, including the deposition testimony of Emily Cecil, which they claim shows that Cecil established the probable cause to detain Reeners and that she made her assessment independently, without undue reliance on what Troup had told her. The court finds this deposition testimony to be largely refuted by the factual record. Cecil clearly relied, at least in part, on the information provided by Troup to reach her conclusion that detention was

warranted. For instance, the 6-401 form that Cecil completed after interviewing Reeners required the person making the request for a mental health detention to confirm that he or she has "observed the following behavior by the person," and, as set forth above, the form explains that the behavior identified on the form should "[s]pecifically include behavior which shows threats or attempts at homicide, suicide, other bodily harm, or behavior placing others in reasonable fear of violent behavior, or which shows that person is unable to avoid severe impairment or injury from specific risks." (Doc. No. 245-19, at 188.) The information Cecil provided in an attempt to satisfy that requirement referred almost exclusively to what "law enforcement" had told her and not to behavior she had actually observed. (*See* Doc. No. 249-19, at 188 ("Law enforcement has been dealing w/ ct. for 3 yrs over delusions that babies and people are being killed due to the fluoride in the water. His harassment of LE, City Workers, the Mayor, etc has continued to escalate and law enforcement believes he's a danger to the community.").) She referred only fleetingly to Reeners' delusions, without suggesting how they made him a danger to anyone. In addition, Cecil testified that, during her telephone call to her supervisor for the purpose of having him "sign-off" on her decision, she conveyed to him a "condensed version" of her conversation with Reeners and "the conversations [she had] had with law enforcement" (Doc. No. 245-22, at 59), again confirming that Troup's information to her was relevant to her determination. And finally, when she arrived at SRMC, when asked by hospital staff, "So what makes you think he needs mental health?," Cecil's initial response was, "Umm, law enforcement has been dealing with him for about two to three years." (Doc. No. 245-18, at 121–22.) Cecil apparently elaborated further on her rationale, out of Reeners' hearing (and outside the reach of Jones' recorder), but her initial response suggests that Reeners' dealings with law enforcement were perhaps the primary reason for his detention.

Second, the information obtained by Cecil through interviewing Reeners, alone, clearly did not give her sufficient grounds to conduct a mental health detention. The court has listened to the entire audio recording and read the transcript of it. While the conversation as a whole may support a conclusion that Reeners was obsessed with his fluoride issue in an unrealistic way, his tone and demeanor throughout the encounter was calm and relaxed, and his statements to Cecil show that he was interested in pursuing his "activism" through legal channels and through the exercise of his First Amendment rights, not by harming anyone. (*See, e.g.*, Doc. No. 248-18, at 19 ( "If I had a problem with somebody, I would go to the police. If they assaulted me or whatever[,] I wouldn't take it up with my own hands. I don't ever intend to harm anybody."); *id.* at 43 (I'm trying to help with . . . all the legal methods."); *id.* at 45 ("I will still use legal remedies, even when people do use lies and natures to try to hurt me, I would not retaliate. I will . . . use the law and try to help people."); *id.* at 66 ("I come to the police to help them. I didn't – I didn't want to get in this position with them. I was just trying to help them. I mean, that's it. So, I mean, obviously I'm not helping, so I need to switch up on the way – because, I mean, my ulterior motive's to help people only."); *id.* at 69 ("I just wanted to help people, that's all I wanted to do.").) When she asked him if he had a history of aggression, Reeners responded, "No, never been in one fight." (*Id.* at 28.) He told her that he did not really "get mad," just frustrated; he added: "I don't see how you fix anything getting mad." (*Id.*)

In short, the court finds *nothing* in the audio recording or transcript of Cecil's conversation that remotely suggests that Reeners' delusions caused him to have a likelihood of harming someone else or himself. Moreover, Cecil herself has offered no evidence that Reeners did or said something not captured on the audio file that gave her cause to believe that he posed a risk of harm to others in the "near future" as required, at a minimum, by Sixth Circuit precedent. Even on the

6-401 form, the best evidence Cecil could point to was that Reeners had "clearly voiced various 'activist' issues" he was "taking on," including working with the FBI on 9/11, working with the Forest Service on eradicating bark beetles, and pursuing a legal class action against Sprint on behalf of other consumers. (Doc. No. 249-19, at 188.) Cecil's statements on the form do not communicate any basis for reasonably concluding that there was a "substantial chance" that Reeners would harm himself or others in the near future, *Simon*, 261 F. App'x at 879, that his delusions were likely to lead him to engage in dangerous behavior, or that he had ever engaged in behavior causing others to reasonably fear harm. The information provided by Cecil on the 6-401 form also did not satisfy the standard articulated on the form itself, which required a description of the behavior witnessed by the person making the detention request that justified such detention, specifically including behavior that "shows threats or attempts at homicide, suicide, other bodily harm, or behavior placing others in *reasonable fear of violent behavior*, or which shows that [the] person is unable to avoid severe impairment or injury from *specific* risks." (Doc. No. 249-19, at 188 (emphasis added).)

Finally, the court cannot find that Reeners' behavior as observed by Cecil *combined* with the information provided to her by Troup—part of which the defendants concede, at least for purposes of their Motion for Summary Judgment, was exaggerated or untrue—provided probable cause to believe that Reeners posed a substantial chance of imminent harm in the very near future, as opposed to a mere speculative risk of harm in the indeterminate future. The behavior, instead, appears to have amounted to the simple "obstreperousness" that the Sixth Circuit has recognized as insufficient. *Simon*, 261 F. App'x at 880. This conclusion is supported by Cecil's characterization of Reeners' behavior as "harassment": "I believe that based upon [Reeners] statements alone, what he admitted to, that coincided with what I was told by law enforcement,

rose to the level of at least harassment." (Doc. No. 245-22, at 58.) Neither the Constitution nor the state statute authorizes *mental health* detention based on harassment.

Cecil, however, is not, and has never been, a defendant in this case. The question is whether the *defendants* had probable cause to believe that Reeners posed a relatively imminent, non-speculative risk of harm to himself or others. The information in their possession consisted of their knowledge of Reeners' prior behavior, their observation of his conduct during Cecil's interview, and the Officers' own interactions with Reeners for the approximately half-hour that Cecil spoke with her supervisor and filled out the 6-401 form.

First, the prior behavior of which the defendants were aware did not give rise to probable cause to believe that there was a substantial chance that Reeners would harm himself or others in the imminent future. Although the defendants go into great detail about their historical dealings with Reeners, nothing that happened outside the few days just prior to his detention could be deemed to have any bearing on whether he posed an imminent risk of harm on June 12, 2014. Regarding the days just prior to the detention, the evidence presented by the defendants shows that, on June 9, 2014, Reeners sat outside City Hall in the smoking gazebo to work on a complaint relating to his having been arresting in connection with the April 2014 chalking incidents. Although he was apparently talking aloud to himself "90 miles a minute," there is no evidence that he was yelling at people or threatening anyone. On June 10, he returned to City Hall to complain that the report that he had been "yelling" on June 9 violated his constitutional rights and to submit a public records request for the dispatch related to the June 9 incident. On that day, according to Rosemary Bates, Reeners was in what Bates described as an "assertive, serious, agitated mode." (Doc. No. 124-8.) She also noted that, when he started talking, it was difficult to get him to stop. (Doc. No. 124-8.) On June 11, Reeners returned to City Hall to report that he was making a

complaint to the Department of Justice. None of this behavior, viewed objectively, would give a reasonable officer probable cause to believe that Reeners posed a substantial risk of imminent harm to himself or others. Instead, this conduct amounts, at most, to the mere obnoxious behavior that the Sixth Circuit has found does not justify detention for a mental evaluation. *Simon*, 261 F. App'x at 880.

Regarding their knowledge of what Reeners and Cecil discussed, the Officers argue, first, that they either could not hear or were not paying attention to Cecil's conversation with Reeners. The suggested inference is that, because they could not hear the conversation, it was reasonable for them to believe that Reeners must have said or done something to Cecil that reasonably put her on notice, as a mental health professional, that Reeners posed an imminent risk of harm. The undisputed evidence, however, shows that the Officers were all close by, and close enough to hear at least substantial parts of the conversation.[14] Troup testified that all of the Officers "were there close by" and that he himself could hear at least parts of the conversation. (Doc. No. 245-2, at 146.) Jones was clearly within earshot, as his recorder picked up nearly all of the conversation. Although he testified that he was not particularly paying attention to it, he agreed that if the microphone picked it up, he could hear it. Viewing the facts in the light most favorable to the plaintiff, for purposes of the defendants' Motion for Summary Judgment, the court must presume that the defendants could hear substantial parts of the conversation, none of which would have supported a conclusion that Reeners was dangerous. Even for those parts they could not hear, they were close enough to observe body language, and there is no evidence that Reeners was ever physically menacing toward Cecil or toward the Officers.

---

[14] In fact, when Cecil was questioning Reeners about his drug and alcohol use, one of the Officers interjected, "he already told me he uses marijuana." (Doc. No. 245-18, at 34.)

Moreover, it is also undisputed that the Officers participated in a substantial portion of the conversation. (*See* Doc. No. 245-18, at 47–69.) As the talk was coming to a close, Cecil engaged all of the Officers (*see* Ballard Dep., Doc. No. 245-3, at 61 ("I think she invited all of us back into it.")), asking them to explain to Reeners what they wanted him to do. They explained that they wanted him to stop bothering the GPD and the people at City Hall with his complaints about fluoride in the water. All of them were able to hear Reeners, rather lucidly, acquiesce to that request. (*See* Doc. No. 245-18, at 66 ("So I'm – I mean, I'm going to agree just like that not to bother city hall or the police department with fluoride, any chalking or any even – even holding signs up, I mean, that's what I – I haven't done that. . . . [B]ut free speech is – can be annoying."); *see id.* at 67 ("I just need to just drop the issue, I mean, I just – if I can't fight it and help it here, I just need to not worry about, it, really.").)

In addition, Jones and at least one other Officer stood on the porch and chatted amiably with Reeners for the half-hour that Cecil was in her car, while the other Officers remained nearby. While they were waiting for Cecil to finish her call, the Officers proposed that Reeners work for the police as a confidential informant. This discussion arose because the Officers told Reeners that they would like to see him channel his energy and activism into getting people not to use drugs. This was a serious conversation about Reeners' getting evidence against drug dealers, apparently because the Officers knew that Reeners at least smoked marijuana and had to be getting it from somewhere. There was discussion about how much confidential informants are paid, and one of the Officers gave Reeners his business card containing his cell phone number. The conversation ended with Jones telling Reeners, "I'm sure she'll be done in a minute and we'll get out of your hair." (Doc. No. 245-18, at 100.) Indeed, during their chat, Reeners repeated that he agreed to stop bothering the GPD and the City about the fluoride and that he would re-channel his energies. (*See,*

*e.g.*, Doc. No. 245-18, at 72–73, 75, 78.) Reeners was calm, cordial, and reasonable throughout this exchange with the Officers.

Finally, there is no evidence that Cecil communicated to the Officers the basis for her conclusion that Reeners posed a risk of harm to anyone. None of the Officers has testified that she did. The only information in the record is the 6-401 form, which she gave to the Officers. That form (1) showed that Cecil was relying in large part on the Officers' belief that Reeners posed a "danger to the community"; and (2) clearly failed to articulate behavior on the part of Reeners that satisfied Tenn. Code Ann. § 6-33-401 or the Constitution.

In light of all of this evidence, the court finds that the Officers did not have probable cause to believe that Reeners posed a substantial risk of imminent or immediate danger to himself or others. Because probable cause was lacking, Reeners' detention violated his rights under the Fourth Amendment.

### 4. *Whether the Defendants Are Entitled to Qualified Immunity*

As indicated above, the determination that a constitutional violation occurred does not end the court's inquiry. The court must consider whether the right was clearly established and whether the officers "reasonably but mistakenly conclude[d] that probable cause [wa]s present." *Wesby*, 138 S. Ct. at 591. In *Wesby*, the Supreme Court again "stressed the need to 'identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment'" to deny qualified immunity. *Id.* at 590 (quoting *White v. Pauly*, 137 S. Ct. at 552); *see also Dolbin*, 786 F. App'x at 57 ("Dolbin cannot identify a single controlling precedent finding a Fourth Amendment violation under similar enough circumstances to put the question beyond doubt. That failure is fatal to his attempts to defeat qualified immunity.").[15]

---

[15] In *Dolbin*, the Sixth Circuit held that officers who conducted a mental health detention were entitled to qualified immunity, because "it was not clearly established that an officer lacked

In this case, the court finds that the plaintiff had a clearly established right not to be subjected to a mental health detention in the absence of probable cause to believe he posed a substantial risk of imminent harm to himself or others. The defendants argue, however, that, under the particularized facts of this case, the right to have the detaining police officers, rather than the mental health professional on site, make the probable cause determination was not well established. They also argue that it was not unreasonable for them to rely upon Cecil and to effectively delegate to her the determination of whether the plaintiff posed the requisite risk of harm, as permitted by the state statute. Ballard, Helson, and Jones also argue that their reliance was even more reasonable, because they had no reason to know that Troup had given Cecil a false or exaggerated depiction of Reeners' prior behavior.

Under the specific facts presented here, based on the information in their own possession, the court finds that it was unreasonable for the Officers to rely upon Cecil's determination. As set forth above, while there is a question of fact as to how much of the conversation between Cecil and Reeners the Officers overheard, the evidence is clear that they were all "close by" and that they heard at least some of it. And regardless of how much or little they heard, they never noticed any threatening behavior by Reeners and were never made aware that Reeners voiced any verbal threats toward anyone while speaking with Cecil. In addition, the Officers participated in a substantial part of the conversation, during which Reeners agreed to comply with their request that he stop bothering City Hall and the GPD with his fluoride issue. They also continued to converse with him after Cecil went to make a phone call from her car. Throughout the entire interaction, although Reeners espoused some eccentric ideas and told some improbable stories, he remained

---

probable cause to seize a suspect for a mental-health evaluation based on a credible report that the suspect was actively suicidal." 786 F. App'x at 53.

calm, engaged, and coherent. He was not out of control, and he never said or did anything to suggest that he posed a substantial risk of imminent harm to anyone, let alone himself. They also talked with his roommates, who expressed no concerns about Reeners' behavior. Reeners' calm response to being taken into custody ("That's fine. It's under duress too, I don't agree to go like this." (*see* Doc. No. 262 ¶ 79; Doc. No. 245-18, at 110)) should have served as a further confirmation that he was not out of control or likely to harm someone in the near future.

In addition, although the form provided to them by Cecil articulated in boilerplate the standard embodied in Tenn. Code Ann. § 33-6-401 for an involuntary mental health detention, the information Cecil wrote on the form should have alerted the Officers that *she* was not applying the correct standard. This conclusion is simply reinforced in Troup's case, since the form reflected Cecil's reliance on what he had told her, and he knew or should have known that some of that information was, at best, exaggerated and, at worst, untrue.

For this reason, the court finds the facts of this case make it distinguishable from the situation in *Ziegler v. Aukerman*, 512 F.3d 777 (6th Cir. 2008), cited by the defendants. In that case, the officer who took the plaintiff into custody was deemed to have probable cause to arrest simply on the basis that he had received a call from a 911 dispatcher reporting that the plaintiff was suicidal and that "there was a clinical certificate requiring that she be returned to the hospital." *Id.* at 783. Although the officer did not personally observe behavior that indicated the plaintiff was suicidal, he had information from a medical professional indicating that she was; he was told that a clinical certificate had been issued verifying as much; and the information he received indicated she had previously been hospitalized, presumably for mental health reasons. The court found that this information provided the officer with "more than enough information to reasonably believe that there was a 'substantial chance' that [the plaintiff] posed a dangerous risk to herself or others."

*Id.* at 784.

Here, however, the Officers were in possession of substantially more information than the police officer in *Ziegler*—information that effectively refuted any probable cause finding. They were not in the position of being required simply to rely on what dispatch told them. They had witnessed Reeners' conduct with their own eyes for a substantial period of time. They knew he was not suicidal, and they had no objective evidence in their possession that suggested that he posed a substantial and reasonably imminent risk of harm to others. In fact, he had promised to cease his fluoride campaign, which he conceded made some people uncomfortable. Thus, under the particular circumstances presented here, the court finds that it was patently unreasonable for the Officers to rely on Cecil to make the detention call.

Regarding the statute upon which the defendants rely, Section 33-6-402 did not actually *require* them to act upon Cecil's 6-401 request. Rather, the statute states that *if* any officer authorized by the state or one of the medical professionals enumerated in the statute "has reason to believe that a person is subject to detention under § 33-6-401," that individual "may take the person into custody" without a warrant for the purpose of a mental health examination. Tenn. Code Ann. § 33-6-402. Cecil's 6-401 request was simply that—a request. Moreover, the "has reason to believe" portion of § 33-6-402 does not lower the standard for taking someone into custody, because § 33-6-401 so clearly requires a finding that the person "poses an immediate substantial likelihood of substantial harm . . . because of the mental illness or serious emotional disturbance." Tenn. Code Ann. § 33-6-401(2). In other words, under the statute, mental illness and even delusions do not *per se* provide *carte blanche* authorization for an involuntary detention. And nothing in the statute absolves the officers who actually conducted the arrest of their obligation to independently determine whether probable cause to support that arrest existed.

The Supreme Court and the Sixth Circuit both require that the right in question be defined with "a high degree of specificity." *Korthals*, 2020 WL 131337, at *2 (citing *Wesby*, 138 S. Ct. at 590). Here, the right at issue is the individual's right under the Fourth Amendment not to be involuntarily detained for the purpose of a mental health assessment without probable cause to believe that the individual poses a substantial risk of relatively imminent harm to himself or others. That right was clearly established at the time of Reeners' detention. The only wrinkle presented is whether the Officers were reasonable in relying on a third-party's assessment of probable cause, when that third party was a mental health professional nominally qualified to make the probable cause determination. Admittedly, the court is not aware of another case directly on point, but the facts of *Ziegler* are sufficiently similar to establish that the reasonableness of the reliance turns upon all of the facts within the arresting officer's ken. *See Ziegler*, 512 F.3d at 784 (finding that all of the information in the officer's possession was enough "that a reasonable person in the officer's position would believe it probable that [the plaintiff] was a danger to herself or others").

As the Officers argue, the doctrine of qualified immunity "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 343, 349 (1986). In this case, unlike in *Ziegler*, the mental health professional was not in possession of any information that the Officers themselves did not also have, and the law accords to them too the obligation to make the probable cause determination. Under these circumstances, reliance on Cecil was not reasonable, and the Officers were plainly incompetent in taking into custody an individual who, though admittedly eccentric and perhaps even delusional, had never threatened harm to himself or done anything to give a reasonable officer in the defendants' position cause or reason to believe that he posed a substantial, imminent risk of harm to others. The Officers' motion for summary judgment on the grounds of qualified immunity

will be denied.

### B.    State Law False Arrest Claims Against Individual Officers

The elements of a false arrest claim under Tennessee law are similar to those of a claim under § 1983. Such a claim requires proof of "(1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint." *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990); *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 54 (Tenn. Ct. App. 2013). Regarding the "unlawfulness" element, a state false arrest claim, like its federal analog, "requires that the defendant must have acted without probable cause." *Brown*, 428 S.W.3d at 54 (citing *Brown v. SCOA Indus., Inc.*, 741 S.W.2d 916, 919–20 (Tenn. Ct. App. 1987)).

In addressing whether a public official is entitled to qualified immunity under state law, the Tennessee Court of Appeals has stated that

> qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

*Youngblood v. Clepper*, 856 S.W.2d 405, 407 (Tenn. Ct. App. 1993) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 247–48 (1974)); *see also Luna v. White Cty.*, No. M2014-02111-COA-R3-CV, 2015 WL 4119766, at *6 (Tenn. Ct. App. June 29, 2015) ("The standard for qualified immunity . . . is whether the officer had reasonable grounds to perform the official conduct which is being challenged."); *Cawood v. Booth*, No. E2007-02537-COA-R-3CV, 2008 WL 4998408, at *12 (Tenn. Ct. App. Nov. 25, 2008) ("[A] qualified immunity analysis is premised in large part on the reasonableness of the officer's actions.").

The Tennessee Supreme Court has addressed the procedure for resolving a qualified immunity question at summary judgment, noting that, when raised by a defendant, qualified

immunity is treated as an affirmative defense. *King v. Betts*, 354 S.W.3d 691, 710 (Tenn. 2011).

> Accordingly, when the public official alleges that the undisputed facts demonstrate that he or she is entitled to qualified immunity, the burden of production shifts to the plaintiff to demonstrate that the public official is not entitled to qualified immunity. A public official establishes a *prima facie* claim of qualified immunity by demonstrating that he or she is a state official acting within his or her discretionary authority. A plaintiff confronted with a summary judgment motion raising qualified immunity . . . can defeat the motion either by demonstrating the existence of material factual disputes or by demonstrating that the defendant is not entitled to qualified immunity as a matter of law.

*King*, 354 S.W.3d at 710 (internal citations omitted).

In this case, as set forth above, probable cause was lacking, and it was objectively unreasonable under the circumstances to rely on Emily Cecil's having issued a 6-401 request. The court concludes that the individual defendants also are not entitled to qualified immunity from suit for false arrest under Tennessee law.

## C.    Section 1983 Municipal Liability Claims Against the City of Gallatin

It is well established that the City of Gallatin cannot be liable based on the unconstitutional actions of its employees under a theory of *respondeat superior*. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *Miller v. Calhoun Cty.*, 408 F.3d 803, 813 (6th Cir. 2005). Instead, to establish municipal liability under § 1983, a plaintiff must establish that a constitutional violation caused his harm and that the municipality itself was responsible for the violation. *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009). While individual police officers may be entitled to qualified immunity based on the reasonableness of their actions under a given set of circumstances, a municipality cannot invoke that defense. *Owen v. City of Independence*, 445 U.S. 622, 657 (1980); *Pollard v. City of Columbus*, 780 F.3d 395, 401 (6th Cir. 2015).

Municipalities are liable for harms resulting from a constitutional violation only when the injury resulted from an "implementation of [the municipality's] official policies or established customs." *Monell*, 436 U.S. at 708 (Powell, J., concurring). The Sixth Circuit has recognized "at

least four avenues" or theories of relief that a plaintiff may follow to establish municipal liability based on an illegal custom or policy:

> The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations."

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (internal citations omitted).

The plaintiff relies on several of these theories for his claim that the City of Gallatin is liable for his false arrest. He argues that the City is liable under *Monell* because: (1) Chief Bandy was an official with final decision-making authority who delegated the City's law enforcement power to Troup to handle Reeners' "mental health intervention as he saw fit" (Doc. No. 245, at 23); (2) Bandy, in his capacity as a final decision-maker on behalf of the City, "ratified" Reeners' detention and commitment by faxing a letter to MTMHI on behalf of the City, asking for Reeners to receive an "in-depth psychological evaluation and treatment" (*id.*); and (3) the City's "policies, training, and customs amounted to a *de facto* practice of permitting mental health arrests without probable cause to believe that the subject is presently dangerous (*id.* at 25). He also argues that the City is liable for Reeners' unconstitutional commitment at MTMHI because it "set the wheels in motion" for that commitment. (Doc. No. 245, at 29.)

## 1. The City's Liability for False Arrest

The Supreme Court has stated that, under appropriate circumstances, liability may be imposed upon a municipality for a single decision by a policymaker. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). However, not every single decision by an officer automatically subjects a municipality to liability under 42 U.S.C. § 1983. Instead, "municipal liability attaches only where the decision maker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* at 481. As the Supreme Court stated in *Pembaur*, the "authority to make municipal

policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law." *Id.* at 483; *see also Monistere v. City of Memphis*, 115 F. App'x 845, 851 (6th Cir. 2004). In addition, "when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

With regard to the "delegation" argument, the plaintiff's theory is that Bandy delegated to Troup his final decision-making authority to effect the mental health detention of Reeners without probable cause. However, the undisputed facts show that Bandy merely delegated to Troup the responsibility of involving a third-party mental health professional for an initial assessment in the community. Moreover, because Bandy clearly ratified Troup's decision to rely on Cecil's determination and to take Reeners into custody, as discussed below, the court rejects the plaintiff's delegation theory.

Regarding ratification, the plaintiff argues that Bandy was a decision-maker with "final authority to establish municipal policy" and that he ratified the unconstitutional arrest. In support of this argument, he claims that "Troup kept Bandy abreast throughout the afternoon and evening of June 12th about what was happening, and Bandy never conveyed any disagreement with it. The next morning, Bandy faxed the letter to MTMHI on behalf of 'the City of Gallatin' asking MTMHI to hold Mr. Reeners for 'in-depth psychological examinations and treatments.'" (Doc. No. 245, at 24–25 (record citations omitted).)

As the defendants argue, there is no evidence that Bandy was a "final policymaker" with respect to involuntary commitments, as opposed to initial detentions. The commitment determination typically happens, and happened in this case, after the police are no longer involved. The defendants do not dispute, however, that Bandy was a final decision- maker with respect to establishing GPD policy relating to mental health detentions by City of Gallatin police officers. The defendants maintain, however, that, while Troup kept Bandy apprised of what was happening to Reeners, Cecil, rather than Troup, actually made the decision to detain Reeners. Even assuming that Troup made that decision, they also argue that there is no evidence that Troup explained to Bandy Cecil's rationale for the detention, so Bandy could not have approved or ratified the basis for the decision. *See Praprotnik*, 485 U.S. at 127 (for a policymaker to ratify a subordinate's decision, thus making that decision chargeable to the municipality, he must approve both the decision "and the basis for it"). The court agrees that there is no evidence that Bandy was aware of or ratified the *basis* for the detention decision, other than the bare fact that Cecil had determined that it was warranted. The court therefore rejects the plaintiff's "ratification" theory insofar as it pertains to Reeners' initial detention.

The plaintiff also alleges that the City is liable because its failure to train its police officers on the matter of involuntary mental health detentions led to the illegal arrest in this case. The defendants argue in their motion that, even assuming the arrest was not supported by probable cause, the City cannot be liable because there is no evidence that the City failed to adequately train its officers.[16] In response, the plaintiff does not contend that the City failed altogether to train its

---

[16] Regarding this argument, the court notes that the defendants failed entirely to include any facts regarding training in their Statement of Undisputed Facts. (Doc. No. 250.) This omission appears to have been an oversight, because the defendants submitted along with their Statement of Undisputed Facts evidentiary materials related to training. Perhaps for this reason, the plaintiff did not object to summary judgment on this issue on the basis of the defendants' failure to provide

police officers on the relevant topic. Rather, he argues that the City is liable because the GPD's "training and policies on mental health arrests were fundamentally deficient in a manner that led directly to [Reeners'] illegal arrest and detention, because GPD's *de jure* and *de facto* policy is and was that mental health arrests are permitted based on the erroneous 'hypothetical potential future danger' standard." (Doc. No. 258, at 13–14.)

The defendants have presented evidence that the GPD provided annual training on "Responding to Mental Illness" in 2013 and 2014. This training appears to have included instruction on identifying the signs and symptoms of mental disorders, communicating and interacting with individuals with mental disorders, and seeking assistance from mental health centers to obtain mental health evaluations. Moreover, the slides produced by the defendants as part of the training show that the training specifically covered the topic of "Involuntary Psychiatric Admissions." (Doc. No. 251-7, at 2.) The relevant slide states in particular:

> To obtain involuntary psychiatric hospitalization on an emergency basis, the person must first be evaluated in the community. The evaluator (mandatory prescreening agent, physician, or licensed psychologist) must determine if the person meets the legal conditions for emergency involuntary commitment.
>
> To be eligible for emergency hospitalization, the individual must meet the following criteria:
>
> (1) The person has a mental illness or serious emotional disturbance AND
>
> (2) The person poses an immediate substantial likelihood of serious harm** [sic] because of the mental illness or serious emotional distress AND
>
> (3) The person needs care, training or treatment because of the mental illness or serious emotional disturbance AND
>
> (4) All available less drastic alternatives to placement in a hospital or treatment resource are unsuitable to meet the needs of the person.

---

factual support for it. Despite having no obligation to do so, the court has reviewed the evidentiary materials referenced in the defendants' Memorandum in support of this argument.

(Doc. No. 251-7, at 2 (emphasis added).) In other words, the slide closely tracks the language of Tenn. Code Ann. § 33-6-403 (and § 33-6-401, since its text is largely incorporated in § 33-6-403), consistent with Bandy's and the Officer defendants' testimony. These slides do not suggest the existence of an unconstitutional policy or training that permitted mental health detentions upon the existence of a mere hypothetical possibility of future harm.

Moreover, it is well established that "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *City of Canton v. Harris*, 489 U.S. 378, 391 (1989); *see also Drakeford v. Cty. of Orange*, 213 F App'x 542, 545 (9th Cir. 2006). Consequently, "[i]t does not suffice to prove that an injury or accident could have been avoided if an officer had had more or better training." *Hanson v. Madison Cty. Detention Ctr.*, 736 F. App'x 521, 542 (6th Cir. 2018) (citing *City of Canton*, 489 U.S. at 391). Instead, the plaintiff must show that the City's failure to train "reflects *deliberate indifference* to the constitutional rights of its inhabitants." *Id.* (citing *City of Canton*, 489 U.S. at 392).

There is no evidence of the City's deliberate indifference here. There are no allegations of a pattern or practice by the Gallatin police officers of conducting unlawful mental health arrests based on less than probable cause. There is no indication that the City was or had reason to be on notice of inadequate training or an incorrect "*de facto*" policy. Consequently, the City cannot be liable on a failure-to-train theory. *See City of Canton*, 489 U.S. at 391 (rejecting municipal liability when an "otherwise sound program has occasionally been negligently administered," and explaining that "[n]either will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet

not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.").

The City is entitled to summary judgment in its favor on the plaintiff's false arrest claim.

### 2. The City's Liability for the False Imprisonment at MTMHI

In Count IV of the Fifth Amended Complaint, the plaintiff seeks to hold the City of Gallatin liable for his commitment at MTMHI from June 13–18, 2014. (Doc. No. 169 ¶¶ 77–84.) He argues now: "Because the City of Gallatin's actions 'set the wheels in motion' on Mr. Reeners's MTMHI detention, Gallatin is liable for it." (Doc. No. 245, at 29 (citing *Miller v. Maddox*, 866 F.3d 386, 395 (6th Cir. 2017)).) More specifically, he claims that Troup's representations that Reeners was getting "worse and worse" and "becoming increasingly violent" formed the basis for Cecil's request, which was rubber-stamped by Dr. Bradley and then became the basis for Dr. Brooks' Certificate of Need and the General Sessions Court's *ex parte* order of commitment. (*Id.* at 30.) He argues that Chief Bandy's fax to MTMHI, requesting that MTMHI hold Reeners for "in-depth psychological examinations and treatments," ratified Troup's actions and the commitment and established that Bandy was a "policymaker" with respect to mental health commitments.

The court finds that the causal link between any City policy and Reeners' detention at MTMHI is too attenuated to justify attributing fault for that commitment to the City. The fault lies, first, in Emily Cecil's misinterpretation of the law and her obligations thereunder, as well as her exaggeration of the type of "threat" posed by Reeners in the documentation she submitted to SRMC and her conversations with personnel there, and the individual police officers' error in relying on her determination. Dr. Bradley likely compounded Cecil's errors by accepting her recommendation without actually interviewing or examining Reeners until he was irate, with reason, at having been forced to cool his heels at SMRC for many, many hours before actually seeing a doctor. Dr. Brooks, too, had independent legal and ethical obligations to assess Reeners

to determine whether he, in fact, posed a risk of harm to himself or others. In other words, the system appears to have failed Reeners at many levels. The court, however, cannot find that any reasonable jury could attribute to the City Reeners' nearly week-long involuntary commitment at MTMHI. The City is entitled to summary judgment in its favor on Count IV of the Fifth Amended Complaint.

### D. Section 1983 Excessive Force Claims Against Jones and Helson

In his Fifth Amended Complaint, Reeners alleges that he was unnecessarily handcuffed, and kept in handcuffs, by Jones and Helson, despite his complaints of pain, and that he suffered pain and injury due to excessive force used by Jones and Helson, in violation of 42 U.S.C. § 1983. (Doc. No. 169 ¶¶ 72–75.)

"The Fourth Amendment prohibits excessive force when arresting someone, which includes 'unduly tight handcuffing.'" *Rudolph v. Babinec*, 939 F.3d 742, 750 (6th Cir. 2019) (quoting *Lyons v. City of Xenia*, 417 F.3d 565, 575 (6th Cir. 2005)). The three elements needed to make out an excessive-force claim related to handcuffing are: (1) the plaintiff complained that the handcuffs were too tight, (2) the officers ignored his complaints, and (3) he suffered "some physical injury" from the handcuffing. *Id.* (quoting *Miller v. Sanilac Cty.*, 606 F.3d 240, 252 (6th Cir. 2010)).

The defendants argue that they are entitled to summary judgment on this claim, because the undisputed facts show that, although the plaintiff complained that his wrist hurt due to a pre-existing injury, he never complained that the cuffs were too tight, cannot show that Jones or anyone else ignored his complaints, and cannot show that he suffered physical injury or exacerbation of his pre-existing injury resulting from the cuffing. The plaintiff responds only that the court already rejected this argument in the context of ruling on the defendants' first Motion for Summary Judgment and that the Sixth Circuit has made it clear that handcuffing in a manner that exacerbates

prior injuries, thus causing physical injury, may constitute excessive force. *See Courtright v. City of Battle Creek*, 839 F.3d 513, 516 (6th Cir. 2016) (affirming the denial of the defendants' motion to dismiss excessive force claims related to handcuffing).

Regarding Reeners' complaints and Jones' response, the transcript of Jones' body recorder establishes that, at the time he was initially handcuffed, Reeners told Jones that his wrist was sore and asked if he could be cuffed with his hands in front of him. Reeners' statement was made while he was being handcuffed, before the process was completed. Jones and Troup told Reeners that "policy" required them to handcuff him with his hands behind his back. (Doc. No. 245-18, at 110–11; Doc. No. 245-5, at 73.) Jones responded to Reeners' concern about his wrist injury by noting that he would double-lock the cuffs so they would not tighten during the ride to the hospital, adding, "Okay, Patrick?" (*Id.* at 111.) Immediately after being handcuffed, Reeners did not complain that his wrist hurt, that the cuffs were too tight, or that being handcuffed with his hands behind his back exacerbated his previous injury. He did not complain about wrist pain for the duration of the ride to the hospital with Jones. Instead, his complaints focused on his conviction that he was being "kidnapped." (Doc. No. 245-18, at 111–21.)

After he and Jones arrived at the hospital and had been there for several minutes, Reeners informed the hospital staff person conducting intake that he "might need some medicine" because his "wrist has been hurting." (Doc. No. 245-18, at 129.) He did not, at that point, attribute the pain to the handcuffs. When the nurse left momentarily, Reeners again told Jones, "My wrist hurts so bad." (Doc. No. 245-18, at 129.) Jones told him then that, as soon as the nurse was done, he would recuff Reeners with his hands in front of him.

Again, Reeners did not specifically claim that the cuffing caused pain, just that his wrist hurt. He began to explain to Jones the injury he had previously sustained: "Yeah, I just broke – I

busted my tendons here a couple weeks ago and it just started getting better . . . . I bent them back [while] [s]hutting my tailgate." (Doc. No. 245-18, at 129–30.) By that point, the nurse had returned and finished taking Reeners' temperature, and Jones immediately told him: "Spin around here, I'll put them in the front for you." (Doc. No. 245-18, at 130.) He again stated he would double-lock them so they would not tighten. (*Id.*) Reeners stated he had "overextended" his wrist and Jones surmised that he had "sprained" it. (*Id.*)

A few minutes later, Reeners stated: "These cuffs really hurt my – my – my wrist is really, really, really sore." (Doc. No. 245-18, at 135.) This is the only point at which Reeners appeared to associate the pain in his wrist with the cuffs, but the statement was fleeting and somewhat ambiguous. He continued, explaining to Jones that his wrist had been hurting for two weeks and that he had treated it with Epsom salts, aspirin, and naproxen. He showed Jones that it was swollen. (Doc. No. 245-18, at 135–36.) He did not specifically ask for the cuffs to be loosened or removed.

A few minutes more passed before another hospital staff person came back to attend to him. Reeners repeated then that his wrist was "really killing" him because he had "damaged . . . tendons." (Doc. No. 245-18, at 141.) Again, he did not attribute the pain to the handcuffs or ask that they be removed.

As the transcript of Jones' record shows, the plaintiff did not mention the pain in his wrist again until approximately an hour later, when a hospital staff person taking Reeners' medical history asked him whether his wrist was the only thing that hurt him at that time. He responded: "Yeah, I had pulled – I (inaudible) and pushed my hand all the way back, so you see it's really swollen over here." (Doc. No. 245-18, at 195.) He said, "My tendons are hurting," and rated the pain at a 13 on a scale of zero to 10. (*Id.*) He also told her he had taken six naproxens the previous night, which had not helped. (*Id.*) He did not attribute the continued pain in his wrist to the

handcuffs.

Shortly after that, around 6:00 p.m. as Jones was going off shift, he removed the handcuffs, explaining to the nurse that Reeners had "sprained ligaments in his wrist." (Doc. No. 248-18, at 201.) An x-ray later that night revealed a possible hairline fracture, but no evidence suggests the handcuffing was responsible for the fracture.

In his deposition, Reeners was asked, "what, if any, injury do you claim as a result of the handcuffs?" (Doc. No. 245-1, at 87.) Reeners responded: "Pain way more than it was when my tendons were damaged." (Doc. No. 245-1, at 88.) He also claimed that he still felt the pain "periodically." (*Id.*) He stated that, after he was arrested, he began having sharp pains in his wrist, which he had not felt at the time of the injury. That statement is contradicted by his statement to the nurse about taking six naproxens, which had not helped the pain. Moreover, he never sought medical attention for the injury, other than the splint he received at the hospital the day he was arrested. (Doc. No. 245-1, at 89.) There is no objective evidence in the record that the cuffing exacerbated his pre-existing injury.

Based on the undisputed evidence in the record, it is clear, with respect to the first element of his excessive-force claim, that Reeners never complained that the handcuffs were too tight or specifically attributed the pain in his wrist to the cuffs. He did not unambiguously indicate, either, that the handcuffs were exacerbating his pre-existing injury. Second, Jones did not ignore his complaints. When Reeners asked, either prior to or while being cuffed if he could be cuffed in the front due to his pre-existing injury, Jones explained that he could not. Although whether GPD policy actually required him to cuff Reeners with his hands behind his back is a disputed fact, Reeners did not actually complain after the cuffs were put on that they hurt him. The next time he complained, Jones told him he would move the cuffs to the front as soon as the nurse was finished,

and he did so, just seconds later. After that, while Reeners made one brief reference to the cuffs, whenever any medical personal approached, Reeners told them he had injured his tendons while closing the tailgate to his truck and that the six naproxen he had taken the night before had not alleviated the pain. He never asked Jones to loosen or remove the handcuffs.

Even if, viewing the facts very generously in favor of Reeners, the court were to conclude that Jones should have read between the lines and understood that Reeners was complaining that the cuffs were exacerbating his pre-existing injury and, thus, that material factual disputes exist as to the first two elements of his claim against Jones, Reeners has not established "some physical injury" from the handcuffing. It is undisputed for purposes of the defendants' motion that he had already damaged the tendons in his wrist prior to the injury. There is no suggestion that the handcuffing caused the possible hairline fracture revealed by the x-ray. Although Reeners claimed, during his deposition, some four and one-half years after the event, that his wrist hurt more as a result of the handcuffing than it had at the time of the injury, he offers no objective medical evidence to support that claim. He does not show that his wrist was bruised or scraped, that he sought medical attention for the injury, or that any medical practitioner offered an opinion that the handcuffing exacerbated his pre-existing injury. According to the Sixth Circuit, "a subjective recounting of pain without some corroboration is not enough." *Rudolph*, 939 F.3d at 752 (citing *Miller*, 606 F.3d at 252). While the plaintiff subjectively claims the pain in his wrist was exacerbated by the handcuffs, there is no corroborating evidence to support his claim. On this basis, both defendants are entitled to summary judgment in their favor on this count.

The court further notes that, even if material facts precluded summary judgment as to the claim against Jones, there is no evidence that Helson was aware of any of Reeners' complaints other than, perhaps, his initial request to be handcuffed with his hands in front of him, which was

not actually a complaint. There is simply no evidence in the record to establish that Helson was aware of Reeners' subsequent complaints about wrist pain resulting from the cuffs or that he ignored them. The claim against Helson is subject to dismissal on this additional basis.

## V.    THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Having concluded that the City is entitled to summary judgment on all claims against it and that Jones and Helson are entitled to summary judgment on the excessive force claims against them, the court will deny without discussion the plaintiff's Motion for Summary Judgment insofar as it seeks a judgment of liability in his favor on those claims.

Regarding the individual Officers' liability for Reeners' unlawful detention, the court recognizes that the liability of each individual must be assessed based on each individual's specific conduct. *Stoudemire*, 705 F.3d at 570. In this case, the facts most clearly establish Troup's and Jones' involvement and, thus, their liability. The evidence regarding Helson's and Ballard's individual involvement is more sparse. However, as set forth above, regardless of the Officers' lack of knowledge of the content of Troup's previous telephone calls with Cecil and irrespective of how much of Cecil's conversation with Reeners they overheard, the available evidence establishes that they were close by while Cecil spoke with Reeners, participated in a substantial part of her exchange with him, and were present for the discussion that took place while Cecil made a phone call from her car. They were also cognizant of the evidence of Reeners' eccentric behavior leading up to the encounter with Cecil. The court finds that these facts, even viewed in the light most favorable to the Officers, establish that each of them lacked probable cause to believe that Reeners posed a substantial risk of harm to himself or others and that it was unreasonable, given the substantial amount of information actually in their possession, to delegate the probable cause determination to Cecil.

The court will therefore grant in part the plaintiff's Motion for Summary Judgment as to Liability, specifically with respect to Officers Troup, Ballard, Helson, and Jones in their individual capacities.

## VI.  CONCLUSION

For the reasons forth herein, the court will grant in part and deny in part each party's Motion for Summary Judgment. An appropriate Order is filed herewith.

_____

ALETA A. TRAUGER
United States District Judge